# 14-1673-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

FINANCIAL GUARANTY INSURANCE COMPANY,

*Plaintiff-Appellant,*

—against—

PUTNAM ADVISORY COMPANY, LLC,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

PETER E. CALAMARI
SEAN P. BALDWIN
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff-Appellant*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Plaintiff-Appellant Financial Guaranty Insurance Company ("FGIC") certifies that (1) FGIC is a wholly owned subsidiary of FGIC Corporation, (2) more than 10% of the stock of FGIC Corporation is held by LaCrosse Financial Products Member, LLC, a wholly owned subsidiary of MBIA Inc., and (3) no other publicly held corporation directly or indirectly holds more than 10% of the stock of FGIC Corporation.

# TABLE OF CONTENTS

<b><u>Page</u></b>

PRELIMINARY STATEMENT ............................................................................1

JURISDICTION...............................................................................................5

ISSUES PRESENTED......................................................................................5

STATEMENT OF THE CASE..........................................................................6

    A.    The Pyxis Guaranty And The Pyxis CDO ...........................................6

    B.    Putnam Induced FGIC To Issue The Pyxis Guaranty By Representing That It—And It Alone—Would Select The Pyxis Collateral ...........................................................................................7

    C.    Contrary To Its Representations, Putnam Secretly Abdicated Control Over Pyxis Collateral Selection To Magnetar .......................8

    D.    Putnam Profited, And FGIC Lost Millions, As A Result Of The Fraud...............................................................................................10

    E.    Procedural History............................................................................11

SUMMARY OF ARGUMENT .......................................................................13

STANDARD OF REVIEW ............................................................................16

ARGUMENT ................................................................................................17

I.    THE SECOND AMENDED COMPLAINT ADEQUATELY ALLEGES FRAUD.....................................................................................17

    A.    FGIC Need Not Plead Loss Causation To Obtain Rescission ............17

        1.    Loss Causation Is Not Required In A Claim For Rescission Based On Fraud ......................................................17

        2.    FGIC Is Entitled To Seek Rescission From Putnam ...............20

    B.    FGIC Need Not Plead Loss Causation Because It Alleges Fraud In The Inducement Of An Insurance Contract....................................22

C.     The SAC Adequately Pleads Loss Causation ....................................25

    1.     Notice Pleading Is Sufficient For Loss Causation ...................25

    2.     The SAC Adequately Alleges Loss Causation ........................29

        a.     *FGIC's losses were the intended and expected consequence of Putnam's fraud* ......................................29

        b.     *Magnetar selected collateral that was much more likely to default than the collateral Putnam would have selected* ................................................................31

        c.     *Magnetar selected collateral that defaulted before the financial crisis* ...........................................35

        d.     *Putnam could have selected collateral that would not have caused Pyxis to default* ....................................36

II.     THE SECOND AMENDED COMPLAINT ADEQUATELY ALLEGES NEGLIGENT MISREPRESENTATION AND NEGLIGENCE ...............................................................39

CONCLUSION ....................................................................45

# TABLE OF AUTHORITIES

**Page**

## Cases

*ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*,
  951 N.Y.S.2d 84, 2012 N.Y. Misc. LEXIS 1940
  (N.Y. Sup. Ct. Apr. 23, 2012)............................................................30

*Arista Records LLC v. Doe*,
  604 F.3d 110 (2d Cir. 2010) ...........................................................34

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................16

*Baker v. Health Mgmt. Sys., Inc.*,
  264 F.3d 144 (2d Cir. 2001) ...........................................................16

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Group, Inc.*,
  37 Misc.3d 1212(A), 961 N.Y.S.2d 356 (N.Y. Sup. Ct. 2012).........19

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Group, Inc.*,
  115 A.D.3d 128, 980 N.Y.S.2d 21 (App. Div. 1st Dep't 2014).........20, 31

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*,
  692 F.3d 42 (2d Cir. 2012) ......................................... 4, 13, 15 16, 39, 41, 42, 43

*In re Bear Stearns Companies, Inc.  Secs., Derivative, and ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ............................................27

*Bennett v. United States Trust Co. of New York*,
  770 F.2d 308 (2d Cir. 1985) ...........................................................20

*Buffalo Builders Supply Co. v. Reeb*,
  247 N.Y. 170, 159 N.E. 899 (N.Y. 1928).......................................17

*CARCO GROUP, Inc. v. Maconachy*,
  718 F.3d 72 (2d Cir. 2013) .............................................................16

*Chan v. Mui*,
  No. 92 CIV. 8258 (MBM), 1993 U.S. Dist. LEXIS 14693 (S.D.N.Y. Oct. 20, 1993) ............................................................................................19

*Credit Alliance Corp. v. Arthur Andersen & Co.*,
  65 N.Y.2d 536, 483 N.E.2d 110 (1985)..........................................40

*D'Angelo v. Bob  Hastings Oldsmobile, Inc.*,
  89 A.D.2d 785, 453 N.Y.S.2d 503 (App. Div. 4th Dep't 1982)........18

*Dexia SA/NV v. Bear, Stearns & Co., Inc.*,
  929 F. Supp. 2d 231 (S.D.N.Y. 2013) ............................................28, 39

*Dornberger v. Metropolitan Life Ins. Co.*,
    961 F. Supp. 506 (S.D.N.Y. 1997) ....................................................19

*Doyle v. Allstate Insurance Co.*,
    1 N.Y.2d 439, 136 N.E.2d 484 (1956)..............................................18

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)............................................................................26

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003) ............................................20, 27, 28, 39

*Emergent Cap., Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    165 F. Supp. 2d 615 (S.D.N.Y. 2001) ..............................................20

*Falcon Crest Diamonds, Inc. v. Dixon*,
    655 N.Y.S.2d 232, 173 Misc. 2d 450 (N.Y. Sup. Ct. 1996)..............24

*In re Fannie Mae 2008 Sec. Litig.*,
    742 F. Supp. 2d 382 (S.D.N.Y. 2010) ..............................................28

*First Nationwide  Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994) ..........................................................26, 34

*Fogarazzo v. Lehman Bros., Inc.*,
    341 F. Supp. 2d 274 (S.D.N.Y. 2004) ..............................................29

*Glanzer v. Shepard*,
    233 N.Y. 236, 135 N.E. 275 (1922)..................................................40

*Gordon v. Burr*,
    506 F.2d 1080 (2d Cir. 1974) ..............................2, 14, 17, 20, 21

*Gross v. State Cooperage Export Crating and Shipping Co.*,
    32 A.D.2d 540, 299 N.Y.S.2d 773 (App. Div. 2d Dep't 1982)..........18

*Holmes v. Grubman*,
    568 F.3d 329 (2d Cir. 2009) ..............................................................34

*Kaufman v. Jaffee*,
    244 A.D. 344, 279 N.Y.S. 392 (App. Div. 1st Dep't 1935)..............21

*Keskal v. Modrakowski*, 249 N.Y. 406, 164 N.E. 333 (1928) ................21

*King County v. IKB Deutsche Industriebank AG*,
    708 F. Supp. 2d 334 (S.D.N.Y. 2010) ..............................................28

*Krinsky v. Title Guarantee and Trust Co.*,
    163 Misc. 833, 298 N.Y.S. 31 (App. Div. 1st Dep't 1937)..........13, 18, 22

*Landesbank Baden-Württemberg v. Goldman, Sachs & Co.*,
    821 F. Supp. 2d 616 (S.D.N.Y. 2011) ..............................................44

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007) ...........................................................28

*Laub v. Faessel*,
    297 A.D.2d 28, 745 N.Y.S.2d 534 (App. Div. 1st Dep't 2002) .........25

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) .......................... 14, 27, 28, 39, 32, 38, 39

*Loreley Fin. (Jersey) No. 28, Ltd. v Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    652732/ 2014, N.Y. App. Div. LEXIS 3269 (App. Div. 1st Dep't May 8,
    2014) ..................................................................................................31

*Loreley Fin. (Jersey) No. 3 Ltd. v Citigroup Global Mkts. Inc.*,
    650212/12, 2014 N.Y. App. Div. LEXIS 3300 (App. Div. 1st Dep't May 8,
    2014) ..................................................................................................31

*MBIA Ins. Co v. Countrywide Home Loans Inc.*,
    105 A.D.3d 412, 963 N.Y.S.2d 21 (App. Div. 1st Dep't 2013) .............14, 23, 25

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
    87 A.D.3d 287, 928 N.Y.S.2d 229 (App. Div. 1st Dep't 2011) .......26, 27, 29, 31

*M&T Bank Corp. v. Gemstone CDO VII Ltd.*,
    68 A.D.3d 1747, 891 N.Y.S.2d 578 (App. Div. 4th Dep't 2009) .....................44

*Mott v. Tri-Continental Financial Corp.*,
    330 F.2d 468 (2d Cir. 1964) ..................................................2, 14, 18

*Ossining Union Free School Dist. v. Anderson*,
    73 N.Y.2d 417, 539 N.E.2d 91 (1989)...............................................41

*Pinter v. Dahl*,
    486 U.S. 622 (1988)..........................................................................21

*Schonfeld v. Hilliard*,
    218 F.3d 164 (2d Cir. 2000) .............................................................36

*Selevan v. N.Y. Thruway Auth.*,
    584 F.3d 82 (2d Cir. 2009) ...............................................................16

*Silver Oak Capital L.L.C. v. UBS AG*,
    82 A.D.3d 666, 920 N.Y.S.2d 325 (App. Div. 1st Dep't 2011) .........26

*Stutman v. Chemical Bank*,
    95 N.Y.2d 24, 731 N.E.2d 608 (2000)...............................................25

*Ultramares Corp. v. Touche*,
    255 N.Y. 170, 174 N.E. 441 (1931)..................................................40

*Zeller v. Bogue Elec. Mfg. Corp.*,
    476 F.2d 795 (2d Cir. 1973) .............................................................37

## Statutes/Rules

28 U.S.C. § 1291 ................................................................................5

28 U.S.C. § 1332 ................................................................................5

N.Y. Ins. Law § 3105 ...............................................2, 12, 14, 23, 24, 25

N.Y. Ins. Law § 3106 ........................................................................23

N.Y. Ins. Law § 3105(a) ...................................................................24

N.Y. Ins. Law § 3105(b) ...................................................................23

Rule 8 ......................................................................2, 14, 17, 29

Rule 8(a) ...........................................................................................26

Rule 9(b) ...........................................................................................26

Rule 12(b)(6) .........................................................................16, 27, 39

## Miscellaneous

60A N.Y. Jur. 2d Fraud and Deceit § 184 ...........................................19

## <u>PRELIMINARY STATEMENT</u>

This lawsuit arises out of a fraudulent scheme by Defendant-Appellee The Putnam Advisory Company LLC ("Putnam") to induce Plaintiff-Appellant Financial Guaranty Insurance Company ("FGIC") to provide $900 million of financial guaranty insurance (the "Pyxis Guaranty") on a collateralized debt obligation ("CDO") named Pyxis ABS CDO 2006-1 ("Pyxis"). Putnam, an experienced asset manager, induced FGIC to provide this insurance by representing that it—and it alone—would select the Pyxis collateral, on which FGIC's exposure under the Pyxis Guaranty depended. This was false. In fact, Putnam secretly allowed Magnetar Capital LLC ("Magnetar")—a "short" investor who bet against Pyxis and whose financial interests were directly adverse to those of "long" investors and FGIC (who bet on Pyxis' success)—to select collateral that would cause Pyxis to default, benefiting Magnetar's short positions and causing FGIC to incur huge liabilities under the Pyxis Guaranty. Had FGIC known this, it would not have issued the Pyxis Guaranty and thus would not have suffered any losses when Pyxis collapsed; and Putnam would not have reaped millions of dollars in fees for its putative management of Pyxis. FGIC therefore brought this lawsuit alleging fraud, negligence, and negligent misrepresentation against Putnam, and seeking, among other things, rescission to restore it to the status quo ante.

The district court (Sweet, J.) erroneously dismissed FGIC's Second Amended Complaint ("SAC") in its entirety, on two grounds. *First*, it dismissed the SAC's fraud claim on the ground that it does not adequately allege that FGIC's losses were caused by Putnam's fraud rather than the financial crisis ("loss causation"). However, to begin with, FGIC seeks rescission based on fraud which, contrary to the district court's holdings, does not require proof of loss causation, *Mott v. Tri-Continental Financial Corp.*, 330 F.2d 468, 470 (2d Cir. 1964), and is "applicable against persons not in privity with the defrauded purchaser but who are party to the fraud," *Gordon v. Burr*, 506 F.2d 1080, 1082 (2d Cir. 1974). Moreover, FGIC alleges fraud in the inducement of an insurance contract, which, under New York Insurance Law § 3105, does not require proof of loss causation. Contrary to the district court's holding, Putnam's misrepresentations were made "by the authority of" the applicant for insurance ("Calyon"), as required by § 3105, because they were incorporated in materials presented *by Calyon* to FGIC to induce it to issue the Pyxis Guaranty *to Calyon*.

In any event, the SAC more than satisfies the Rule 8 notice pleading requirements for loss causation, by plausibly alleging that (1) the Pyxis fraud was *intended* to cause Pyxis to default, which would necessarily cause FGIC to suffer losses under the Pyxis Guaranty; (2) a substantial number of Magnetar-selected assets identified by FGIC even without the benefit of discovery were significantly

more likely to default than assets Putnam would have selected acting independently; (3) a substantial number of these assets defaulted before the financial crisis even began; and (4) while all 26 of the CDOs created by Magnetar (including Pyxis) have defaulted, a substantial number of comparable CDOs have not done so, confirming that the collateral pool Putnam would have selected acting independently might well have enabled Pyxis to avoid default and FGIC to avoid losses on the Pyxis Guaranty.

Instead of accepting these allegations as true and drawing all reasonable inferences in FGIC's favor, as required on a motion to dismiss, the district court systematically drew inferences *against* FGIC that are unsupported or even contradicted by the SAC. Thus, the district court inferred that (1) the Magnetar-selected assets identified by FGIC to date comprise all of the Magnetar-selected assets in the Pyxis portfolio, even though the SAC alleges that Magnetar controlled selection of the entire portfolio and the full pool of Magnetar-selected assets cannot be known without discovery; (2) the Magnetar-selected assets were not sufficient to cause FGIC harm, even though the default of *any* collateral incrementally increased FGIC's losses under the Pyxis Guaranty; (3) the financial crisis began well before 2008, contrary to the SAC's allegations; and (4) the non-Magnetar CDOs identified by FGIC as benchmarks were not comparable, despite the SAC's well-pled allegations that they were.

3

*Second*, the district court erroneously held that the SAC does not allege a "special relationship" between FGIC and Putnam sufficient to support the SAC's negligence-based claims.  This holding is squarely refuted by this Court's decision in *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42 (2d Cir. 2012), which held that a special relationship was adequately alleged between a CDO portfolio manager, like Putnam, who represented it would manage the portfolio in the plaintiff investor's interests, and the investor, who, like FGIC, made clear that it relied on the manager's expertise.  The district court's attempt to distinguish *Bayerische* on the ground that the investor was a third-party beneficiary of the Portfolio Management Agreement ignores the express holding in *Bayerische*—consistent with well-settled New York law—that contractual privity is not required for a special relationship.  Further, the district court's holding that a CDO manager's relationship with an investor is "much closer in scope and shared goals" than with an insurer, SPA35, is simply wrong; as the SAC alleges, FGIC's fate, like that of long investors, was tied directly to Pyxis' performance, and was thus dependent on Putnam's expertise.  Finally, the district court's holding that certain disclaimers in the Pyxis offering materials preclude a special relationship ignores that the offering materials in *Bayerische* contained materially identical disclaimers and that Putnam made misrepresentations directly to FGIC outside the offering materials.

4

## JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1332 because FGIC is a citizen of New York and Putnam is a citizen of Massachusetts, and the amount in controversy exceeds $75,000 exclusive of interests and costs. This Court has appellate jurisdiction under 28 U.S.C. § 1291 to review the district court's final judgment dated April 18, 2014, SPA1. Notice of appeal was timely filed on May 16, 2014. A1540.

## ISSUES PRESENTED

1.      Whether New York law requires a plaintiff, in particular an insurer, who seeks rescission based on fraud to prove loss causation in addition to transaction causation.

2.      Whether, in any event, FGIC sufficiently pled loss causation.

3.      Whether material misrepresentations made with the full knowledge of an applicant for insurance and transmitted by the applicant to an insurer to induce the insurer to issue an insurance policy to the applicant, are misrepresentations made "by the authority of" the applicant.

4.      Whether the "special relationship" required in a claim for negligence or negligent misrepresentation is adequately pled where the complaint alleges that the defendant specifically induced the plaintiff to enter a transaction by

representing that it would act to protect the plaintiff's interests, and the plaintiff made clear to the defendant that it relied on it to do so.

## STATEMENT OF THE CASE

### A.    The Pyxis Guaranty And The Pyxis CDO

The SAC alleges that, pursuant to the Pyxis Guaranty, FGIC insured payment of all obligations owed to Calyon by a FGIC subsidiary under a swap transaction referencing $900 million of contingent payment obligations owed by Calyon to Pyxis (the "Pyxis Swap").  A187 (SAC ¶¶ 7-8).  The SAC alleges that, if FGIC had not issued the Pyxis Guaranty, Pyxis would not have closed and Putnam would not have reaped large fees from Pyxis.  A186-87 (SAC ¶¶ 6-8).

The SAC alleges that FGIC's liability under the Pyxis Guaranty depended on the performance of the Pyxis CDO, which in turn depended on the performance of the underlying Pyxis portfolio.  A187 (SAC ¶ 9).  The Pyxis portfolio consisted of residential mortgage-backed securities ("RMBS") and securities issued by other CDOs also backed by RMBS.  A199-200 (SAC ¶ 44).  Pyxis was a managed CDO, which meant that its portfolio could change at any time at the discretion of the collateral manager, Putnam.  A193 (SAC ¶ 29).  Consequently, the SAC alleges that FGIC and other investors were heavily dependent on the experience, independence, and integrity of Putnam.  A194, 208-09 (SAC ¶¶ 31, 65).  As Putnam itself stated in the Pyxis Offering Memorandum, "[b]ecause the

composition of the [portfolio] will vary over time, the performance of the [portfolio] depends heavily on the skills of the Collateral Manager in analyzing, selecting, and managing the [portfolio]." A194 (SAC ¶ 30) (emphasis omitted).

The SAC further alleges that Pyxis was one of 26 "Constellation" CDOs sponsored by Magnetar, in each of which Magnetar took both an equity position (to induce other investors to participate) and a much larger short position. A196-198, 236-245 (SAC ¶¶ 36-42, 129-150). Putnam was well aware that Magnetar was a net short investor in Pyxis because it helped to arrange many of Magnetar's short positions. A203-08 (SAC ¶¶ 53-61). As a net short investor, Magnetar stood to profit if Pyxis failed. A184-85 (SAC ¶ 1). Thus, the SAC alleges that Magnetar's interests were directly opposed to those of long investors and FGIC. A184-85 (SAC ¶ 1).

### B.   Putnam Induced FGIC To Issue The Pyxis Guaranty By Representing That It—And It Alone—Would Select The Pyxis Collateral

In July 2006, Calyon and Putnam began to market Pyxis to FGIC. A208 (SAC ¶ 62). The SAC alleges that, to assure FGIC of the quality of the Pyxis portfolio, Putnam represented that it would select the assets for the portfolio, acting independently and in good faith in the interests of long investors. A208-11, 217 (SAC ¶¶ 65-72, 86-87). These representations were made in the Pyxis offering materials, which were prepared by Calyon and presented by Calyon

to FGIC to induce it to issue the Pyxis Guaranty. A208-9 (SAC ¶¶ 62, 68). They were also reiterated in the course of FGIC's extensive due diligence for Pyxis, including in emails transmitted to FGIC by Calyon during July 2006 and in an August 2006 on-site review by FGIC personnel of Putnam's operations in Boston and a follow-up conference call. A211-13 (SAC ¶¶ 73-74, 76-78).

In addition, the SAC alleges that Putnam represented, through a "target portfolio" provided to FGIC by Calyon a few weeks before closing, that at least $145 million of the Pyxis portfolio would be prime RMBS—which, by definition, are significantly less likely to default than subprime RMBS. A214-15 (SAC ¶ 79).

### C.    Contrary To Its Representations, Putnam Secretly Abdicated Control Over Pyxis Collateral Selection To Magnetar

The SAC alleges that Putnam's representations were false, and that Putnam secretly allowed Magnetar to select the collateral, even though it knew that Magnetar's interests were directly contrary to those of long investors and FGIC. A218 (SAC ¶ 89). The SAC further alleges that, had FGIC known this, it would never have issued the Pyxis Guaranty. A184-85, 187, 245-46 (SAC ¶¶ 1, 9, 153).

FGIC's allegations are based on a wealth of documentary evidence and testimony disclosed in numerous lawsuits relating to Magnetar's CDOs—including documents and testimony of Putnam's own witnesses specifically relating to Pyxis. A189, 219-229, 241-45 (SAC ¶¶ 16, 91-116, 142-150). Based on this evidence, the SAC alleges that, among other things: (1) Magnetar insisted that Putnam

would "have to play ball" on Pyxis, and executed a "behind the scenes" side letter giving Magnetar and Deutsche Bank "veto rights over any" collateral purchased for Pyxis, A220, 221-22 (SAC ¶¶ 93, 95); (2) Magnetar made clear which collateral it wanted to include in the Pyxis portfolio, and Putnam made clear its willingness to accommodate Magnetar, A219-20, 221-26, 230-31 (SAC ¶¶ 91-93, 95-107, 120); (3) Magnetar made clear its intention to short huge amounts of the collateral it was selecting for Pyxis, and Pyxis itself, and Putnam agreed to help it do so, A219-20, 223, 226-27 (SAC ¶¶ 91-93, 98-99, 109); and (4) Magnetar's co-equity sponsor on Pyxis, Deutsche Bank, described Magnetar's CDOs, including Pyxis, as "not CDOs but . . . structured separate accounts [for the benefit of Magnetar and Deutsche Bank]," and stated that "Putnam got it," A227 (SAC ¶ 110).

The SAC also sets forth numerous additional allegations confirming Magnetar's control over portfolio selection, including that: (1) Pyxis had exposure to at least fifteen other Magnetar CDOs (all of which defaulted), A230 (SAC ¶ 117); (2) there was a remarkably high correlation between the Pyxis portfolio and the portfolios of other Magnetar CDOs, A233 (SAC ¶ 121); (3) Putnam arranged for Pyxis to invest in more than three times the specified concentration limit of low-rated, high risk ABX Index investments—a favored Magnetar investment that worked in the interests of short investors rather than long

9

investors and FGIC—and concealed these investments by investing in both the ABX Index and its constituent RMBS, A234 (SAC ¶ 123); (4) Putnam initially provided FGIC with a "target portfolio" for Pyxis that included $145 million of prime RMBS, but then, without alerting investors or FGIC, replaced all of these prime RMBS in the final portfolio with subprime RMBS which were much more likely to default, again favoring Magnetar, A214-15, 236 (SAC ¶¶ 79, 127-28); and (5) email evidence from litigations relating to other Magnetar CDOs, most of which were settled for large amounts, shows that Magnetar exercised exactly the same control over asset selection on its other CDOs, A236-37 (SAC ¶ 129), directly selecting many assets and using similar "pre-ok" or "veto powers" arrangements to reject better quality assets, A242-43, 250-51 (SAC ¶¶ 145, 165), describing the CDOs as "highly structured separate account mandate[s]," *id.*, increasing the fees paid to at least one structurer and collateral manager who had included assets Magnetar wanted to short in the deal as a "reward for good behavior," *id.*, and discussing with Deutsche Bank how to "hide" Magnetar's involvement in the CDOs, *id.*

### D.    Putnam Profited, And FGIC Lost Millions, As A Result Of The Fraud

The SAC alleges that Putnam benefited from its fraud by earning larger than usual fees with little risk, A245 (SAC ¶ 151), because, as Deutsche Bank stated, Putnam's fees were "virtually assured" by Magnetar's "significant control" of

Pyxis, A201-02, 227-28 (SAC ¶¶ 46-47, 110, 112).  Moreover, if Putnam had not

cooperated with Magnetar on Pyxis, Magnetar would not have hired it for any

other CDOs, A199 (¶ 43), including a second Pyxis CDO, Pyxis ABS 2007-1

("Pyxis 2"), from which Putnam earned millions more in fees, A203 (SAC ¶ 51).

By contrast, when Pyxis defaulted, FGIC was obliged to pay millions to discharge

its obligations under the Pyxis Guaranty, as a direct result of Putnam's fraud.

A245 (SAC ¶ 152).

### E.    Procedural History

FGIC filed this lawsuit on October 1, 2012, A8, and its First Amended

Complaint ("FAC") on November 16, 2012, A68.  On September 10, 2013, the

district court (Sweet, J.) dismissed the FAC for failure to state a claim, with

permission to replead.  A168.  FGIC filed the SAC on September 30, 2013,

alleging fraud, negligence and negligent misrepresentation.  A184.

On April 28, 2014, the district court dismissed the SAC for failure to state a

claim, and final judgment was entered in favor of Putnam.   SPA 1, 38;

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 12 Civ. 7372 (RWS), 2014 U.S.

Dist. LEXIS 58745, at *1 (S.D.N.Y. Apr. 28, 2014).  The district court held that

the SAC failed to allege fraud because it failed to sufficiently plead that

Magnetar's alleged control of the collateral selection process for Pyxis caused

FGIC's losses, as opposed to the "global financial crisis."  SPA25-26.  The district

11

court rejected FGIC's argument that it did not need to plead loss causation because it sought rescission for fraud, holding both that loss causation was required for such a claim and that in any case FGIC could not seek rescission because it was not in privity with Putnam.  SPA23-25.  The district court also rejected FGIC's argument that it did not need to plead loss causation because loss causation is not required on a claim for fraud in the inducement of an insurance contract under N.Y. Ins. Law § 3105, holding that, even though Putnam's misrepresentations were incorporated in various materials prepared by Calyon and presented to FGIC by Calyon to induce FGIC to issue the Pyxis Guaranty to Calyon, they were not made "by the authority of" Calyon as required by § 3105.  SPA22-23.  Finally, the district court rejected FGIC's argument that loss causation was adequately pled by FGIC, despite the SAC's allegations that FGIC's losses were the intended and expected consequence of Putnam's fraud, that known Magnetar-selected collateral was inherently more likely to default than the collateral Putnam would have selected, that known Magnetar-selected collateral defaulted before the financial crisis began, and that all Magnetar CDOs have defaulted whereas a substantial number of comparable non-Magnetar CDOs have not done so.  SPA25-31.

The district court further held that the SAC failed to state a claim for negligence or negligent misrepresentation because it did not sufficiently allege a "special relationship" between FGIC and Putnam. SPA31-37.  The district court

held that *Bayerische* was distinguishable on the grounds that (1) there was privity between the portfolio manager and the investor in *Bayerische*, rejecting FGIC's argument that privity is not required for a special relationship; (2) the relationship between the portfolio manager and investor in *Bayerische* was closer than that between FGIC and Putnam, rejecting FGIC's argument that, as the SAC alleges, FGIC's interests were directly aligned with those of investors, and that FGIC, like the *Bayerische* investor, met directly with Putnam to receive assurances Putnam would protect its interests; and (3) the disclaimers in the offering materials here barred a special relationship, rejecting FGIC's argument that the *Bayerische* offering materials contained materially identical disclaimers.  SPA32-37.

## **SUMMARY OF ARGUMENT**

### **I.**

The district court's holding that the SAC does not adequately plead loss causation is incorrect for three independent reasons.

*First,* contrary to the district court's holding, where, as here, the plaintiff seeks rescission based on fraud, the "plaintiff is not bound to show that pecuniary loss resulted from the misrepresentations." *Krinsky v. Title Guarantee and Trust Co.*, 163 Misc. 833, 839, 298 N.Y.S. 31, 37 (App. Div. 1st Dep't 1937) (emphasis omitted).  It is sufficient to allege, as FGIC does, that "the plaintiff received something other than that for which he bargained,"

*Mott*, 330 F.2d at 470—namely, exposure to a portfolio with a much higher risk of default. Also contrary to the district court's holding, FGIC is entitled to seek rescission against Putnam even though the parties were not in privity of contract. *Gordon*, 506 F.2d at 1083 (holding that "rescission [is] applicable against a defrauder not in privity of contract with the victim of the fraud").

*Second*, FGIC does not need to prove loss causation because it alleges fraud in the inducement of an insurance contract, which under New York Insurance Law § 3105 does not require proof of loss causation. *MBIA Ins. Co v. Countrywide Home Loans Inc.*, 105 A.D.3d 412, 412, 963 N.Y.S.2d 21, 22 (App. Div. 1st Dep't 2013). Contrary to the district court's holding, Putnam's misrepresentations were made "by the authority of" the "applicant for insurance," as required by § 3105, because they were incorporated in materials prepared and presented to FGIC *by Calyon* specifically to induce FGIC to issue the Pyxis Guaranty *to Calyon*.

*Third*, in any event, the SAC satisfies the Rule 8 notice pleading requirements for loss causation. The SAC plausibly alleges that, despite the marketwide downturn, FGIC "would have been spared all or an ascertainable portion of [its] loss absent [Putnam's] fraud." *Lentell v. Merrill Lynch & Co*., 396 F.3d 161, 175 (2d Cir. 2005). Specifically, the SAC alleges that (1) the purpose of the Pyxis fraud was to cause Pyxis to default,

which would necessarily cause FGIC to suffer losses under the Pyxis Guaranty, A184-85 (SAC ¶ 1); (2) the Magnetar-selected collateral identified by FGIC without the benefit of discovery was inherently more likely to default than collateral Putnam would have selected acting independently, A190 (SAC ¶ 18); and (3) $95.5 million of the known Magnetar-selected assets defaulted before the financial crisis even began, A249-50 (SAC ¶ 160). Further, contrary to the district court's holding that the SAC does not allege that there are any assets Putnam could have selected that would not have defaulted as a result of the financial crisis, that is precisely what the SAC alleges, and it backs this up by alleging that, while all 26 CDOs created by Magnetar CDOs have defaulted, a substantial proportion of comparable non-Magnetar CDOs have not done so. A246-47 (SAC ¶ 156). In rejecting these allegations as insufficient, the district court failed to accept all well-pleaded allegations as true and to draw all reasonable inferences in FGIC's favor, as required on a motion to dismiss.

## II.

The district court's holding that the SAC does not adequately allege the "special relationship" necessary to support negligence-based claims is refuted by *Bayerische*. There, a special relationship was held to be adequately pled where a CDO portfolio manager, like Putnam here, induced an investor to participate by representing that it would use its expertise to manage the CDO's portfolio in the

investor's interests, and the investor, like FGIC here, made clear to the manager that it was relying on it to do so. Contrary to the district court's holding, as *Bayerische* holds, the absence of privity does not preclude a special relationship. Also contrary to the district court's holding, FGIC's relationship to Putnam is materially identical to the *Bayerische* investor's relationship to its portfolio manager, because, as the SAC alleges, FGIC's interests are directly aligned with those of investors and likewise depend directly on the performance of the Pyxis collateral, and because FGIC met directly with Putnam to ensure it would protect its interests. Finally, contrary to the district court's reliance on certain disclaimers in the Pyxis offering materials to preclude a special relationship, the offering materials in *Bayerische* contained materially identical disclaimers.

## <u>STANDARD OF REVIEW</u>

This Court reviews *de novo* a district court's dismissal of claims at the Rule 12(b)(6) stage. *CARCO GROUP, Inc. v. Maconachy*, 718 F.3d 72, 79 (2d Cir. 2013) (citing *Baker v. Health Mgmt. Sys., Inc.,* 264 F.3d 144, 149 (2d Cir. 2001)). Further, this Court "assume[s] all 'well-pleaded allegations' to be true, and 'determine[s] whether they plausibly give rise to an entitlement to relief.'" *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## ARGUMENT

## I. THE SECOND AMENDED COMPLAINT ADEQUATELY ALLEGES FRAUD

The district court dismissed FGIC's fraud claim on the ground that the SAC does not adequately allege loss causation. SPA24-25. This is wrong for three independent reasons. *First*, New York law does not require a plaintiff to establish loss causation to obtain rescission based on fraud. *Second*, New York law does not require an insurer to establish loss causation in a claim for fraud in the inducement of an insurance contract. *Third*, even if loss causation were a required element of FGIC's fraud claim here, the SAC more than adequately satisfies the Rule 8 notice pleading standard for loss causation.

### A. FGIC Need Not Plead Loss Causation To Obtain Rescission

#### 1. Loss Causation Is Not Required In A Claim For Rescission Based On Fraud

The SAC seeks rescission to restore FGIC to the status quo ante. *See* A69 (SAC ¶ 171) ("FGIC should be restored to the status quo ante . . . ."); A257 (SAC Prayer for Relief (a)) (seeking "damages to restore [FGIC] to the status quo ante . . . ."); *see also Gordon*, 506 F.2d at 1085 (equating rescission with "restor[ing] the victim to the status quo").[1]

---

[1]  Rescission may be effected by an award of damages where it is impossible or impracticable to fully unwind the transaction. *Buffalo Builders Supply Co. v. Reeb*, 247 N.Y. 170, 176, 159 N.E. 899, 901 (N.Y. 1928) (affirming an award of damages where chattels sold pursuant to a fraudulent transaction were no longer in

Although "injury is an essential element in an action for fraud," where rescission is sought, "a finding of injury may be predicated upon a showing that the plaintiff received something other than that for which he bargained." *Mott,* 330 F.2d at 470. As a New York appellate court explained:

> *It is well settled that in an action based upon rescission for misrepresentations a plaintiff is not bound to show that pecuniary loss resulted from the misrepresentations*. It is sufficient that plaintiff received something different from what she contracted for and that she might not have accepted the same had the facts not been misrepresented to her.

*Krinsky*, 163 Misc. at 839, 298 N.Y.S. at 37 (emphasis in original); *see also D'Angelo v. Bob Hastings Oldsmobile, Inc.*, 89 A.D.2d 785, 785, 453 N.Y.S.2d 503, 503 (App. Div. 4th Dep't 1982) ("In such an action [for rescission], unlike a cause of action in damages on the same ground, proof of . . . pecuniary loss is not needed."); *Gross*, 32 A.D.2d at 540, 299 N.Y.S.2d at 774-75 ("[I]t is not necessary for a defrauded party to show that he has suffered pecuniary damages in order to

---

defendant's possession, on ground that "[t]hese circumstances do not bar the equitable remedy of rescission for wrong done. The terms upon which rescission may be granted where complete restoration of the parties to their former position is impossible rests in the sound discretion of the courts."); *Doyle v. Allstate Insurance Co.*, 1 N.Y.2d 439, 443, 136 N.E.2d 484, 486 (1956) ("[W]here the granting of equitable relief appears to be impossible or impracticable, equity may award damages in lieu of the desired equitable remedy."); *Gross v. State Cooperage Export Crating and Shipping Co.*, 32 A.D.2d 540, 540, 299 N.Y.S.2d 773, 775 (App. Div. 2d Dep't 1982) ("Nor will rescission be necessarily denied where the plaintiff cannot return consideration in the form of labor and services that have been bestowed upon him by defendant. The value of the benefits received may be allowed in lieu of restoration.").

obtain rescission."); *Dornberger v. Metropolitan Life Ins. Co.*, 961 F. Supp. 506, 543 (S.D.N.Y. 1997) ("[A] plaintiff seeking rescission on the ground of fraud need not show actual pecuniary loss"); *Chan v. Mui*, No. 92 CIV. 8258 (MBM), 1993 U.S. Dist. LEXIS 14693, at *7 n.2 (S.D.N.Y. Oct. 20, 1993) ("Although plaintiff did not allege damages or loss causation specifically, his claim of fraudulent inducement is not defective because . . . he may obtain a remedy of rescission instead of damages for that form of fraud"); 60A N.Y. Jur. 2d Fraud and Deceit § 184 ("[A plaintiff need not show] pecuniary loss by reason of the fraud in order to obtain rescission of the transaction or contract induced by it.").

Thus, a New York trial court recently upheld an investor's claim for rescission predicated on fraud as to the investment quality of a CDO, based solely on a pleading of transaction causation. *Basis Yield Alpha Fund (Master) v. Goldman Sachs Group, Inc.*, 37 Misc.3d 1212(A), at *7, 961 N.Y.S.2d 356 (N.Y. Sup. Ct. 2012) ("While it is obviously true that the collapse of the housing market led to [Plaintiff] incurring a loss on the securities, causation has been established because, but for Goldman's representations, [Plaintiff] alleges it would never have purchased the securities and suffered a loss that was reasonably related to Goldman's representations.").[2]

---

[2] Although parts of this decision were reversed on appeal, the decision to sustain the fraud claim was affirmed. *Basis Yield Alpha Fund (Master) v. Goldman Sachs*

Despite this settled law, in dismissing the First Amended Complaint, the district court held that FGIC was required to plead loss causation on its claim for rescission. A176. The only authority cited for this proposition was the district court's own prior decision in *Emergent Cap., Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 165 F. Supp. 2d 615, 627 n. 2 (S.D.N.Y. 2001). However, that decision (1) was reversed on appeal to the extent it dismissed the plaintiff's fraud claim for failure to plead loss causation, *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197-98 (2d Cir. 2003); and (2) relied on *Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 316 (2d Cir. 1985), which did not involve a claim for rescission, but merely a claim for damages based on the decline in market value of stock purchased as a result of fraud, *id.* at 310, and is thus perfectly consistent with the rule that loss causation is not required in a claim for rescission based on fraud.

## 2.    FGIC Is Entitled To Seek Rescission From Putnam

In dismissing the SAC, the district court compounded its error by holding that FGIC cannot even seek rescission because FGIC and Putnam were not in privity of contract. SPA25. That holding is directly contradicted by another decision of this Court, *Gordon*, 506 F.2d 1080, which held that, in an action for rescission predicated on fraud, rescission is "applicable against persons not in

---

*Group, Inc.*, 115 A.D.3d 128, 140-41, 980 N.Y.S.2d 21, 31 (App. Div. 1st Dep't 2014).

privity with the defrauded purchaser but who are party to the fraud." *Id.* at 1082; *see also id.* at 1083 ("New York courts have long held rescission applicable against a defrauder not in privity of contract with the victim of the fraud.").  The Court reasoned that, "as between the innocent purchaser and the wrongdoer who, though not a privy to the fraudulent contract, nonetheless induced the victim to make the purchase, equity requires the wrongdoer to restore the victim to the status quo." *Id.* at 1085; *see also Pinter v. Dahl*, 486 U.S. 622, 647 n.23 (1988) (holding that under common law, "[w]hen rescission is predicated on fraud, privity is not essential") (citing *Gordon*, 500 F.2d at 1085, and *Keskal v. Modrakowski*, 249 N.Y. 406, 408, 164 N.E. 333 (1928)); *Kaufman v. Jaffee*, 244 A.D. 344, 345, 279 N.Y.S. 392, 394 (App. Div. 1st Dep't 1935) (holding that plaintiff could rescind contract and recover value of property transferred thereunder either from corporate counterparty to which property was transferred or from individual defendants by whose representations plaintiff was induced to enter contract).

Like the individual defendants in *Gordon*, Putnam was a "wrongdoer who, though not a privy to the fraudulent contract, nonetheless induced the victim to make the purchase." *Gordon*, 506 F.2d at 1085.  Thus, as between FGIC and Putnam, "equity requires [Putnam] to restore [FGIC] to the status quo," *id.*, and FGIC may seek rescission against Putnam.

The SAC alleges that FGIC is entitled to rescission because, as a result of Putnam's fraud, it received something different from what it bargained for—exposure to a portfolio with a much higher risk of default—and, had it known the true facts, it would not have issued the Pyxis Guaranty. *Krinsky*, 163 Misc. at 839, 298 N.Y.S. at 37 ("It is sufficient that plaintiff received something different from what she contracted for and that she might not have accepted the same had the facts not been misrepresented to her.").[3] Thus, FGIC has adequately pled transaction causation—the only causation it is required to plead to obtain rescission.

### B. FGIC Need Not Plead Loss Causation Because It Alleges Fraud In The Inducement Of An Insurance Contract

FGIC does not need to allege loss causation for the further, independent reason that its claim is for fraud in the inducement of an insurance contract. Such a claim is informed by both New York common law and N.Y. Insurance Law, which

---

[3]  *See* A184-85 (SAC ¶ 1) ("Had FGIC known that Putnam was not selecting the Pyxis collateral independently, but was instead allowing the selection process to be controlled by a net short investor, FGIC would never have provided insurance on Pyxis, and FGIC would not have lost millions when Pyxis defaulted—as Magnetar planned."); A208-09 (SAC ¶ 65) (Putnam's representation that it would select the Pyxis collateral independently "was vitally important to FGIC because . . . the most important determinant of a CDO's performance is the skill of the collateral manager in selecting and maintaining the credit quality of its underlying portfolio."); A245-46 (SAC ¶ 153) ("FGIC never would have issued the Pyxis Guaranty—and thus would not have suffered any losses under the Pyxis Guaranty—had it known Putnam was not acting independently in the selection of assets for the Pyxis Portfolio."); A251 (SAC ¶ 168) ("Without [Putnam's] material misstatements and omissions, FGIC would not have issued the Pyxis Guaranty.").

entitles an insurer to "avoid any contract of insurance or defeat recovery thereunder" if it was induced to enter into the contract by a material misrepresentation of fact. N.Y. Ins. Law § 3105(b). Section § 3105(b) entitles an insurer not only to avoid an insurance policy but also to recover payments made pursuant to a policy without resort to rescission *and without proof of loss causation*. *MBIA,* 105 A.D.3d at 412, 963 N.Y.S.2d at 22 (holding that "pursuant to Insurance Law §§ 3105 and 3106, plaintiff was not required to establish causation in order to prevail on its fraud and breach of contract claims," and that § 3105(b) allows "recovery of payments made pursuant to an insurance policy without resort to rescission").

In dismissing the First Amended Complaint, the district court held that § 3105 was inapplicable because Putnam "did not apply for any insurance, nor did it enter into any sort of contract—insurance-related or otherwise—with FGIC." A176-77. The district court overlooked that § 3105 expressly applies to misrepresentations made "by the authority of" the applicant or the insured. *See* N.Y. Ins. Law § 3105(a) (defining "representation" as "a statement as to past or present fact, made to the insurer by, *or by the authority of*, the applicant for insurance or the prospective insured") (emphasis added).

Subsequently, in dismissing the SAC, the district court held that "[t]o act 'by the authority of' Calyon, Putnam must have acted as Calyon's agent under New

York law." SPA23. However, nothing in New York Insurance Law nor in case law imposes such a requirement. The sole authority cited by the district court, *Falcon Crest Diamonds, Inc. v. Dixon*, 655 N.Y.S 2d 232, 173 Misc.2d 450 (N.Y. Sup. Ct. 1996), merely held that, under § 3105(a), "a party *may* make a material misrepresentation through a broker," *id.* at 236 (emphasis added)—not that a broker/agent relationship must exist in order for a misrepresentation to be made "by the authority of" the insured or applicant. In other words, *Falcon Crest* holds that an agency relationship is sufficient for § 3105 to apply, not that it is necessary.

Here, Calyon was both the applicant for insurance and the insured under the Pyxis Guaranty. A185, 187, 208, 218 (SAC ¶¶ 2, 7, 62-63, 88). Whether or not Putnam acted as Calyon's agent, Putnam's misrepresentations were necessarily made to FGIC "by the authority of" Calyon because Calyon incorporated those misrepresentations in the Pyxis offering materials and in emails containing Putnam's answers to FGIC's questions about collateral selection, and then presented those materials to FGIC specifically to induce it to issue the Pyxis Guaranty to Calyon. A209, 212 (SAC ¶¶ 68, 74). Had Putnam only made its misrepresentations to FGIC separately from Calyon, it might have been necessary to establish that Putnam acted as Calyon's agent to establish that § 3105 applies. However, Calyon not only knew of but was *directly involved in* communicating Putnam's misrepresentations to FGIC to persuade FGIC to provide insurance *that*

*would benefit Calyon*. *Id.* Thus, there can be no question that Putnam's misrepresentations were made to FGIC with Calyon's authority, because Calyon itself provided them to FGIC for its own benefit.

Because N.Y. Ins. Law § 3105 applies, FGIC does not need to allege loss causation to sustain its fraud claim. *MBIA Ins. Co.*, 105 A.D.3d at 412. FGIC needs only to plead transaction causation, which it has done. *See* Point I.A, *supra*.

### C.    The SAC Adequately Pleads Loss Causation

If, as explained in Points I.A and B, *supra*, loss causation is not a required element of FGIC's fraudulent inducement claim seeking rescission, then the judgment below must be reversed and this Court need not reach this Point I.C. If, however, this Court rejects the arguments in Points I.A and B and holds that loss causation is required, it should consider this Point I.C and find that the SAC adequately pleads loss causation.

#### 1.    Notice Pleading Is Sufficient For Loss Causation

Loss causation requires "that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Laub v. Faessel*, 297 A.D.2d 28, 31, 745 N.Y.S.2d 534, 536 (App. Div. 1st Dep't 2002) (quoting Prosser and Keeton, Torts § 41, at 263 (5th ed.)); *see also Stutman v. Chemical Bank*, 95 N.Y.2d 24, 30, 731 N.E.2d 608, 612 (2000) ("A fraudulent misrepresentation is a legal cause of a pecuniary loss

resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance.") (quoting Restatement (Second) of Torts § 548A). Thus, loss causation is adequately alleged if "it was foreseeable that [Plaintiff] would suffer losses as a result of relying on [Defendant's] alleged misrepresentations . . . ." *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 296, 928 N.Y.S.2d 229, 235 (App. Div. 1st Dep't 2011); *see also Silver Oak Capital L.L.C. v. UBS AG*, 82 A.D.3d 666, 667, 920 N.Y.S.2d 325, 327 (App. Div. 1st Dep't 2011) ("[P]laintiffs sufficiently allege loss causation since it was foreseeable that they would sustain a pecuniary loss as a result of relying on [defendant's] alleged misrepresentations.").

Further, the defendant's fraud need not have been the sole cause of the plaintiff's losses. It is sufficient if it was "a substantial factor in the sequence of responsible causation." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994) (internal quotation marks omitted).

As the district court correctly held, "[a]llegations of loss causation are not subject to the heightened pleading standard of Rule 9(b)." SPA26. Even in the federal securities fraud context, such allegations need merely satisfy the notice pleading standard in Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). This requirement is "not meant to impose a

great burden upon a plaintiff." *Id.* (citing ).  Thus, the plaintiff only needs to "provide [the] defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.*

"[I]f the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Cap.* 343 F.3d at 197; *see also MBIA*, 87 A.D.3d at 296 ("It cannot be said, on this pre-answer motion to dismiss, that MBIA's losses were caused, as a matter of law, by the 2007 housing and credit crisis. . . . [I]t is the job of the fact finder to determine which losses were proximately caused by misrepresentations and which are due to extrinsic forces.") (internal citation and quotation marks omitted); *In re Bear Stearns Companies, Inc. Secs., Derivative, and ERISA Litig.,* 763 F. Supp. 2d 423, 507 (S.D.N.Y. 2011) ("[A]t the motion to dismiss stage, the . . . Complaint need not rule out all competing theories for the [loss]; that is an issue to be determined by the trier of fact on a fully developed record.").

*Lentell*, 396 F.3d 161, relied on by the district court, is not to the contrary. *Lentell* merely holds that the occurrence of a market-wide phenomenon "decreases" the prospect that a plaintiff's loss was caused by the alleged fraud, and that a plaintiff in such circumstances "must allege facts that support an inference that . . . [plaintiff] would have been spared all or an ascertainable portion of [its]

loss absent the fraud."  396 F.3d at 174-75; *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (holding that a plaintiff need only allege "facts that would allow a fact-finder to ascribe some rough proportion of the whole loss to [Defendants'] misstatements").    Thus, "*Lentell* does not place upon plaintiffs the heavy burden of pleading facts sufficient to exclude other non-fraud explanations."  *Dexia SA/NV v. Bear, Stearns & Co., Inc.*, 929 F. Supp. 2d 231, 243 (S.D.N.Y. 2013) (internal quotation marks omitted).

As long as this relatively low threshold is met, the court should permit the plaintiff to establish its case through discovery, even where it suspects that the intervening market-wide phenomenon will ultimately prove to be the major or sole cause of the plaintiff's losses.  *See In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 414 (S.D.N.Y. 2010) ("Although it may be likely that a significant portion, if not all, of Plaintiffs' losses were actually the result of the housing market downturn and not these alleged misstatements, at this stage of pleading, the Court need not make a final determination as to what losses occurred and what actually caused them, and need only find that Plaintiffs' allegations are plausible.") (internal quotation marks omitted); *King County v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 343, 346 (S.D.N.Y. 2010) ("[E]ven though I am uncertain whether plaintiffs will be able to ultimately prove that any portion of their losses were caused by the defendants' conduct as opposed to the credit crisis,

that is not their burden at this stage."); *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 285 (S.D.N.Y. 2004) (holding that even where it "appear[s] on the face of the pleading that recovery is very remote and unlikely" and it is uncertain "whether a plaintiff is likely to prevail ultimately," this is "not the test" at the motion to dismiss stage).

### 2.   The SAC Adequately Alleges Loss Causation

The SAC's loss causation allegations more than satisfy the notice pleading requirements of Rule 8.   Relying solely on publicly available information, and without the benefit of any discovery, the SAC contains extensive factual allegations that support, at a minimum, a plausible inference that FGIC "would have been spared all or an ascertainable portion of [its] loss absent [Putnam's] fraud," *Lentell*, 396 F.3d at 175, and that FGIC's losses were reasonably foreseeable, *MBIA*, 87 A.D.3d at 296, 928 N.Y.S.2d at 235.

#### a.   FGIC's losses were the intended and expected consequence of Putnam's fraud

To begin with, the SAC alleges that the *entire purpose* of Putnam's fraud, *i.e.*, of Magnetar's adverse selection of Pyxis collateral, was to cause Pyxis to default, and thus necessarily to cause FGIC to suffer losses under the Pyxis Guaranty.   A184-85, 246 (SAC ¶¶ 1, 155).   Magnetar was motivated to ensure that Pyxis defaulted and that FGIC suffered losses because Magnetar shorted not only the Pyxis collateral but multiple levels of the Pyxis structure—specifically

29

including the super senior Pyxis tranche insured by FGIC.  A205-06 (SAC ¶ 56)

(alleging that in November 2006, when Calyon asked Magnetar if it was interested

in buying protection against Pyxis Class A notes, Magnetar responded that it was

"actually pretty full on Pyxis A," but that it would be interested in buying more

protection on other classes, including the "super level").  Thus, it was the intended

and expected consequence of the Pyxis fraud that Pyxis would default and FGIC

would suffer losses under the Pyxis Guaranty.  A246 (SAC ¶ 155).

That, without more, was held to be sufficient to satisfy the loss causation

pleading requirement in *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 951

N.Y.S.2d 84, 2012 N.Y. Misc. LEXIS 1940, at *40-42 (N.Y. Sup. Ct. Apr. 23,

2012), *rev'd on other grounds by* 106 A.D.3d 394, 963 N.Y.S.2d 210

(App. Div. 1st Dep't 2013).  There, as here, the defendant CDO structurer

("Goldman") was alleged to have fraudulently concealed that the portfolio of its

CDO was selected by a net short investor ("Paulson").  There, as here, the

defendant argued that loss causation had not been adequately pled because "any

portfolio of this type would have been swept up in the meltdown of the subprime

market and experienced considerable writedowns."  *Id.* at *39-40.  The court

rejected this argument, holding that the complaint sufficiently pled loss causation

simply by alleging that "Paulson 'specified the parameters of the collateral to be

included in the initial reference portfolio; . . . proposed additional RMBS to be

included in the final reference portfolio; and vetoed specific RMBS that ACA proposed to be included in the final reference portfolio;'" and that "[a]s Goldman Sachs and Paulson intended from the outset . . . , Paulson's influential role in selecting the reference portfolio had a direct and adverse impact on the performance of every long position in [the CDO], including the Financial Guaranty." *Id.* at 41.  The court concluded that "it [cannot] be said, on this pre-answer motion to dismiss, 'that [the insurer's] losses were caused, as a matter of law, by the 2007 housing and credit crisis.'"  *Id.* at *42 (*quoting MBIA Ins. Co.*, 87 A.D.3d at 296).[4]

> b.    *Magnetar selected collateral that was much more likely to default than the collateral Putnam would have selected*

Although the fact that FGIC's losses were the intended and expected consequence of Putnam's fraud should suffice to allege loss causation, the SAC

---

[4]    In three recent decisions, the New York Appellate Division's First Department has sustained fraud claims involving similar allegations of fraudulent misconduct in the selection of CDO portfolios—two of which were controlled by Magnetar—and involving materially identical allegations of loss causation.  *See Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*, 115 A.D.3d 128, 980 N.Y.S.2d 21; *Loreley Fin. (Jersey) No. 28, Ltd. v Merrill Lynch, Pierce, Fenner & Smith Inc.*, 652732/11, 2014 N.Y. App. Div. LEXIS 3269, at *4-5, 985 N.Y.S.2d 499 (App. Div. 1st Dep't May 8, 2014); *Loreley Fin. (Jersey) No. 3 Ltd. v Citigroup Global Mkts. Inc.*, 650212/12, 2014 N.Y. App. Div. LEXIS 3300, at *3-4 (App. Div. 1st Dep't May 8, 2014).  Although the court did not expressly rule on the sufficiency of the loss causation pleadings in those cases, its silence on the issue while sustaining the fraud claims is telling—especially given that failure to plead loss causation was expressly asserted as a ground for dismissal in both *Basis Yield* and *Citigroup*.

contains extensive additional allegations confirming that Magnetar's adverse collateral selection, which Putnam misrepresented and concealed, caused "all or an ascertainable portion of" FGIC's losses. *Lentell*, 396 F.3d at 175.

To begin with, even without the benefit of discovery, FGIC has identified a substantial amount of Pyxis collateral that was selected by Magnetar and that was much more likely to default than assets Putnam would have selected acting independently. Most notably, Putnam's target portfolio for Pyxis included $145 million of prime RMBS that was subsequently replaced in the final portfolio by subprime RMBS—which are definitionally more likely to default than prime RMBS. A236, 247 (SAC ¶¶ 126-28, 157). The SAC alleges that the only plausible explanation for this "bait and switch"—to which long investors and FGIC were not alerted, and which was clearly contrary to their interests—is that Magnetar insisted on the switch to promote its shorting strategy. A236, 246-47 (SAC ¶¶ 126-28, 157). The SAC also alleges that $167 million of assets that FGIC was able to identify, even without discovery, as having been selected by Magnetar defaulted significantly faster (25% on average) than other assets in the Pyxis portfolio. A247-250 (SAC ¶¶ 158-60).

The district court rejected these allegations as insufficient on the ground that the SAC does not explain how the selection of significantly weaker assets in 10-11% of the Pyxis portfolio was sufficient to cause Pyxis to default. SPA28.

32

This holding is flawed for three reasons. *First*, the district court's assumption that Magnetar's adverse collateral selection could only harm FGIC if it caused a certain minimum level of losses to Pyxis is simply wrong. Because, as the SAC alleges, Pyxis' losses were sufficiently large to reach the "super senior" tranche and to impose liability on FGIC under the Pyxis Guaranty, A188, 208, 218 (SAC ¶¶ 12, 63, 88), every additional asset selected by Magnetar that caused loss to Pyxis incrementally *increased* the amount of FGIC's liability. In other words, every loss flowing to Pyxis from Magnetar-selected collateral increased the *severity* of the Pyxis default and added to FGIC's liability under the Pyxis Guaranty. Thus, FGIC can show that Putnam's fraud caused an ascertainable portion of its harm if it shows that Magnetar's adverse selection caused *any* Pyxis assets to fail and Pyxis to suffer *any* harm as a result.

*Second*, the SAC does not allege that the Magnetar-selected assets identified by FGIC to date comprise the *entire pool* of assets selected by Magnetar, as the district court wrongly assumes. SPA28. To the contrary, the SAC alleges that these assets are merely the specific assets "for which—*even without the benefit of discovery*—[FGIC] has clear evidence that Magnetar directed selection." A247-48 (SAC ¶ 158) (emphasis added). In fact, the SAC alleges that Magnetar controlled the *entire* collateral selection process, either by affirmatively selecting assets itself or by vetoing any assets it did not want in the portfolio.

33

A184-86, 189-90 (SAC ¶¶ 1, 4, 6, 18).  Without discovery, FGIC is neither able

nor required to identify with specificity the entire universe of assets that Putnam

allowed Magnetar to affirmatively select, because that information is peculiarly

within Putnam's possession and control.  *See Arista Records LLC v. Doe*, 604 F.3d

110, 120 (2d Cir. 2010) ("The *Twombly* plausibility standard . . . does not prevent a

plaintiff from pleading facts alleged 'upon information and belief' where the facts

are peculiarly within the possession and control of the defendant.")

(internal citations and quotation marks omitted).

*Third*, the question is not whether the Magnetar-selected collateral was the

exclusive cause of FGIC's losses, but simply whether it was "a substantial factor in

the sequence of responsible causation."  *First Nationwide*, 27 F.3d at 769 (internal

quotation omitted).  At a minimum, it is reasonable to infer that adverse selection

of a large portion of the Pyxis portfolio—which, as explained above, was likely

much more than 10-11% of the portfolio—was a "substantial factor" in causing

FGIC's losses, and the district court should therefore have drawn an inference to

that effect in FGIC's favor.  Instead, the district court improperly drew an

inference *against* FGIC on this question.  That was clear error.  *Holmes v.*

*Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (holding that on a motion to dismiss

the court must "construe [the] complaint liberally, accepting all factual allegations

in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor") (internal quotation marks omitted).

          c.    *Magnetar selected collateral that defaulted before the financial crisis*

In addition, the SAC alleges that $95.5 million of known Magnetar-selected assets defaulted before the events that precipitated the financial crisis and a market-wide decline in house prices even occurred—indeed, $63 million of these assets defaulted as early as 2007. A249-50 (SAC ¶ 160). Necessarily, therefore, these defaults could not have been caused by subsequent market-wide events but must have been caused by the assets' inherent defects.

The district court wrongly rejected this allegation, too, holding that it "does not promote an inference that the defaults were caused by anything other than marketwide events leading up to the market downturn in 2008." SPA29. Again, the district court failed to accept the allegations in the SAC as true and improperly drew an inference *against FGIC*—namely, that there were "marketwide events leading up to the market downturn" which were sufficient to cause these assets to default. SPA29. The SAC plausibly alleges the exact opposite, and that allegation must be taken as true for the purposes of this motion.

> d.  *Putnam could have selected collateral that would not have caused Pyxis to default*

As shown above, the SAC adequately alleges that Magnetar selected collateral for Pyxis that was sufficient to cause Pyxis to default and to cause FGIC's losses.  Nevertheless, the district court held that, even if that were true, FGIC's claims must still be dismissed because the SAC fails to allege that, in light of the marketwide downturn, "there are [a] set of assets Putnam could have selected that would have complied with the Pyxis eligibility requirements and constraints set forth in the Offering Memoranda [sic] and still would have avoided default."  SPA29.

To the contrary, that is precisely what the SAC alleges:

Had Putnam selected the Pyxis collateral itself, . . . Pyxis would not have defaulted as quickly as it did, and may well not have defaulted at all.  At a minimum, any losses incurred by Pyxis would have been substantially smaller than they were.  Thus FGIC's liability for losses incurred by Pyxis would either not have been incurred at all, or would have been substantially smaller.

A246 (SAC ¶ 154).[5]  Indeed, the very reason Magnetar insisted on controlling collateral selection was that it believed Putnam could select assets that would avoid

---

[5]  The district court ignored that FGIC can show loss causation by plausibly alleging that Pyxis defaulted *more quickly* as a result of Magnetar's adverse selection, because a faster default would have caused FGIC to lose the use of the money it was required to pay out under the Pyxis Guaranty months or years earlier.  *Schonfeld v. Hilliard*, 218 F.3d 164, 183 (2d Cir. 2000) ("Under New York law, the measure of damages for fraud is governed by the out-of-pocket rule which permits recovery for a plaintiff's reliance interest, *including damages incurred by*

a default.  Otherwise, Magnetar would simply have allowed Putnam to select the collateral, knowing that whatever assets it selected would cause a default.

That Putnam could have selected assets that would have not defaulted is further confirmed by the fact that, while all 26 of Magnetar's CDOs (including Pyxis) have defaulted—almost all before the end of 2008 [6] —a substantial proportion of comparable non-Magnetar CDOs have not done so. A246-47 (SAC ¶ 156).  As of December 2008, when Pyxis defaulted, 94% of Magnetar's 2006-vintage mezzanine CDOs had defaulted, while only 40% of non-Magnetar 2006-vintage mezzanine CDOs had done so.  *Id.*  Moreover, as of April 2012 (the most recent publicly available data), all of Magnetar's 2006-vintage mezzanine CDOs had defaulted, while only 72% of non-Magnetar vintage mezzanine CDOs had done so.  *Id.*  Again, exactly which assets Putnam would have selected acting independently, and how those assets would have performed, are matters that are peculiarly within Putnam's knowledge and cannot be established by FGIC without discovery, but, based on the above data, it is, at a

---

*passing up other business opportunities.*") (internal quotation marks omitted) (emphasis added); *Zeller v. Bogue Elec. Mfg. Corp.*, 476 F.2d 795, 803 (2d Cir. 1973) (corporation's loss of use of funds loaned to defendant a cognizable loss if plaintiff shows that "but for defendants' fraud, [the corporation] would have chosen to invest the monies in its own operations[,] and that [it] could have used the funds more profitably in its own business").

[6] The SAC alleges that Magnetar secretly and adversely controlled collateral selection for all of its CDOs.  A198-99, 230-33, 236-45 (SAC ¶¶ 36-43, 117-121, 129-150).

minimum, plausible that, as the SAC alleges, Putnam would have selected assets that would not have defaulted.

Nevertheless, the district court rejected these allegations as insufficient because "the SAC does not plead what exactly made the Magnetar and non-Magnetar CDOs comparable." SPA30. But, as the district court (inconsistently) acknowledged, the SAC "alleges that the CDOs compared have identical vintages and collateral classes." *Id.* However, even this was not sufficient for the district court, which went on to hold that "FGIC fails to allege any basis that vintage and collateral classes are more significant than any of other structural features [sic]." *Id.* Again, the district court improperly controverted FGIC's factual allegation that the non-Magnetar CDOs were comparable, and again it went so far as to draw an inference *against FGIC*—namely, that they were not comparable—despite FGIC's plausible and well-pleaded allegation to the contrary. That, too, was clear error.

In effect, the district court concluded that the SAC must be dismissed because FGIC has failed to exclude the possibility that its losses might have been caused by the financial crisis regardless of Putnam's fraud. But FGIC does not need to do this at the pleading stage. FGIC needs merely to allege facts plausibly supporting an inference that an ascertainable portion of its losses were caused by Magnetar's adverse collateral selection—which it has done. *See Lentell*, 396 F.3d at 174-75. Whether it may ultimately be shown that FGIC's losses were

proximately caused by marketwide events rather than Putnam's fraud "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Cap.,* 343 F.3d at 197; *see also Dexia*, 929 F. Supp. 2d at 243 ("*Lentell* does not place upon plaintiffs the heavy burden of pleading facts sufficient to exclude other non-fraud explanations.") (internal quotation marks omitted).

More fundamentally, the district court's holding ignores that the financial crisis that it assumes was the cause of FGIC's losses was itself caused *by precisely the type of misconduct in which Putnam engaged.* Thus, perversely, the district court's holding would allow Putnam and other RMBS defrauders to hide behind the very crisis *they created* in order to avoid liability for their fraud. Indeed, the district court's holding would insulate these actors from the consequences of their fraud precisely because their fraud was so pervasive and egregious that, collectively, it triggered a global financial crisis. That is contrary to common sense, and it is not the law. FGIC has sufficiently pled loss causation.

## II.   THE SECOND AMENDED COMPLAINT ADEQUATELY ALLEGES NEGLIGENT MISREPRESENTATION AND NEGLIGENCE

The district court's sole ground for dismissing FGIC's negligence-based claims—that the SAC fails to allege a "special relationship" or duty necessary to support these claims—is squarely refuted by this Court's decision in *Bayerische*.

In *Bayerische*, the plaintiff CDO investor was allegedly induced to purchase notes by the representations of the CDO's portfolio manager—made, like

Putnam's, both in marketing materials and in face-to-face meetings—that the manager's interests were aligned with the investor's and that the investor could rely on the manager's care and competence in managing the CDO's portfolio. *Id.* at 58-61. The manager moved to dismiss the plaintiff's claim for negligent misrepresentation on the ground that it did not adequately plead a special relationship. The Court denied the motion, holding that "[t]o meet [the] requirements [for a special relationship] . . . a plaintiff must establish that (1) the defendant had awareness that its work was to be used for a particular purpose; (2) there was reliance by a third party known to the defendant in furtherance of that purpose; and (3) there existed some conduct by the defendant linking it to that known third party evincing the defendant's understanding of the third party's reliance." *Id.* at 59 (citing *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 551, 483 N.E.2d 110, 118 (1985), *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922), and *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931) (Cardozo, C.J.)). The Court held that these requirements were met because the manager knew the investor relied on it to perform its obligations pursuant to the portfolio management agreement ("PMA")—equivalent to the collateral management agreement here—and the manager, like Putnam, actively helped to solicit the investor's investment by representing that it would

manage the CDO in the investor's favor, evincing an understanding and intent that the investor would rely on its performance.  *Id.* at 61.

This case is materially indistinguishable from *Bayerische*.  Although, as the district court noted, the investor in *Bayerische* was a third-party beneficiary of the PMA, SPA 34-35, a contractual relationship is not necessary for a special relationship.  Indeed, the Court in *Bayerische* expressly held that the manager's duty of care arose not out of the contract but "out of the independent characteristics of the relationship between [the investor] and [the collateral manager], and the circumstances under which [the investor] purchased the Notes linked to the Reference Portfolio that [the collateral manager], under the PMA, was to manage." *Bayerische*, 692 F.3d at 59; *see also Ossining Union Free School Dist. v. Anderson*, 73 N.Y.2d 417, 420-421, 539 N.E.2d 91, 92-93 (1989) (holding that parties need not be in privity of contract in order to have a special relationship for purposes of a negligent misrepresentation claim).  Similarly here, Putnam's duty of care arises out of contractually independent characteristics—namely, FGIC's reliance on Putnam's expertise and Putnam's knowledge and direct encouragement of such reliance.  A252-54 (SAC ¶¶ 175-80).

The district court's further holding that, "[i]n *Bayerische*, the investing relationship between Alladin [sic], the CDO marketer and manager, and Bayerische, a third-party notes holder [sic] was much closer in scope and shared

goals than the one a guarantor of a transaction has with a CDO manager," SPA 35, is both demonstrably wrong and contradicted by the well-pled allegations of the SAC. As the SAC alleges, FGIC's interests were directly aligned with those of long investors in FGIC: both were dependent on the performance of the Pyxis portfolio, and thus "for long investors—and for FGIC—nothing was more important than the competence and independence of the collateral manager—in this case, Putnam." A185 (SAC ¶ 2). Thus, just like the *Bayerische* investor, FGIC met face to face with Putnam and had follow-up phone calls with Putnam to confirm in detail precisely how Putnam would protect its interests with respect to Pyxis. A212-14 (SAC ¶¶ 76-78).

Nor was the district court correct in holding that certain disclaimers in the Pyxis offering materials preclude a special relationship—specifically, disclaimers advising investors not to rely on representations other than those made in the Offering Memorandum and to "rely on their own examination of the co-issuers and the terms of the offering," and further stating that Putnam was not acting in the capacity of a "fiduciary" or "financial advisor." SPA33. Materially identical disclaimers were contained in the *Bayerische* Offering Circular,[7] but they did not

---

[7] *See* A1233-34 ("In connection with the purchase of the Offered Notes . . . none of [certain enumerated parties, including the Collateral Manager] is acting as a fiduciary or financial or investment adviser for the purchaser;" "In connection with the purchase of the Offered Notes . . . the purchaser has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to

preclude the Court from holding that a special relationship had been adequately pled.[8]

Finally, contrary to the district court's holding, FGIC does not allege that a special relationship arose solely out of Putnam's "superior knowledge of the particulars of its own business practices." SPA36. Rather, FGIC alleges that such a relationship arose, as in *Bayerische*, out of FGIC's reliance, known and deliberately induced by Putnam through extensive meetings and communications, on Putnam's representations that it would employ its superior expertise in portfolio management in the interests of long investors and FGIC. Thus, a "special

---

the extent it has deemed necessary, and it has made its own investment decisions . . . based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by [the Collateral Manager];" "In connection with the purchase of the Offered Notes . . . the purchaser is not relying . . . upon any advice, counsel or representations [made by the Collateral Manager] other than in this Offering Circular for such Offered Notes and any representations expressly set forth in a written agreement with [the Collateral Manager].")

[8]   Moreover, Putnam's representations that it would "select and manage the Collateral" acting "with reasonable care and in good faith" were made, *inter alia*, in the Offering Memorandum, A217 (SAC ¶¶ 86-87), on which investors, including FGIC, were advised to rely by the very disclaimers to which Putnam draws attention.   Further, FGIC's extensive due diligence efforts, and the representations made by Putnam in the course of those efforts, A211-15 (SAC ¶¶ 73-80), were exactly the sort of "examination" that investors were urged to rely on by those same disclaimers.

relationship" is adequately alleged here, and FGIC's negligence-based claims are

properly pled.[9]

---

[9]  The cases relied on by the district court, SPA33, are inapposite.  Unlike the plaintiffs in *M&T Bank Corp. v. Gemstone CDO VII Ltd.,* 68 A.D.3d 1747, 891 N.Y.S.2d 578 (App. Div. 4th Dep't 2009) and *Landesbank Baden-Württemberg v. Goldman, Sachs* & Co., 821 F. Supp. 2d 616 (S.D.N.Y. 2011), FGIC did not enter into a "typical arms-length business transaction" with Putnam, but rather repeatedly met and communicated with Putnam to receive assurances that it could rely on its expertise in managing Pyxis and to determine precisely how Putnam intended to exercise that expertise. Moreover, in *Landesbank* the plaintiff alleged that the defendant misrepresented the quality of the CDO's portfolio, not, as here, *who selected* the portfolio.  The court found no special relationship because the contents of the CDO's portfolio were fully disclosed in public filings, and thus the fraud was discoverable by the plaintiff through "means of verification . . . available to it." *Id.*  By contrast, FGIC could not have known from public filings or any other source that Putnam would, directly contrary to its representations, secretly cede control over collateral selection to a third party with interests adverse to FGIC's.

## **CONCLUSION**

The district court's judgment should be reversed.

Dated:  New York, New York          Respectfully submitted,
          July 2, 2014

                                    QUINN EMANUEL URQUHART &
                                    SULLIVAN, LLP

                                    By:    /s/        Peter E. Calamari
                                           Peter E. Calamari
                                           (petercalamari@quinnemanuel.com)
                                           Sean P. Baldwin
                                           (seanbaldwin@quinnemanuel.com)

                                           51 Madison Avenue, 22nd Floor
                                           New York, New York  10010
                                           (212) 849-7000

                                           *Attorneys for Plaintiff-Appellant*
                                           *Financial Guaranty Insurance*
                                           *Company*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Certificate of Compliance with Type-Volume Limitation, Typeface
Requirements and Type Style Limitations

1.      This brief complies with Fed. R. App. P. 32(a)(7)(B)(i), because it contains 10,955 words (according to the Microsoft Word 2007 word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.


/s/      Peter  E. Calamari                              _____7/2/2014_____ _

*Attorney for Plaintiff-Appellant*                              Date

# SPECIAL APPENDIX

## TABLE OF CONTENTS

PAGE

Opinion re Motion to Dismiss Second Amended Complaint,
dated April 28, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SPA-1

Clerk's Judgment Appealed From, dated April 28, 2014 . . . . . . . . . . . . .  SPA-38

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

FINANCIAL GUARANTY INSURANCE COMPANY,

                       Plaintiff,

  - against -

THE PUTNAM ADVISORY COMPANY, LLC

                     Defendant.

----------------------------------------X

12 Civ. 7372 (RWS)

OPINION



A P P E A R A N C E S:

    <u>Attorneys for the Plaintiff</u>

    QUINN EMANUEL URQUHART & SULLIVAN, LLP
    51 Madison Avenue, 22nd Floor
    New York, New York 10010
    By:  Peter E. Calamari, Esq.
         A. William Urquhart, Esq.
         Sean Baldwin, Esq.
         Paul P. Hughes, Esq.

    <u>Attorneys for the Defendant</u>

    MILBANK, TWEED, HADLEY & MCCOY LLP
    1 Chase Manhattan Plaza
    New York, New York 10005
    By:  James N. Benedict, Esq.
         Sean M. Murphy, Esq.
         Thomas A. Arena, Esq.
         Robert C. Hora, Esq.

**Sweet, D.J.**

The Defendant Putnam Advisory Company, LLC ("Putnam" or "Defendant") has moved to dismiss the Second Amended Complaint ("SAC") filed by Plaintiff Financial Guaranty Insurance Company ("FGIC" or "Plaintiff") alleging (1) fraud, (2) negligent misrepresentation, and (3) negligence pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. Based on the conclusions set forth below, Defendant's motion is granted.

## I.   Prior Proceedings

On October 1, 2012, FGIC filed a complaint against Putnam in which it asserted causes of action for fraud, negligent misrepresentation and negligence. FGIC subsequently filed an amended complaint ("AC") that asserted the same claims, and Defendant moved to dismiss. Defendant's motion to dismiss the AC was granted on September 10, 2013, with leave to replead within 20 days. *See Financial Guar. Ins. Co. v. Putnam Advisory Co.*, No. 12 Civ. 7372, 2013 WL 5230818 (S.D.N.Y. Sept. 10, 2013) ("*FGIC I*"). FGIC filed the SAC on September 30, 2013, again alleging fraud, negligent misrepresentation and negligence.

1

The instant motion was heard and marked fully submitted on November 20, 2013.

## II. <u>Allegations of the SAC</u>

The following facts, assumed to be true, are taken from the SAC:

The allegations of the SAC arises out of Putnam's alleged misrepresentation of the management of a Collateralized Debt Obligation ("CDO") called Pyxis ABS CDO 2006-1 ("Pyxis") to FGIC, which provided a financial guaranty insurance policy to Pyxis (the "Pyxis Guaranty"). Plaintiff alleges that Putnam fraudulently misrepresented it, and it alone, would select the collateral for Pyxis and that it would do so acting independently and in good faith in the interests of long investors (*i.e.*, investors for profit when the investment performs as designed and succeeds). Plaintiff alleges that Putnam made these misrepresentations to induce Plaintiff to insure $900 million of credit protection on Pyxis, which ensured that Pyxis would close, but that Putnam did not select the Pyxis collateral independently or in good faith. Instead, Plaintiff alleges that Putnam allowed the collateral selection process to be controlled by Magnetar Capital LLC ("Magnetar"), a hedge fund

manager with short investments on Pyxis (*i.e.*, investments that would pay off if Pyxis defaulted).

CDO's are special purchase financial vehicles that purchases, or assumes the risk of, a portfolio of assets ("portfolio"), such as bonds or loans, and issues securities. They take cash flow-generating assets and repackaged them into tranches that can be sold to investors. A CDO's portfolio can include a variety of assets, such as commercial or residential mortgage-backed securities ("CMBS" and "RMBS," respectively), securities issued by other CDOs or credit default swaps ("CDS") referencing those types of obligations. The pooled assets in the portfolio are essential debt obligations that serve as collateral for the CDO. Ideally, the assets that form the CDO portfolio generate a stream of cash flows (*e.g.*, from mortgage payments) that the CDO uses to pay its expenses and make interest and principal payments to the CDO's note holders. Any remaining cash flows go to the CDO's equity investors, if there are any. Whether a CDO's issued securities will be repaid in full depends primarily on the CDO's structure and the credit quality (and subsequent performance) of the portfolio of assets in the CDO. Thus, for a CDO comprised primarily of RMBS, CDO noteholders will be more likely to receive promised payments of interest and principal if the rate of collection on the

underlying individual mortgages is high.  The higher the credit quality of the mortgages in the portfolio, the more likely payments to the CDO note holders will be made.  (SAC ¶ 25).

       To buy their portfolio of assets, CDOs raise money from investors by issuing multiple classes of notes and equity interests.  A CDO's notes are not necessarily all subject to the same level of risk.  Rather, CDO notes are issued in "tranches" representing different levels of risk (and therefore potential reward).  This is achieved by creating a hierarchical structure of note holders in the CDO.  The senior tranche of a CDO typically receives the highest "AAA" rating.  "Super senior" CDO tranches, which are intended to be even more remote from loss, are senior to another tranche that is also rated AAA. Because the most senior tranches receive proceeds from the CDO portfolio first, they bear the lowest risk of sustaining losses in the CDO structure.  (*Id.* ¶ 26).

       Correspondingly, CDO notes do not all offer the same level of anticipated return to their purchasers.  The interest on CDO notes is set according to their expected level of risk. More junior tranches generally offer higher interest, but are exposed to a higher risk of shortfalls, because their position in the CDO structure exposes them to losses in the portfolio

before the more senior notes.  The more senior tranches, on the other hand, receive lower investment returns because they benefit from greater subordination and thus carry lower risk. (*Id.* ¶ 27).

*The Pyxis CDO*

Pyxis was designed to be a "managed CDO," whereby the assets for the CDO were to be selected by a collateral manager, and the composition of the portfolio may change from time to time. (*Id.* ¶ 29).  Managing a CDO portfolio typically involves, among other things, selecting the assets for inclusion in the initial portfolio, monitoring the credit status of the individual underlying assets, reinvesting payment proceeds from maturing underlying assets and making substitutions in the portfolio of assets (*i.e.*, buying and selling assets) to the extent consistent with the CDO's operative agreements.  A collateral manager, therefore, can greatly impact a CDO's performance and either lower or raise its risk profile. (*Id.*).

Pyxis was a "hybrid" CDO: its $1.5 billion portfolio (the "Pyxis Portfolio") included both "cash" and "synthetic" underlying assets.  (SAC ¶ 44).  Approximately 23% (or $350 million par value) of the assets in Pyxis was comprised of

"cash" assets, that is, investments that Pyxis actually purchased. The remaining 77% (or $1.15 billion par value) of the Pyxis Portfolio was comprised of "synthetic" assets, which are assets created through credit default swaps that referenced other asset-backed securities not actually owned by Pyxis.[1] (Id.). In these credit default swaps, Pyxis sold credit protection to counterparties in exchange for premium payments. The performance of these securities would thus determine the returns (or losses) to Pyxis under the credit default swaps. If the assets performed well, Pyxis would enjoy the premium payments without having to make any credit protection payments. However, if the assets performed badly, then Pyxis would have to make credit protection payments to the credit default swap counterparty, potentially up to the full notional amount of the referenced obligation. (Id.).

Pyxis took the risk that the securities would not perform through selling protection to Calyon Corporate and

---

[1] Credit default swaps are commonly used forms of credit protection (similar to credit insurance) in which, in return for the payment of premiums by one party (the "buyer" of credit protection), the counterparty (the "seller" of credit protection) agrees to make payments upon the occurrence of one or more agreed upon "Credit Events" (as defined in the CDS transaction documents), generally including, without limitation, a default by the issuer of a specified security to pay when due the principal of or interest on that security. (SAC ¶ 35). In general, the buyer of credit protection has a "short" position with respect to the specified security, since it will be entitled to a payment if the specified security defaults. Conversely, the seller—and through the seller, the guarantor—of credit protection has a "long" position with respect to the specified security, since it bears the risk of default by the issuer on the specified security. (Id.).

6

Investment Bank ("Calyon"). (*Id.* ¶ 45). Calyon performed the role of credit protection buyer, in that it paid the premiums to Pyxis under the credit default swap in exchange for protection payments in the event that one or more Credit Events occurred on any of the Portfolio assets. For most of the specified assets, Calyon represented that it acted only as an intermediary, meaning that the ultimate short positions were held by other market participants whose identity was never disclosed. This was achieved through a series of "back to back hedging transactions" between Calyon and other counterparties. (*Id.*). In this way, Calyon effectively acted as a conduit for parties willing to take a short position on particular assets, with Pyxis acting as the "long" investor. Payments under the credit default swaps would flow between Pyxis and the ultimate short counterparty via Calyon; if the referenced assets performed well, Pyxis would simply receive its premium, which was paid by the short counterparty to Calyon and then passed from Calyon to Pyxis (with Calyon keeping a portion of the premium for itself). If the referenced assets performed badly, Pyxis would be obligated to make loss payments that would ultimately flow to the short party via Calyon. (*Id.*).

*Magnetar*

7

Magnetar was founded in 2005. From its launch in 2005 through 2007, Magnetar grew 500% in terms of assets under management, from approximately $1.5 billion under management to approximately $9 billion. (SAC ¶ 36). Plaintiff alleges that this growth occurred largely from profits from Magnetar's shorting scheme: Magnetar would facilitate the creation of CDOs with portfolios of RMBS and CDO securities ultimately backed by RMBS. Magnetar then shorted those very same CDOs, generally by means of credit default swaps, and netted substantial profits when they defaulted. (*Id.*)

In early 2006, as default rates on subprime mortgages in the United States began to rise, Magnetar began to bet heavily against securities backed by subprime mortgages. (*Id.* ¶ 37). It did so by shorting subprime RMBS and RMBS CDOs through the use of credit default swaps. Under the credit default swaps Magnetar entered, if one or more Credit Events occurred on any of the underlying RMBS and RMBS CDOs, Magnetar would receive payments under the credit default swaps. (*Id.*).

During this period, Magnetar found it increasingly difficult to buy large amounts of credit default swap protection on subprime RMBS CDO tranches, because there were not many investors willing to take the most risky, equity stakes in CDOs.

8

(*Id.* ¶ 38).    Plaintiff alleges that to solve this problem, Magnetar worked secretly with a number of collateral managers to launch a series of CDOs which were designed by Magnetar to allow it to take short positions on billions of dollars of subprime mortgage bonds at below-market costs.  (*Id.*).  Magnetar served as the equity investor for these CDOs, making it possible to procure investors willing to take long positions in the CDOs. (*Id.*).  In return, Magnetar had control of the composition of the assets within the CDOs.  (*Id.*).  Magnetar's short position to its equity position was often 6-to-1 or even higher, meaning that when a Magnetar CDO failed, the payoff on Magnetar's short positions was at least six times the amount of Magnetar's equity investment in the CDO.  (*Id.* ¶ 42).


*Pyxis and Magnetar*


Putnam acted as the putative collateral manager on Pyxis. For its role as collateral manager, Putnam was to receive a fixed (or "senior") fee of fifteen basis points, or 0.15% of the outstanding principal of the Pyxis CDO per year. Because of the size of Pyxis, which, like all Constellation CDOs, was far larger than a typical CDO (with an initial deal volume of $1.5 billion), Putnam's fixed fee would be $2.25 million for the first year.  (*Id.* ¶ 46).  Plaintiff alleges that Putnam's fixed

9

fee of 15 basis points (0.15%) was higher than the fixed fee paid to the collateral manager in all but three of Magnetar's 26 CDOs, and higher than the total fee, including both fixed and incentive fees, on all but six of Magnetar's CDOs. (*Id.*). In addition to its fixed fee, Putnam was also to receive an additional "incentive" (or "subordinated") fee of five basis points, amounting to $0.75 million for the first year. (*Id.* ¶ 47). Payment of this fee was dependent not on Pyxis performing well, but rather on Magnetar receiving its target return, which in turn was effectively guaranteed by certain provisions favoring the equity investors in the Pyxis governing documents. (*Id.*). The fee structure allowed Putnam to receive its fixed and subordinated fees long after Pyxis began to fail. (*Id.* ¶ 48). The SAC alleges that Putnam was motivated to cooperate with Magnetar on Pyxis because Putnam saw Magnetar as the key to entering the structure finance CDO market. (*Id.* ¶ 51). Indeed, Putnam was selected to serve as collateral manager for a second Pyxis CDO, Pyxis ABS CDO 2007-1 ("Pyxis 2"), which closed just a few months after Pyxis. (*Id.*).

The equity ("Preference Shares") and the lowest tranche of notes ("Class X Subordinated Notes") issued by Pyxis were held equally by Magnetar and Deutsche Bank. (SAC ¶ 53). Although the Preference Shares had a nominal value of $82.5

10

million, Magnetar and Deutsche Bank bought them at a 75% discount, for a total payment of $20.625 million. (*Id.*) In addition, Magnetar and Deutsche Bank paid a total of $61.875 million for their Class X Subordinated Notes, meaning that they each paid a total of $41.25 million for the shares and notes they held in Pyxis. (*Id.*).

Pyxis, like Magnetar's other CDOs, was structured in such a way that, as long as it avoided default, the preference shares and Class X notes would receive much larger payments of principal and interest than the senior notes during the first five years of its existence, by which time they would both be fully paid out—and they would receive a large portion of their investment back within just over a year if Pyxis avoided default for that long, which it did. (*Id.* ¶ 54). This structure could only be altered with the consent of the preference shareholders: Magnetar and Deutsche Bank. (*Id.*). Thus, the typical CDO triggers which would have redirected funds away from the holdings of Magnetar and Deutsche Bank to senior note holders in the event of certain events reflecting deterioration in the performance of the portfolio were removed, and Magnetar's risks and eventual losses, despite owning the equity and lowest (usually most risky) tranche of notes in Pyxis, were lower than those of senior note holders. (*Id.*). Magnetar also received an

upfront payment as a rebate to the purchase price of long positions taken by the Magnetar funds. For Pyxis, this was $4.5 million. (*Id.* ¶ 55).

Overall, Magnetar's long position on Pyxis by the time Pyxis defaulted was approximate $21 million. (*Id.* ¶ 56). In comparison, Magnetar's short position on the CDOs in which it invested averaged approximately 7% of the aggregate assets of those CDOs. This amounts to, by estimate, a total of $105 million short position on Pyxis. (*Id.* ¶ 57). Magnetar also bought other protection on Pyxis from dealers who wished to offset their exposure; the protection amounted to a total of $60 million. (*Id.* ¶ 58).

*Putnam's Representations To FGIC*

In July 2006, Putnam, with Calyon, began marketing Pyxis. As with all CDOs, the financial success of Pyxis was totally dependent upon the performance of the underlying collateral. In early July 2006, Calyon contacted FGIC to solicit credit protection for the Pyxis CDO. Calyon represented that the CDO would be managed by Putnam, who would select its portfolio acting independently and in good faith in the best interests of the investors. (SAC ¶ 62). Under the deal Calyon

**SPA-14**

presented to FGIC, FGIC was to insure all payments owed by its wholly-owned subsidiary FGIC Credit Products LLC under a credit default swap which would provide credit protection on the $900 million Super Senior Pyxis tranche. (*Id.* ¶ 63). The closing of the Pyxis CDO required FGIC or another investor to provide this insurance. (*Id.* ¶ 64).

To induce FGIC to issue the Pyxis Guaranty, Putnam represented to FGIC that it was an experienced and reputable collateral manager and that it would select the assets for the Pyxis Portfolio diligently and independently in the interest of long-term investors. (*Id.* ¶¶ 65-71). Putnam also initially represented that the "target portfolio" for Pyxis would include at least $60 million of prime RMBS assets. (*Id.* ¶ 72). Prime RMBS assets are RMBS in which the underlying loans are made to "prime" borrowers, that is, those with high credit scores and other characteristics indicating a high likelihood of repayment of the loan. Mid-prime and subprime RMBS, by contrast, consist of loans made to higher risk borrowers.

Documents provided by Putnam to FGIC, such as the Pyxis Pitchbook and Offering Memorandum, contained extensive representations that Putnam would select the Pyxis portfolio and described Putnam's duties, strategy and "long-term investment"

13

goals in doing so.   (*Id.* ¶¶ 66-72, 86-87).  Putnam made similar written and oral representations to FGIC in the course of FGIC's extensive due diligence for Pyxis.  (*Id.* ¶¶ 73-74, 76-78).

On August 3, 2006, as part of FGIC's due diligence, Putnam and FGIC met face-to-face.  (*Id.* ¶ 77).   During this meeting, Putnam, led by Carl Bell, represented that Putnam, and Putnam alone, would select and manage the assets in the Pyxis Portfolio.   (*Id.* ¶ 77).   Putnam also made affirmed to FGIC during this meeting Putnam's experience, independence and integrity.   (*Id.*).   In a follow-up due diligence call with FGIC, Putnam again made clear that it would select and manage the assets for Pyxis, and that it had considerable experience in the RMBS market, particularly in the market for subprime RMBS, of which the Pyxis Portfolio would primarily be composed.   (*Id.* ¶ 78).

On August 9, 2006, Putnam provided an updated target portfolio that purported to show the final target portfolio for Pyxis for FGIC's review and analysis.  (*Id.* ¶ 79).   This target portfolio showed that at least $145 million of the Pyxis Portfolio would be prime RMBS assets, almost two and a half times the amount of such assets previously slated for the portfolio.  (*Id.* ¶ 79).   There were no prime assets in the final

portfolio.  (*Id.* ¶ 75).


        FGIC would ultimately provide the Pyxis Guaranty.  The Pyxis Guaranty insured payment of all obligations owed by FGIC's wholly-owned subsidiary, FGIC Credit Products LLC, under a CDS referencing Pyxis (the "Pyxis Swap").  (*Id.* ¶ 8).  Under the Pyxis Swap, in return for Calyon's payment of premiums, FGIC Credit Products LLC agreed that, if Pyxis defaulted, it would make all the payments owed by Calyon on its underlying swap with Pyxis.  (*Id.*).


*Magnetar's Control Of Putnam And Pyxis*


        The SAC alleges that Putnam's representations to FGIC as to its independence were false.  Plaintiff's allegations as to Magnetar's control over Pyxis include the following:


- Magnetar selected Putnam to act as the collateral manager for Pyxis.  (SAC ¶ 91).

- Magnetar was actually in control over the Pyxis asset selection process, and Magnetar used Pyxis as a vehicle for its short strategy.  (*Id.* ¶¶ 91-92).  According to the testimony of Carl Bell (Head of Investments at Putnam), Jim Prusko (Magnetar executive) approached Bell to ask if Putnam would act as the collateral manager for Pyxis. Prusko used to work for Putnam and supervised Bell while he was at the company.  Prusko made clear to Bell that Pyxis would have a hybrid structure focused on "subordinate . . . BBB rated residential bonds."  (*Id.* ¶ 92).

15

- Prusko and Michael Henriques (Deutsche Bank, Magnetar's co-equity investor on Pyxis) discussed Magnetar's CDO shorting strategy with Bell. (*Id.* ¶¶ 93-95, 99-101, 110, 115, 130, 145).

- Prusko insisted that Putnam would "have to play ball" on Pyxis, and executed a "behind the scenes" side letter giving Magnetar and Deutsche Bank "veto rights over any" collateral purchased for Pyxis. (*Id.* ¶¶ 93, 95).

- Prusko and Bell had numerous communications in which Prusko made clear which collateral he wanted to include in the Pyxis portfolio. Prusko told Bell that Magnetar would "source the CDO exposure synthetically" and that "[w]e will buy CDO CDS on names of your choosing." Prusko further told Alex Rekeda (Calyon) that he did not want Putnam "buying CDO's without us knowing about it," and that he thought Putnam was "on the same page with us buying the cdo cds [sic]." (*Id.* ¶¶ 91-93, 95-107, 120).

- Prusko, Bell and other Putnam employees had communications in which Prusko made clear Magnetar's intention to short tens of millions of dollars of the collateral he was selecting for Pyxis. In one communication, Prusko suggested to Bell that Putnam increase the synthetic portion of Pyxis, which would allow Magnetar to short more of the assets in Pyxis. (*Id.* ¶ 98). Prusko explained: "It's very hard to get off sizable CDO CDS trades unless they're done against a deal, and this is a natural delta hedge against our equity." Bell replied: "Got it. So when we find a deal we want to buy, we shouldn't put in an order with the syndicate desk but have Calyon broker a synthetic trade between you and [Pyxis] at an agreed upon level?" Prusko responded: "That would be preferable ...." (*Id.* ¶ 98; *see also id.* ¶¶ 91-93, 98-99, 109).

- Bell and Rekeda discussed the importance of concealing Magnetar's involvement in Pyxis. As Rekeda explained: "any time a manager is trying to negotiate a structure, while mentioning the equity investor, it immediately raises a redflag . . . . we should try to offer [the investor] some other rationale rather than interests [sic] of the junior investors." (*Id.* ¶ 113).

- Magnetar selected Putnam to act as collateral manager for Pyxis 2 due to its satisfaction with Putnam's cooperation on Pyxis. (*Id.* ¶¶ 51, 91, 112).

16

- After Pyxis defaulted, Bell joked with Prusko about how much money Magnetar had made from its short-selling strategy. (*Id.* ¶ 115).


Putnam's investments in the Pyxis CDOs itself were allegedly suspicious:


- Putnam invested over half of Pyxis' cash allocated to CDO investments in four other Magnetar CDOs, even though there were 223 ABS CDOs issued in 2006 alone from which Putnam could have selected. (*Id.* ¶ 117).

- There was a high correlation between the issuers of securities included in Pyxis' portfolio and the issuers of securities included in other Constellation CDOs. 55% of the referenced RMBS or CDOs in the Pyxis Portfolio were included in at least five other Magnetar CODs, and 28% of referenced RMBS or CDOs were included in at least ten other Magnetar CDOs. (*Id.* ¶ 121). There were over 1,000 RMBS and 500 ABS CDOs issued in 2005-2007. (*Id.*). Economic consultants retained by Plaintiff concluded that the probability of this happening by chance was less than 1 in a billion. (*Id.* ¶ 122).

- Putnam concealed the extent to which Pyxis sold protection on the ABX Index of low-rated RMBS. The ABS Index is an independent benchmark designed to measure the overall value of mortgages made to borrowers with subprime or weak credit. Magnetar pushed Putnam to push the limit represented to Pyxis investors on investment in the ABX Index to a level more than three times the specified concentration limit. This led to a greater concentration of risk on a small number of transactions and worked in favor of Magnetar's short investments. (*Id.* ¶ 123).


Plaintiff alleges that both Putnam and Magnetar believed that the assets Magnetar selected for Pyxis would be more likely to default than the assets Putnam would have

17

selected had it acted independently. (*Id.* ¶ 155). Moreover, Magnetar's CDOs defaulted in greater numbers, and defaulted more quickly, than comparable CDOs. (*Id.* ¶156).

On April 30, 2008, the credit rating of the tranche of Pyxis notes that FGIC had insured (the "Super Senior Tranche") was downgraded from AAA to C. Ultimately, Pyxis defaulted and FGIC incurred potential liability of up to $900 million under the Pyxis Guaranty. (*Id.* ¶ 152).

## III. Discussion

### A.   *The Applicable Standard*

Putnam has moved to dismiss FGIC's claims of fraud, negligent misrepresentation and negligence pursuant to Rule 12(b)(6) and, to the extent applicable, Rule 9(b) and the PSLRA. On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *County of Suffolk, N.Y. v. First Am. Real Estate*

*Solutions*, 261 F.3d 179, 187 (2d Cir. 2001) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995), *cert. denied*, 519 U.S. 808, 117 S. Ct. 50, 136 L. Ed. 2d 14 (1996)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). This is not intended to be an onerous burden, as plaintiffs need only allege facts sufficient in order to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

For claims that sound in fraud, the complaint "must satisfy the heightened pleading requirements set forth in Rule 9(b), as well as the pleading standard mandated by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)." *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir.2012). Under Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state when and where

19

the statements were made, and (4) explain why the statements were fraudulent." *Id.* (quoting *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir. 2004)) (quotation marks omitted).  Under the PSLRA, a plaintiff must (1) "specify each misleading statement," (2) "set forth facts on which a belief that a statement is misleading was formed," and (3) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (*quoting Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 345 (2005)) (quotation marks and brackets omitted).


B.    *The SAC Has Failed To State A Claim For Fraud*


As previously noted in *FGIC I*, to state a claim for fraud under New York law, a plaintiff must allege "a material misrepresentation of fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." *FGIC I*, 2013 WL 5230818, at *2 (quoting *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 979 (N.Y. 2009)).  "[L]oss causation is an element of New York common law fraud action." *Gordon Partners v. Blumenthal*, 293 Fed. App'x 815, 818 (2d Cir. 2008) (citing *Laub v. Faessel*, 745 N.Y.S.2d 534, 536 (3d Dep't 2002)).  To adequately allege loss causation, a plaintiff "must plead facts that indicate that the information

concealed by the defendant['s] misrepresentations was the reason the transaction turned out to be a losing one." *Dexia SA/NV v. Bear, Stearns & Co., Inc.,* No. 12 Civ. 4761(JSR), 2013 WL 856499, at *8 (S.D.N.Y. Feb. 27, 2013) (quoting *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir. 1994)) (quotation marks omitted).

Reraising an argument it previously made, FGIC contends that it is not required to allege loss causation under New York common law and Insurance Law § 3105, which entitles an insurer to "avoid any contract of insurance or defeat recovery thereunder" if it was induced to enter into an insurance contract by a material misrepresentation of fact. *See* N.Y. Ins. Law § 3105(b); *see also MBIA Ins. Co v. Countrywide Home Loans Inc.,* 936 N.Y.S.2d 513, 523-24 (N.Y. Sup. Ct. 2012) ("*MBIA I*"). FGIC contends § 3105(b) entitles an insurer to recover "payments made to an insurance policy without resort to rescission" and without proof of loss causation. *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* 105 A.D.3d 412, 412 (1st Dep't 2013) ("*MBIA II*") (affirming lower court's holding that "pursuant to Insurance Law §§ 3105 and 3106, plaintiff was not required to establish causation in order to prevail on its fraud and breach of contract claims"); *see also MBIA I,* 936 N.Y.S.2d at 523-24 ("It is without basis in case law to require [the plaintiff] to

21

provide a causal link between the alleged misrepresentations and [the losses suffered by the plaintiff].").

*FGIC I* previously held that the law on fraud in the inducement of an insurance contract and *MBIA I* was inapplicable because Putnam "did not apply for any insurance, nor did it enter into any sort of contract—insurance-related or otherwise— with FGIC." 2013 WL 5230818, at *4. FGIC contends that § 3105 is nevertheless applicable because it applies not only to misrepresentations made by the applicant for insurance or the insured, but also to misrepresentations made "by the authority of" the applicant or the insured. *See* N.Y. Ins. Law § 3105(a) (defining "representation" as "a statement as to past or present fact, made to the insurer by, or by the authority of, the applicant for insurance or the prospective insured").

Calyon was the applicant for insurance and the insured under the Pyxis Guaranty. (SAC ¶¶ 2, 7, 62-63, 88). Putnam was neither a party to the Pyxis Guaranty nor a party to Calyon's swap with FGIC's subsidiary. Putnam's alleged misrepresentations thus must be made "by the authority of" Calyon for § 3105 to apply. To act "by the authority of" Calyon, Putnam must have acted as Calyon's agent under New York law. *See Falcon Crest Diamonds, Inc. v. Dixon*, 655 N.Y.S. 2d

232, 236 (N.Y. Sup. Ct. 1996) (construing "by the authority of" to mean that "a party may make a material representation through a broker"). "Courts in this District have required that facts establishing agency be pled with Rule 9 particularity where the agency relationship itself was an integral element of the alleged fraud." *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 111 n.6 (S.D.N.Y. 2009) (citing *Kolbeck v. LIT Am., Inc.*, 923 F. Supp. 557, 569 (S.D.N.Y. 1996)); *see also Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 121 (E.D.N.Y. 2011) (if a purported agency relationship "is an integral element of an alleged fraud, courts have required the facts establishing agency be pled with Rule 9(b) particularity"). The SAC alleges no facts to support an inference that Putnam acted as Calyon's agent or broker in obtaining the Pyxis Guaranty or when it made its representations to FGIC. FGIC contends that "most of Putnam's [alleged] misrepresentations were made in offering materials . . . which, in turn, were prepared by Calyon and were presented by Calyon to FGIC" (Opp. at 12), but the SAC does not allege that Calyon directed Putnam's statements in the offering materials regarding the Pyxis Guaranty. Instead, as FGIC concedes, the materials were "prepared by Calyon" and "presented by Calyon to FGIC." (*Id.*). As such, the SAC does not allege sufficient facts for an inference that Putnam was acting "by the authority" of Calyon when it made its statements in the offering materials or to

23

FGIC.

In any event, § 3105 contemplates two situations: (i) where an insurer seeks to "avoid any contract of insurance," that is, to rescind the contract, or (ii) seeks to "defeat recovery thereunder." N.Y. Ins. Law § 3105. New York common law "is never abrogated by implication" and "must be held no further changed than the clear import of the language used in a statute absolutely requires." N.Y. Stat. Law § 301, cmt. 2 (McKinney 2013). Neither situation proposed in § 3105 is present here. Rescission is available only where the parties are in privity of contract. *See, e.g., Ins. Co. of Penn. v. Park & Pollard Co.*, 180 N.Y.S. 143 (1st Dep't 1920). FGIC has no contract with Putnam, and rescission is not available here.[2] Similarly, FGIC cannot "defeat recovery" under the Pyxis Guaranty by bringing suit against Putnam, as Putnam is not a party to the Guaranty. Consequently, § 3105 is inapplicable here.

Turning to loss causation, the SAC has not sufficiently pled that Magnetar's alleged control of the collateral selection process for Pyxis caused FGIC's losses, as

---

[2] FGIC contends that where a plaintiff seeks rescission, the link between the misrepresentation and the loss ultimately suffered is irrelevant, thus loss causation need not be pled here because FGIC seeks rescissory relief. However, as noted, rescission is not available here.

opposed to the global financial crisis. Allegations of loss causation are not subject to the heightened pleading standard of Rule 9(b); they need merely to satisfy the notice pleading standard in Rule 8(a), under which "a short and plain statement . . . that provides defendants with some indication of the loss and the causal connection that the plaintiff has in mind" will suffice. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)); *In re Bear Stearns Co., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 488 (S.D.N.Y. 2011) (same); *see also In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F.Supp.2d 148, 163 (S.D.N.Y. 2008) (noting that there is no heightened standard for pleading loss causation). For pleading purposes, loss causation exists "if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 173 (2d Cir. 2005).

     When a loss occurs around the time of a marketwide economic collapse, loss causation issues are difficult.

     "[W]hen the plaintiff's loss coincides with a
     marketwide phenomenon causing comparable losses to
     other investors, the prospect that the plaintiff's

> loss was caused by the fraud decreases," and the
> plaintiff's claim fails when "it has not adequately
> ple[]d facts which, if proven, would show that its
> loss was caused by the alleged misstatements as
> opposed to intervening events."

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005). To plead loss causation in the backdrop of a marketwide downturn, the complaint must allege facts that support "an inference that . . . plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Id.* at 175; *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (under Rule 8(a), a plaintiff need only allege "facts that would allow a fact-finder to ascribe some rough proportion of the whole loss to [defendants'] misstatements"). Therefore, to state a claim, the SAC must allege that Putnam's misstatements regarding its independence or omissions regarding Magnetar's involvement in Pyxis caused some proportion of the loss suffered by FGIC.

The SAC alleges loss causation with the following alleged facts: First, compared to non-Magentar CDOs, Magnetar CDOs defaulted in greater numbers, and defaulted more quickly than comparable CDOs. (SAC ¶ 156). Second, certain assets selected by Magnetar for Pyxis were significantly more likely to default than assets that Putnam would have selected acting

26

independently, namely that $145 million prime RMBS in the original target portfolio was swapped with $145 subprime RMBS. (*Id.* ¶ 157). Third, the assets in the Pyxis Portfolio alleged to have been selected by Magnetar defaulted more quickly than other assets in the Pyxis portfolio. (*Id.* ¶¶ 158-60). Fourth, $95.5 million of known Magnetar-selected assets defaulted before the events that precipitated the financial crisis. These allegations, taken together, do not allow for an inference of loss causation.

As an initial matter, the SAC does not allege how Magnetar's selection of assets in the Pyxis Portfolio caused Pyxis to default, the event that would trigger the Pyxis Guaranty and FGIC's loss. (*Id.* ¶ 8). The pool of assets alleged to be controlled by Magnetar represented roughly 11% of the $1.5 billion collateral pool, and the SAC does not allege how the selection of safer assets in this 11% pool would have prevented a default. Similarly, the SAC alleges that $145 million of prime RMBS was swapped with $145 million of subprime RMBS, but this represents only 10% of the portfolio. Putnam also represented to FGIC in the due diligence process that the Pyxis Portfolio would be composed primarily of subprime RMBS.

In addition, the SAC does not allege that but for

Magnetar's override of Putnam's collateral management responsibilities, Putnam would have selected other assets that would have performed better than those in the Pyxis collateral pool. Even though Putnam's original target portfolio for Pyxis included a substantial amount of prime RMBS that was swapped for subprime RMBS, the SAC does not make any allegation that there are any set of assets Putnam could have selected that would have complied with the Pyxis eligibility requirements and constraints set forth in the Offering Memoranda and still would have avoided default. Similarly, FGIC's allegation that $95.5 million of known Magnetar-selected assets defaulted before the events that precipitated the financial crisis does not promote an inference that the defaults were caused by anything other than marketwide events leading up to the market downturn in 2008. Even if the Magnetar-selected assets in the Pyxis portfolio defaulted more quickly than other assets, there is nothing in the SAC that alleges that this 11% of the portfolio defaulting 4.2 months ahead of the remaining Pyxis assets was sufficient to cause Pyxis to default ahead of any market-wide downturn or isolates Pyxis' default in any reasonable manner from the market downturn.

The SAC provides a comparison that shows that compared to non-Magnetar CDOs, Magnetar CDOs defaulted in greater

numbers, and defaulted much more quickly, than comparable CDOs. (SAC ¶ 156). As of December 2008, when Pyxis defaulted, 94% of Magnetar's 2006-vintage mezzanine CDOs had defaulted, while only 40% of non-Magnetar 2006-vintage mezzanine CDOs had done so. As of April 2012, all 18 of Magnetar's 2006-vintage mezzanine CDOs had defaulted while only 72% of 2006-vintage non-Magnetar mezzanine CDOs had defaulted. However, this comparison does not necessarily lead to an inference that Putnam's misrepresentation caused FGIC's losses. The comparison itself is problematic, as the SAC does not plead what exactly made the Magnetar and non-Magnetar CDOs comparable, including whether the alleged Magnetar CDOs or comparable CDOs had the same asset eligibility criteria, payment waterfall, trigger structure or other features of Pyxis. FGIC alleges that the CDOs compared have identical vintages and collateral classes, but FGIC fails to allege any basis that vintage and collateral classes are more significant than any of other structural features. FGIC further fails to show how the Magnetar CDOs and the hundreds of non-Magnetar CDOs issued during 2006 could have had identical collateral classes and can be compared with each other given that they likely all included different sets of RMBS and CDOs as collateral, and the SAC does not provide any link as to this comparison and to the Pyxis Portfolio and its default.

As with the AC, FGIC has not provided the SAC with any alleged facts sufficient to infer that there was any pool of collateral that could have avoided default while still conforming to Pyxis' detailed eligibility criteria. *See FGIC I*, 2013 WL 5230818, at *3 (citing *Lentell*, 396 F.3d at 174). Since only Pyxis' default would trigger the loss to FGIC, the SAC has failed to "allege[ ] facts that would allow a factfinder to ascribe some rough proportion of the whole loss to the . . . misstatements," rather than external market forces. *City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 715 (S.D.N.Y. 2013) (quoting *Lentell*, 396 F.3d at 174). Accordingly, the SAC has failed to plead loss causation, and FGIC's fraud claim must be dismissed.

    C.   *The SAC Has Failed To State A Claim For Negligence Or Negligent Misrepresentation*

In granting Putnam's prior Motion to Dismiss, *FGIC I* held that to prevail on FGIC's claims for negligence or negligent misrepresentation, FGIC must allege facts showing that the relationship between FGIC and Putnam was "sufficiently close as to approach that of privity'" since it was undisputed that "there is no actual privity between the parties." *FGIC I*, 2013 WL 5230818, at *4 (quoting *Anschutz Corp. v. Merrill Lynch &*

30

*Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012)).

As in its opposition to the previous Motion to Dismiss, FGIC contends that a "special relationship" was formed between Putnam and FGIC as delineated in *Bayerische Landesbank, New York Branch v. Aladdin Capital Management LLC*, 692 F.3d 42 (2d Cir. 2012). The SAC provides new allegations regarding this special relationship, including references to a meeting at Putnam's offices and phone interviews between Putnam and FGIC. The SAC also alleges that "FGIC sought and received directly from Putnam representations and assurances to the effect that Putnam would exercise its professional expertise to manage and independently select the collateral for the Pyxis Portfolio." (SAC ¶ 180). These representations were made "directly to FGIC on August 3, 2006, August 7, 2006, and on other occasions," as well as in "the Pitchbook, Offering Memorandum, Term Sheet, and Collateral Management Agreement." (*Id.*). The SAC alleges that FGIC relied on the assurances, which "created a 'special relationship' of trust and confidence between Putnam and FGIC." (*Id.* ¶ 181).

As an initial matter, the documents upon which FGIC relied expressly disclaim any creation of a special duty. "[T]he Pyxis Pitchbook . . . expressly stated that "[n]one of

31

. . . the Putnam Advisory Company, LLC . . . , or any of their respective affiliates are acting as a financial advisor nor in [a] fiduciary capacity [i]n respect of the transaction to any investor . . . ." *FGIC I*, 2013 WL 5230818, at *4 n.3). Similarly, the "Presentation for Investors" for Pyxis, dated July 2006 and cited in the SAC (SAC ¶¶ 68-18), states that "[n]one of . . . the Putnam Advisory Company, LLC . . . , or any of their respective affiliates are acting as financial adviser nor in [a] fiduciary capacity . . . to any investor . . . ." (Hora Decl. Ex. 4 at 2). The Pyxis Offering Memorandum states that "investors must rely on their own examination of the co-issuers and the terms of the offering, including the merits and risks involved." (*Id.* Ex. 1 at iii). Such disclosures preclude any claim of a direct fiduciary or similar duty. *See, e.g.*, *M&T Bank Corp. v. Gemstone CDO VIL Ltd.*, 68 A.D.3d 1747, 1749 (4th Dep't 2009) (dismissing negligent misrepresentation claim against CDO collateral manager where "'Preliminary Offering Circular' and 'Debt Investor Presentation' . . . contained numerous disclaimers and advised plaintiff to perform its own due diligence"); *Landesbank BadenWiirttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 624 (S.D.N.Y. 2011) (dismissing negligent misrepresentation claim where "the [Offering] Circular expressly disclaimed any special relationship").

FGIC contends that a special relationship was still formed, notwithstanding this language in the documents, as similar language was contained in the *Bayerische* offering circular but the *Bayerische* court still held that a "legal duty" arose between the third-party beneficiary of notes and the notes issuer. *Id.* at 59.

As previously noted in *FGIC I*, in *Bayerische*, the plaintiff, Bayerische Landesbank ("BL") had purchased notes sold by a CDO (the "Alladin CDO") that was structured, marketed and managed by defendant Alladin. 692 F.3d at 46. In ignoring the disclaimer language and finding a legal duty between BL and Alladin, *Bayerische* emphasized the totality of representations and circumstances the issuer made to the third-party notes purchaser, including the issuer's marketing materials, face-to-face meetings with the issuer and statements made by the issuer, which were enough to conclude that a sufficiently close relationship had developed between Bayerische and Alladin. *Id.* at 59. Notably, the Portfolio Management Agreement in *Bayerische* had an "end and aim" to install Aladdin as the manager of the portfolio on behalf of the noteholders and Bayerische. *Id.* at 60.

Unlike in *Bayerische*, FGIC was the guarantor of the

third-party swap between Calyon and a FGIC subsidiary and not a direct third-party beneficiary. Section 20 of the Collateral Management Agreement identified the third-party beneficiaries thereunder, and does not name FGIC. (Hora Decl. Ex. 2 at § 20). While FGIC's participation was critical to the closing of the transaction (SAC ¶ 64), the "end and aim" of Pyxis was not for FGIC's benefit. In *Bayerische*, the investing relationship between Alladin, the CDO marketer and manager, and Bayerische, a third-party notes holder was much closer in scope and shared goals than the one a guarantor of a transaction has with a CDO manager. FGIC's benefit was not the "end and aim of the transaction," *Credit Alliance*, 65 N.Y.2d at 549, 493 N.Y.S.2d 435, 483 N.E.2d 110 (emphasis omitted) (quoting *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922)), and FGIC has not alleged sufficient facts to demonstrate how FGIC, as a guarantor, could have a relationship with Putnam that can be "'so close as to approach that of privity, if not completely one with it.'" *Bayerische*, 692 F.3d at 60 (quoting *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 550, 493 N.Y.S.2d 435, 483 N.E.2d 110 (N.Y. 1985)).

FGIC contends that a special relationship did arise from FGIC's known reliance on Putnam's representations that it would employ its superior knowledge of the interests of long

34

investors. However, as previously noted in *FGIC I*, Putnam's superior knowledge and reliance by FGIC does not create the requisite special relationship. *FGIC I*, 2013 WL 5230818, at *4; *see also MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 297 (1st Dep't 2011) (finding that "[t]he claim that [the defendant] had superior knowledge of the particulars of its own business practices is insufficient to sustain [a] cause of action [for negligent misrepresentation]" where the plaintiff "ha[d] failed to allege facts showing that these sophisticated commercial entities engaged in anything more than an arm's length business transaction"); *Sebastian Holdings, Inc. v. Deutsche Bank AG*, 78 A.D.3d 446, 447 (1st Dep't 2010) ("[The plaintiff]'s alleged reliance on defendant's superior knowledge and expertise . . . ignores the reality that the parties engaged in arm's-length transactions pursuant to contracts between sophisticated business entities that do not give rise to [the type of] fiduciary duties [necessary to support a negligent misrepresentation claim]"). To increase the scope of the "orbit of duty" a defendant owes to include any party who relied upon a defendant and the defendant's superior knowledge where no privity exists between the party and the defendant would significantly broaden the scope of liability under "special relationship" cases, a factor the Circuit Court warned against in *Bayerische*. *Bayerische*, 692 F.3d at 59 ("[I]n the absence of

35

privity, the scope of the 'orbit of duty' to third parties must be carefully examined 'to limit the legal consequences of wrongs to a controllable degree and . . . protect against crushing exposure to liability.'" (quoting *Strauss v. Belle Realty Co.,* 65 N.Y.2d 399, 402, 492 N.Y.S.2d 555, 482 N.E.2d 34 (N.Y. 1985))). Accordingly, a "special relationship" has not been established based on the allegations contained in the SAC, and FGIC has failed to allege facts sufficient to state a claim for negligence or negligent misrepresentation.

## IV.   Conclusion

Based on the conclusions set forth above, the Defendant's motion to dismiss the SAC is granted and the SAC is dismissed.

It is so ordered.

New York, NY
April *28* , 2014

_____
ROBERT W. SWEET

SPA-38

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

FINANCIAL GUARANTY INSURANCE
COMPANY,

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED  4/28/2014

                                        Plaintiff,              12 **CIVIL** 7372 (KBF)

            -against-                                           **JUDGMENT**

THE PUTNAM ADVISORY COMPANY, LLC,

                                        Defendant.

---------------------------------------------------------------X


Whereas Defendant having moved to dismiss the Second Amended Complaint ("SAC")

pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure (Doc. # 23) on

October 15, 2013, and the matter having come before the Honorable Robert W. Sweet, United

States District Judge, and the Court, on April 18, 2014, having rendered its Opinion (Doc. # 33),

granting Defendant's motion, and dismissing the SAC, it is,

**ORDERED, ADJUDGED AND DECREED:**  That for the reasons stated in

the Court's Opinion dated April 28, 2014 (Doc. # 33), the Defendant's motion to dismiss the SAC

is granted and the SAC is dismissed.


**DATED:**  New York, New York
            April 28, 2014


                                        **RUBY J. KRAJICK**
                                        _____
                                        **Clerk of Court**
                              **BY:**
                                        _____
                                        **Deputy Clerk**