# 14-1673-cv

## United States Court of Appeals

*for the*

## Second Circuit

FINANCIAL GUARANTY INSURANCE COMPANY,

*Plaintiff-Appellant,*

– v. –

PUTNAM ADVISORY COMPANY, LLC,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

MILBANK, TWEED, HADLEY
  & MCCLOY LLP
SEAN M. MURPHY
THOMAS A. ARENA
ROBERT C. HORA
IAN E. BROWNING
*Attorneys for Defendant-Appellee*
One Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

## CORPORATE DISCLOSURE STATEMENT

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellee The Putnam Advisory Company, LLC hereby states as follows:

Defendant-Appellee is a wholly-owned indirect subsidiary of Putnam Investments, LLC, all of whose voting shares are owned by Great-West Lifeco U.S. Inc., which in turn is a wholly-owned indirect subsidiary of Great-West Lifeco Inc., a Canadian corporation whose shares are publicly traded on the Toronto Stock Exchange.

Great-West Lifeco Inc. is a majority-owned subsidiary of Power Financial Corporation, which is also a Canadian corporation whose shares are publicly traded on the Toronto Stock Exchange.  Power Financial Corporation is a majority-owned subsidiary of Power Corporation of Canada, which is also a Canadian corporation whose shares are publicly traded on the Toronto Stock Exchange.  Voting control of a majority of the voting shares of Power Corporation of Canada is held by The Desmarais Family Residuary Trust.

# Table of Contents

CORPORATE DISCLOSURE STATEMENT ................................................ i

TABLE OF AUTHORITIES ......................................................................... iv

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF THE ISSUES .................................................................... 6

STATEMENT OF THE CASE ........................................................................ 7

STATEMENT OF FACTS .............................................................................. 9

STANDARD OF REVIEW ........................................................................... 16

SUMMARY OF THE ARGUMENT ........................................................... 17

ARGUMENT .................................................................................................. 18

I.      FGIC LACKS STANDING TO PURSUE THIS APPEAL .............. 18

II.     THE DISTRICT COURT PROPERLY HELD THAT FGIC'S
        CLAIMS FAIL TO PLEAD LOSS CAUSATION ........................... 21

        A.      FGIC's Argument That It Is Relieved From Pleading Loss
                Causation Because It Seeks Rescission Is Meritless ............... 21

        B.      New York Insurance Law Does Not Relieve FGIC Of Its
                Burden To Plead Loss Causation ............................................ 25

        C.      FGIC's Allegations Of Loss Causation Are Deficient ........... 28

                1.      The Applicable Pleading Standard ............................... 29

                2.      The SAC Did Not Adequately Plead Loss Causation
                        Under Either Rule 9(b) Or Rule 8(a) ........................... 30

III.    FGIC'S FRAUD CLAIMS SHOULD BE DISMISSED ON
        GROUNDS NOT REACHED BY THE DISTRICT COURT ......... 37

        A.      The SAC Failed To Allege A Strong Inference Of Scienter ... 37

                1.      The SAC Failed To Allege A Plausible Motive For
                        Putnam's Participation In The Alleged Fraud .............. 37

                2.      The SAC Failed To Allege Circumstantial Evidence Of
                        Conscious Misbehavior Or Recklessness ..................... 43

        B.      FGIC Failed To Plead An Actionable Misrepresentation Or
                Omission .................................................................................. 48

1.      FGIC Failed To Allege Any Misrepresentations
        Regarding Putnam's Role ............................................... 48

2.      FGIC Failed To Plead A Misrepresentation Concerning
        The Composition Of The Pyxis Portfolio ...................... 51

3.      FGIC Failed To Plead A Misrepresentation Or Omission
        As To The Identity Of Any Short Counterparty ............ 54

IV.     THE DISTRICT COURT PROPERLY HELD THAT THE SAC
        FAILED TO STATE A CLAIM FOR NEGLIGENT
        MISREPRESENTATION OR NEGLIGENCE ................................ 56

CONCLUSION .......................................................................... 64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*,
    951 N.Y.S.2d 84 (Sup. Ct. 2012)............................................................ 31

*Alki, Partners, L.P. v. Windhorst*,
    472 F. App'x 7 (2d Cir. 2012) ................................................................ 42

*Anschutz Corp. v. Merrill Lynch & Co.*,
    690 F.3d 98 (2d Cir. 2012) .................................................................... 56

*APWU v. Potter*,
    343 F.3d 619 (2d Cir. 2003) .................................................................. 19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).......................................................................... 16, 17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) .................................................................... 17

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp.*,
    980 N.Y.S.2d 21 (App. Div. 2014).................................................... 22, 36

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*,
    692 F.3d 42 (2d Cir. 2012) ............................................................ 58, 59, 62

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................. 16

*Citibank, N.A. v. K-H Corp.*,
    968 F.2d 1489 (2d Cir. 1992) ................................................................ 31

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013).......................................................................... 20

*Cohen v. Stevanovich*,
    722 F. Supp. 2d 416 (S.D.N.Y. 2010) .................................................... 41

*Cooper v. U.S. Postal Serv.*,
  577 F.3d 479 (2d Cir. 2009) ..................................................... 19

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)................................................................. 18

*Dexia SA/NV v. Bear, Stearns & Co.*,
  929 F. Supp. 2d 231 (S.D.N.Y. 2013) ...................................... 29

*Dornberger v. Metro. Life Ins. Co.*,
  961 F. Supp. 506 (S.D.N.Y. 1997) ........................................... 23

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005)................................................................. 30

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v.*
  *JPMorgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ..................................................... 50

*Emigrant Bank v. UBS Real Estate Sec., Inc.*,
  854 N.Y.S.2d 39 (App Div. 2008)............................................. 61

*Epirus Capital Mgmt., LLC v. Citigroup Inc.*,
  No. 09 Civ. 2594 (SHS), 2010 U.S. Dist. LEXIS 42200
  (S.D.N.Y. Apr. 28, 2010) ......................................................... 52

*Eurycleia Partners, LP v. Seward & Kissel, LLP*,
  12 N.Y.3d 553 (N.Y. 2009) ..................................................... 17

*Falcon Crest Diamonds*, Inc. v. Dixon, 655 N.Y.S.2d 232, 236
  (Sup. Ct. 1996)......................................................................... 27

*Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*,
  No. 09 Civ. 4050, 2010 WL 3790810 (S.D.N.Y. Sept. 28,
  2010) ........................................................................................ 29

*Gordon v. Burr*,
  506 F.2d 1080 (2d Cir. 1974) ............................................ 24, 25

*Graham Packaging Co., L.P. v. Owens-Illinois, Inc.*,
  892 N.Y.S.2d 1 ........................................................................ 55

*Griffel v. Belfer*,
      248 N.Y.S.2d 940 (App. Div. 1964)....................................................... 22

*HSH Nordbank AG v. UBS AG*,
      941 N.Y.S.2d 59 (App. Div. 2012)............................................. 53, 57, 58

*HSH Nordbank, AG v. UBS AG*,
      No. 600562/08, 2008 N.Y. Misc. LEXIS 10416 (Sup. Ct.
      Oct. 21, 2008) ...................................................................................... 62

*Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*,
      445 F. App'x 368 (2d Cir. 2011) ............................................................ 43

*Janus Capital Grp., Inc. v. First Derivative Traders*,
      131 S. Ct. 2296 (2011)............................................................................ 52

*Kalnit v. Eichler*,
      264 F.3d 131 (2d Cir. 2001) ................................................................... 43

*Katyle v. Penn Nat'l Gaming, Inc.*,
      637 F.3d 462 (4th Cir. 2011) .................................................................. 30

*Landesbank Baden-Württemberg v. Goldman, Sachs & Co.*,
      478 F. App'x 679 (2d Cir. 2012) ............................................................ 38

*Landesbank Baden-Württemberg v. Goldman, Sachs & Co.*,
      821 F. Supp. 2d 616 (S.D.N.Y. 2011) .................................................... 57

*Laub v. Faessel*,
      745 N.Y.S.2d 534 (App. Div. 2002)....................................................... 31

*Lentell v. Merrill Lynch & Co.*,
      396 F.3d 161 (2d Cir. 2005) ................................................................... 29

*Lerner v. Fleet Bank, N.A.*,
      459 F.3d 273 (2d Cir. 2006) ................................................................... 17

*Lipsky v. Commonwealth United Corp.*,
      551 F.2d 887 (2d Cir. 1976) ................................................................... 43

*Loreley Fin. (Jersey) No. 3 Ltd. v. Citigroup Global Mkts. Inc.*,
      987 N.Y.S.2d 299 (App. Div. 2014)....................................................... 36

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    No. 12 Civ. 3723, 2013 WL 1294668 (S.D.N.Y. Mar. 28,
    2013) ............................................................................................. *passim*

*Loreley Fin. (Jersey) No. 4 Ltd. v. UBS Ltd.*,
    978 N.Y.S.2d 615 (Sup. Ct. 2013) .......................................... 23

*Loreley Fin. (Jersey) No. 7 Ltd. v. Credit Agricole & Inv. Bank*,
    Index No. 650673/2010, slip op. (N.Y. Sup. Ct. June 9,
    2011) ....................................................................................... 46

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) .................................................. 30

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................ 19, 21

*M&T Bank Corp. v. Gemstone CDO VII, Ltd.*,
    891 N.Y.S.2d 578 (App. Div. 2009) ................................ 57, 61

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
    928 N.Y.S.2d 229 (App. Div. 2011) ....................................... 62

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
    963 N.Y.S.2d 21 (App. Div. 2013) ......................................... 28

*McNally Wellman Co. v. New York State Elec. & Gas Corp.*,
    63 F.3d 1188 (2d Cir. 1995) .................................................. 37

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2009) ............................................................... 19

*Mott v. Tri-Continental Fin. Corp.*,
    330 F.2d 468 (2d Cir. 1964) .................................................. 23

*Paese v. Hartford Life & Accident Ins. Co.*,
    449 F.3d 435 (2d Cir. 2006) .................................................. 25

*Permasteelisa, S.p.A. v. Lincolnshire Mgmt., Inc.*,
    793 N.Y.S.2d 16 (App. Div. 2005) ......................................... 55

*Postler & Jaeckle Corp. v. Cnty. of Monroe Indus. Dev.
    Agency*,
    582 N.Y.S.2d 328 (Sup. Ct. 1992) ........................................ 27

*Rosado v. China N.E. Petroleum Holdings, Ltd.*,
   692 F.3d 34 (2d Cir. 2012) ........................................................ 30

*Rudman v. Cowles Commc'ns*,
   30 N.Y.2d 1 (N.Y. 1972) .......................................................... 22

*Sebastian Holdings, Inc. v. Deutsche Bank AG*,
   912 N.Y.S.2d 13 (App. Div. 2010)............................................. 62

*Shipping Fin. Servs. Corp. v. Drakos*,
   140 F.3d 129 (2d Cir. 1998) ..................................................... 19

*Stewart v. Jackson & Nash*,
   976 F.2d 86 (2d Cir. 1992) ....................................................... 56

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)................................................................. 20

*Taylor v. Bernanke*,
   No. 13-CV-1013, 2013 U.S. Dist. LEXIS 128533 (E.D.N.Y.
   Sept. 9, 2013) ......................................................................... 21

*Travelers Cas. & Sur. Co. v. Dormitory Auth.*,
   734 F. Supp. 2d 368 (S.D.N.Y. 2010) ........................................ 56

*United States v. Hays*,
   515 U.S. 737 (1995)................................................................. 19

*Water St. Leasehold LLC v. Deloitte & Touche LLP*,
   796 N.Y.S.2d 598 (App. Div. 2005)........................................... 62

*Woods v. Maytag Co.*,
   807 F. Supp. 2d 112 (E.D.N.Y. 2011) ........................................ 27

**Statutes/Rules**

Fed. R. Civ. P. 9(b) ...................................................................... 30

N.Y. Stat. Law § 301, cmt. 2 (McKinney 2013) ............................ 26

N.Y. Ins. Law § 3105................................................................... 26

# PRELIMINARY STATEMENT[1]

Plaintiff-Appellant, Financial Guaranty Insurance Company ("FGIC"), alleges it guaranteed its wholly-owned subsidiary's obligations under a credit default swap tied to the performance of a collateralized debt obligation called the Pyxis ABS CDO 2006-1 ("Pyxis" or the "Pyxis CDO"). FGIC was not a noteholder of the Pyxis CDO. FGIC did not enter into any contracts with the Pyxis CDO or with Defendant-Appellee Putnam Advisory Company, LLC ("Putnam"), and it was not a party to the credit default swap ("CDS") between its subsidiary and Calyon (f/k/a "Crédit Agricole Corporate and Investment Bank"). Neither FGIC's subsidiary nor Calyon are parties to this lawsuit.

Putnam was not the sponsor, underwriter or structurer of Pyxis; the underwriter was Calyon. Calyon, not Putnam, was responsible for the vast bulk of the offering documents sent to prospective investors. Instead, as the Pyxis collateral manager, Putnam was responsible for selecting collateral assets that complied with detailed Eligibility Criteria and Collateral Quality Tests set forth in the Pyxis Offering Memorandum.

---

[1] Citations to the Joint Appendix take the form "A__." Citations to FGIC's Brief take the form "Br. at __."

Claiming that Pyxis's default exposed it to "potential liability" under the guaranty to its subsidiary (the "Guaranty"), FGIC alleged a broad scheme to defraud involving the Pyxis CDO and asserted it would never have entered into the Guaranty but for Putnam's purported fraudulent inducement. FGIC alleged that Putnam intentionally selected "toxic assets" for inclusion in Pyxis's collateral portfolio for the express purpose of causing the $1.5 billion CDO to fail. According to the Second Amended Complaint ("SAC"), Putnam engaged in this conduct, not to enrich itself, but to enable a third party, Magnetar Capital LLC ("Magnetar"), to reap hundreds of millions of dollars on short positions referencing those same "toxic assets." Just as FGIC did not sue Calyon, FGIC did not sue Magnetar, the Pyxis equity investor FGIC alleges secretly controlled the collateral selection process.

The District Court (Sweet, J.) properly dismissed FGIC's state law claims for failure to plead loss causation. Specifically, the District Court held that FGIC had failed plausibly to plead how its alleged losses were the direct result of the purported fraud as opposed to the intervening financial crisis that wiped out virtually all CDO investments based on subprime mortgages. The District Court further held that FGIC had failed to allege Putnam could have selected any pool of collateral assets meeting the

2

restrictions imposed by the Offering Memorandum that would have prevented Pyxis from defaulting.  The District Court also dismissed FGIC's claims for negligent misrepresentation and for negligence on the separate ground that FGIC had failed to allege the existence of a special relationship of trust and confidence between Putnam and FGIC, which was neither a Pyxis noteholder nor in contractual privity with Putnam.

FGIC's claims fail for several additional grounds this Court may consider on appeal.  First, each of FGIC's claims is subject to dismissal because FGIC cannot satisfy Constitutional standing requirements.  FGIC failed to allege an actual "injury in fact."  FGIC alleged only that the 2008 default of Pyxis exposed it to "potential liability" under the Guaranty.  FGIC did not allege the terms of the Guaranty.  It did not allege that Calyon or any other party made any demands for payment on the CDS allegedly secured by the Guaranty.  And, most significantly, FGIC did not allege it had made any payments pursuant to the Guaranty.

FGIC's fraud claim was also subject to dismissal for failure to plead scienter.  FGIC argued that Putnam's alleged desire to earn "high" collateral manager fees was sufficient to establish its scienter to engage in a billion dollar fraud.  But the allegations of the SAC showed that Putnam's fees were well below the normal rate of a CDO collateral manager.  Further,

3

a significant portion of Putnam's fees were subordinated to the payments owed by Pyxis to noteholders; if Pyxis defaulted and could not pay all of the noteholders, Putnam would not receive its subordinated fee. Finally, all of Putnam's fees were to be calculated on the basis of a monthly portfolio asset amount that excluded defaulted securities in the collateral pool. In other words, if any of the CDO's collateral assets failed, Putnam would not receive its fee with respect to that particular security; the more collateral assets that failed, the smaller the fee Putnam would and did receive. FGIC failed to plead scienter.

The SAC also failed to allege a material misrepresentation or omission by Putnam, which was not responsible for the vast majority of information in the Offering Memorandum or other materials distributed to investors. Even if Putnam bore such responsibility, the Offering Memorandum did not contain any misrepresentations. It described at length the composition of the securities that would be collateralizing the CDO (the vast majority of which were subprime and mid-prime residential mortgage-backed securities ("RMBS")), the relatively low credit rating of these securities, and all pertinent structural features of the CDO. The Offering Memorandum also disclosed that more than 75% of the portfolio, with a value well in excess of $1 billion, would consist of CDS and that third

4

parties would be taking the short position on those securities.  FGIC did not allege that any of these CDS failed to meet the terms of the CDO or that it was denied an opportunity to inspect the portfolio prior to issuing its Guaranty.  Finally, although FGIC alleged that Putnam should have disclosed that Magnetar was taking a short position against the CDO itself, it did not allege that Putnam knew the overall size of these positions or that Putnam knew that Magnetar was "net short" with respect to the Pyxis CDO or that Magnetar's short trades were anything other than an ordinary hedging strategy.

## STATEMENT OF THE ISSUES

The District Court dismissed FGIC's fraud claim for failure to plead loss causation. The Court also dismissed FGIC's negligent misrepresentation and negligence claims for failure to plead a duty owed by Putnam to FGIC. In addition, numerous other grounds exist for affirming the District Court's judgment. *See infra* at Section III.

1.    Did the District Court correctly hold that FGIC failed to plead the required element of loss causation because the SAC did not sufficiently allege that any losses suffered by FGIC were caused by any material misrepresentations or omissions by Putnam, as opposed to the contemporaneous, market-wide downturn in RMBS?

2.    Did the District Court properly dismiss FGIC's negligence and negligent misrepresentation claims on the ground that FGIC had failed to plead facts sufficient to demonstrate a "special relationship" of trust and confidence with Putnam?

3.    Did the District Court have jurisdiction over this action in light of FGIC's failure to allege that it suffered an injury in fact?

4.    Should the District Court's dismissal of FGIC's fraud claim be affirmed on the ground that FGIC failed to plead that Putnam had acted with scienter?

6

5.      Should the District Court's dismissal of FGIC's fraud claim be affirmed on the ground that FGIC failed to plead that Putnam had made any actionable material misrepresentations or omissions?

<u>**STATEMENT OF THE CASE**</u>

In October 2006 FGIC allegedly issued the Guaranty, which insured the obligations of its subsidiary, FGIC Credit Products LLC, under a CDS referencing the Pyxis CDO. (*See* A187.) Putnam was not a party to either the CDS or the Guaranty. Although FGIC alleged it "incurred potential liability of up to $900 million" under the Guaranty as a consequence of Pyxis's default (*see* A188), it did not allege that its subsidiary made any payments to Calyon on the underlying CDS or that FGIC made any payments to Calyon (or to FGIC's subsidiary) on the Guaranty. Nor did FGIC allege the specific terms of the Guaranty or the conditions under which it would be required to honor any obligations owed by its subsidiary to Calyon.

The Pyxis CDO, like virtually all other CDOs collateralized by subprime RMBS, was downgraded and subsequently defaulted during the financial crisis in 2008. (*See* A175.) FGIC waited until October 1, 2012, to file this action. FGIC named as a defendant only Putnam, the collateral manager of the Pyxis CDO. FGIC did not assert claims against either

7

Calyon, the arranger and underwriter of the CDO, or Magnetar, an equity investor on whose behalf Putnam allegedly engaged in the purported $1.5 billion fraud.

On November 16, 2012, before Putnam had filed a responsive pleading to the initial complaint, FGIC filed the Amended Complaint. On December 21, 2012, Putnam moved to dismiss the Amended Complaint under Rules 12(b)(6) and 9(b). On September 10, 2013, following oral argument, the District Court dismissed the Amended Complaint in its entirety, but granted FGIC leave to replead.

On September 30, 2013, FGIC filed the SAC. On October 15, 2013, Putnam moved to dismiss the SAC under Rules 12(b)(6) and 9(b). Putnam included with its motion several documents quoted in the SAC or incorporated by reference, including the Pyxis Offering Memorandum, the Pyxis Indenture, and a marketing book referred to as the "Investor Presentation." Putnam also included several emails discussed in the SAC which FGIC alleged supported its claims. Although some of the emails involved Putnam employees, many did not copy any Putnam representatives, but were communications involving non-parties Calyon, Magnetar, and Deutsche Bank, the other equity investor in the Pyxis CDO.

On April 28, 2014, the District Court dismissed the SAC in its entirety. It dismissed FGIC's fraud claim based on FGIC's failure to plead loss causation and FGIC's negligence-based claims based on FGIC's failure to plead a special relationship of trust and confidence. The District Court entered judgment for Putnam, dismissed the SAC with prejudice, and closed the case. This appeal followed.

## STATEMENT OF FACTS

### A.    The Pyxis ABS CDO 2006-1

The Pyxis CDO, like CDOs in general, was an investment vehicle that raised money by issuing debt obligations to investors in the form of notes. Pyxis acquired a portfolio of asset-backed securities and other assets as collateral. (A269.)

As a managed CDO, Pyxis had a collateral manager—Putnam—which selected and managed the portfolio of assets on behalf of the CDO. The income generated from the collateral assets was used to pay principal and interest on the CDO's notes. (*See* A191-92.) The rights to the cash flow from the collateral assets were determined by the seniority of the notes, with the higher-rated classes (or "tranches") of notes receiving payments before the lower-rated tranches. (*See* A192.) Pyxis also issued a non-rated "equity" tranche, which received payments only after the notes

received their full payments from the returns on the collateral assets. (A191-92.) Because they are paid last and are subordinated, equity tranche investors bear the first risk of loss if the collateral assets deteriorate. (A193.)

The various notes and the equity tranches were offered for sale in a private placement to "Qualified Institutional Buyers" under Rule 144A of the Securities Act of 1933. (A269.) Accordingly, the purchasers were sophisticated institutional investors deemed capable of evaluating the transaction based on the disclosures in the offering documents. The Pyxis Offering Memorandum expressly warned that each investor must rely on its "own examination of the Co-Issuers and the terms of the offering, including the merits and risks involved." (A271.) By purchasing notes, investors were deemed to have agreed that they "had access to such financial and other information concerning the Issuer and the Offered Securities as [they have] deemed necessary to make [their] own independent decision to purchase Offered Securities[.]" (A498-99.)

Pyxis was a "hybrid" CDO, which meant that its $1.5 billion collateral portfolio included both "cash" and "synthetic" assets. (A199.) As fully disclosed in the Offering Memorandum, approximately 23% of the Pyxis portfolio was comprised of "cash" assets—that is, RMBS bonds, CDO notes, and other securities purchased by Pyxis. (*Id.*) The remaining roughly

77% (or $1.15 billion par value) of the portfolio was comprised of "synthetic" assets, created through CDS referencing RMBS bonds, CDO notes, and other securities not actually owned by Pyxis. (A199-200.) As FGIC clearly understood, under a CDS, the Pyxis CDO assumed the credit risk of the reference obligation—the underlying RMBS or CDO—by taking the "long" position that the reference obligation would increase in value. The counterparty to the CDS would take the "short" position that the reference obligation would depreciate in value.

The Pyxis CDO had the right to receive premium payments from the "short" counterparties on the CDS in exchange for the obligation "to make loss payments" to the short counterparties if the referenced assets performed poorly. (A199-201.) The Pyxis Offering Memorandum advised that the short CDS counterparties had interests that may not be aligned with the noteholders. (A316.) Further, the Offering Memorandum explained that the CDO's arranger and underwriter, Calyon, would assume these short counterparty positions in the first instance, and would have the right to transfer some or all of the risk of these positions through back-to-back hedging arrangements with other market participants selected in its "sole discretion." (A327; *see also* A200-01.) Accordingly, Pyxis noteholders (and FGIC) were on notice that sophisticated, institutional investors, whose

identities they would not know, would be making "short" bets that the collateral underlying the Pyxis CDO would perform poorly.

The sophisticated participants in the Pyxis CDO were also advised, as FGIC admitted in the SAC, that the Pyxis portfolio would be "primarily backed by subprime RMBS" (A186, A203, A214)—loans made to borrowers with weaker credit histories and high debt-to-income ratios. Indeed, as FGIC knew, the Offering Memorandum disclosed that *a minimum* of 80%, and a possible maximum of 100%, of the RMBS would be collateralized by subprime and mid-prime mortgages. (*See* A310, A406, A421-22; *see also* A215 ("This deal allows FGIC to take exposure to the *subprime RMBS sector* . . . .") (emphasis added).)

The Offering Memorandum expressly provided that investors could not rely on any statements or representations made outside the memorandum itself. (A270.) The document further disclosed that Putnam was not responsible for any information contained therein, except for extremely limited information set forth in a brief four-page section describing the Collateral Manager. (*Id.*) That section did little more than identify Putnam as the collateral manager, describe Putnam's corporate structure, and list short biographies of the Putnam employees assigned to this transaction. (*See* A472-75.)

12

**B.    Putnam's Role As Collateral Manager For The Pyxis CDO**

Putnam was not a fiduciary to investors in Pyxis, and it certainly was not a fiduciary to non-investor FGIC.  Putnam's role as the Pyxis collateral manager was defined by a Collateral Management Agreement ("CMA") between Putnam and Pyxis, dated October 3, 2006. (*See* A195, A199-200, A217.)  Pursuant to this agreement, Putnam agreed to "supervise and direct the investment and reinvestment of the Collateral" in accordance with the detailed Eligibility Criteria and Collateral Quality Tests described in the CDO Indenture.  (A585-86; *see also* A874-91).  The SAC did not allege that a single collateral asset selected by Putnam did not meet these detailed criteria or tests, or that any of the collateral received lower credit ratings than required by the Indenture or other offering documents.

Putnam's contractual fee arrangement with Pyxis fully incentivized Putnam to select assets it believed would perform well.  Under the Collateral Management Agreement, Pyxis agreed to pay Putnam a monthly senior collateral management fee equal to 0.15% per annum of the portfolio's Monthly Asset Amount, and a quarterly subordinated collateral management fee equal to 0.05% per annum of the portfolio's Monthly Asset Amount.  (A595-96.)  Although the SAC described the senior fee as "fixed" (*see* A201), it was not "fixed" in any respect.  The definition of "Monthly

13

Asset Amount," against which Putnam would receive its 0.15% per annum senior fee and its 0.05% per annum subordinated fee, expressly excluded any defaulted collateral assets. (A672, A675-76.) Thus, any defaults in the collateral assets would decrease the Monthly Asset Amount and the size of both Putnam's senior and subordinated fees.

Putnam's right to receive the quarterly subordinated fee was subject to yet further contractual limitation. The Indenture specified that Putnam's subordinated fee was junior to the Pyxis noteholders' rights to receive interest payments on their securities. (*See* A350-54.) Significantly, as stated in the Offering Memorandum, Putnam would receive its subordinated fee only after all six classes of noteholders (from Class A-1 through Class X) received the amount each such class was entitled to receive per distribution date. (A354.)

### C. FGIC's Guaranty Of Its Wholly-Owned Subsidiary's CDS With Calyon

FGIC is a large and sophisticated monoline insurer. FGIC was not an investor in Pyxis. It did not purchase any notes or equity issued by Pyxis. Nor did FGIC enter into any CDS that were to be included in the Pyxis collateral portfolio.

Instead, the SAC alleges that FGIC "insured payment of all obligations owed by FGIC's wholly-owned subsidiary, FGIC Credit

14

Products LLC, under a CDS referencing Pyxis . . . ." (A187.) Under the CDS guaranteed by FGIC, "FGIC Credit Products LLC agreed that, if Pyxis defaulted, it would make all the payments owed by Calyon" on a $900 million CDS between Calyon and Pyxis. (*Id.*) According to FGIC, it entered into the Guaranty "to take exposure to the subprime RMBS sector . . . ." (A215-16.) As alleged in the SAC, FGIC performed rigorous "due diligence" prior to issuing the Guaranty, including "an analysis of the deal's structure . . . and the assets that would be included in the Pyxis Portfolio." (A211.)

### D.   Magnetar's Equity Stake And First Risk Of Loss

In Pyxis, as with CDOs generally, equity holders are the last in line to receive payments from the CDO. (*See* A350-59.) If a default occurs, the equity holders suffer the first loss. FGIC itself characterized the equity position as the riskiest stake in the CDO. (A196-97.) According to FGIC, Magnetar and Deutsche Bank purchased the entire equity stake in Pyxis. (A203.) Magnetar and Deutsche Bank also allegedly made a second long investment, purchasing the $61.875 million Class X Subordinate Notes that were just one rung above the equity and, after the equity, would suffer the next loss if the CDO defaulted. (*Id.*; *see also* A269, A350-59.)

15

FGIC alleged that Pyxis was "structured in such a way that, as long as it avoided default, the preference shares and Class X notes would receive much larger payments of principal and interest than the senior notes during the first five years of its existence" and "would receive a large portion of their investment back within just over a year." (A204.)  The SAC, however, contained no allegations that this so-called "triggerless" structure was not fully disclosed to FGIC and other market participants in the offering materials.  (*See id.*)  Nor did FGIC allege that this structural feature would have prevented Magnetar and Deutsche Bank from suffering the first loss in the event of a Pyxis default.

## **STANDARD OF REVIEW**

This Court reviews de novo the District Court's dismissal of a complaint on a motion to dismiss under Rule 12(b)(6).  The standard in both the District Court and in this Court is the same:  all of the allegations must be plausible on their face to survive a motion to dismiss.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).  A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Legal conclusions are accorded

no weight and are not to be construed as true, just as formalistic recitations of the elements of the legal claims do not suffice. *Id.*

To state a claim for fraud under New York law, FGIC must plead a material misrepresentation, knowledge of the statement's falsity, intent to induce reliance, justifiable reliance by FGIC, and actual damages. *See Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (N.Y. 2009). FGIC's common law fraud claim is also subject to the heightened pleading requirements of Rule 9(b). *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Rule 9(b) requires that FGIC plead facts giving rise to a "strong inference" of fraudulent intent on the part of Putnam. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006).

## SUMMARY OF THE ARGUMENT

I.    FGIC's claims fail on multiple independent grounds. At the outset FGIC lacks Constitutional standing to pursue its appeal. FGIC's allegation that it incurred "potential liability" with non-parties under the terms of the Guaranty did not establish a concrete and imminent "injury in fact" traceable to the conduct of Putnam.

II.    Each of FGIC's claims fail for failure to plead loss causation. In asserting a fraud claim seeking damages, FGIC is required to

17

plead loss causation.  As the District Court held, FGIC failed plausibly to allege that Magnetar's purported control of the Pyxis collateral selection process, as opposed to the market-wide downturn in the subprime mortgage market, caused FGIC to suffer any losses under the Guaranty.

III.    FGIC's fraud claims fail for additional reasons not addressed by the District Court, but which were presented below and which this Court may now consider.  The SAC did not plead a strong inference of scienter.  The SAC also failed to plead that Putnam made any misrepresentations or fraudulent omissions or that Putnam had a duty to disclose the facts about which FGIC now complains.

IV.    FGIC's negligence and negligent misrepresentation claims also fail.  As the District Court held, the SAC did not allege "actual privity" or its functional equivalent between Putnam and FGIC, and the Offering Memorandum expressly disclaimed any fiduciary or special duty running from Putnam to FGIC.

## ARGUMENT

## I.    FGIC LACKS STANDING TO PURSUE THIS APPEAL

As the party invoking federal jurisdiction, FGIC bears the burden of establishing standing.  *See, e.g., DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 & n.3 (2006).  The "irreducible constitutional minimum"

of standing has three prerequisites: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent," not "conjectural or hypothetical"; (2) a causal connection to the injury that is "fairly . . . trace[able]" to the defendant's conduct as opposed to that of "some third party" not before the court; and (3) a determination that it would be "likely," not merely "speculative," that a favorable decision for the plaintiff will remedy the injury.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks and citations omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2009).[2]  FGIC cannot establish any of these prerequisites.

FGIC did not allege a cognizable injury in fact sufficient to establish standing.[3]  The SAC alleged only that FGIC incurred "potential liability of up to $900 million" under the Guaranty.  (A188, A245.)   The SAC did not allege any payments made by FGIC pursuant to the Guaranty,

---

[2] Inferences should not be drawn in the plaintiff's favor when evaluating whether it has established standing to seek judicial relief.  *See Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) ("[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."); *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003) (same).

[3] Although Putnam did not raise this issue below, FGIC's lack of standing may not be waived.  *See, e.g.*, *United States v. Hays*, 515 U.S. 737, 742 (1995); *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 489 (2d Cir. 2009).

any demand for payment by Calyon under the Guaranty, or any specific losses FGIC actually incurred.  As the Supreme Court held in *Clapper v. Amnesty International USA*, 133 S. Ct. 1138 (2013), "[a]llegations of *possible* future injury" do not pass constitutional muster.  *Id.* at 1147 (internal quotation marks omitted).

The SAC also failed to allege that FGIC's "potential liability" will accrue at any point in time, let alone that this purported liability is "imminent."  *Id.* ("threatened injury must be certainly impending to constitute injury in fact" (internal quotation marks omitted); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("some day' intentions—without … any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require") (citation and internal quotation marks omitted)).  In sum, a party "cannot manufacture standing . . . based on hypothetical future harm that is not certainly impending." *Clapper*, 133 S. Ct. at 1143.

Finally, even assuming FGIC's "potential liability" qualifies as an "injury in fact," FGIC did not allege that its purported injury is "fairly trace[able]" to Putnam's conduct as opposed to the independent conduct of

parties not before the Court.  *Lujan*, 504 U.S. at 560.[4]  Putnam is not party to

the Guaranty between FGIC and FGIC's wholly-owned subsidiary; Putnam

also is not a party to the CDS between FGIC's subsidiary and Calyon.

(A187.)  Although neither FGIC's subsidiary nor Calyon was a party to the

proceeding before the District Court, the future conduct of those entities will

directly impact the extent of any "potential liability" FGIC may face.  Given

their significance to the causal chain, FGIC's alleged injury cannot be

characterized as "fairly traceable" to Putnam.

> In light of the foregoing, the Court therefore lacks subject

matter jurisdiction over this appeal and the SAC should be dismissed.

## II.    THE DISTRICT COURT PROPERLY HELD THAT FGIC'S CLAIMS FAIL TO PLEAD LOSS CAUSATION

### A.    FGIC's Argument That It Is Relieved From Pleading Loss Causation Because It Seeks Rescission Is Meritless

> FGIC's assertion that loss causation is not required for a

rescission claim based on fraud is predicated on a fallacy:  the SAC does not

assert a claim for rescission, which is a separate cause of action under New

---

[4] *See also Taylor v. Bernanke*, No. 13-CV-1013, 2013 U.S. Dist. LEXIS 128533, at *18 (E.D.N.Y. Sept. 9, 2013) (noting that, "[w]here the occurrence of the future injury depends on the actions of a third party not included in the plaintiff's suit, the Supreme Court has shown particular reluctance to conclude that the 'imminence' requirement is met") (citation omitted).

York law.  *See, e.g., Griffel v. Belfer*, 248 N.Y.S.2d 940, 941 (App. Div. 1964).

The only relief FGIC sought against Putnam was damages. (A257-58.)  The word "rescission" does not appear anywhere in the SAC, much less in FGIC's prayer for relief.  FGIC presumably did not seek rescission against Putnam because there is no contract between FGIC and Putnam to rescind.  Putnam was not a party to the Guaranty.  Moreover, FGIC did not allege that it lacks a complete and adequate remedy at law, which precludes FGIC from seeking rescission as equitable relief.  *See Rudman v. Cowles Commc'ns*, 30 N.Y.2d 1, 13 (N.Y. 1972).[5]

Even assuming FGIC had asserted a claim for rescission, it would be unsustainable.  The SAC made no attempt to allege why it would be impracticable for FGIC to seek to rescind the FGIC Guaranty with its wholly-owned subsidiary.  Nor did the SAC allege why it would be impracticable for FGIC's wholly-owned subsidiary to seek to rescind its CDS contract with Calyon.  FGIC's election not to seek rescission from the

---

[5] FGIC's reliance on the New York Supreme Court's decision in *Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp.*, 980 N.Y.S.2d 21, 31 (App. Div. 2014), is misplaced.  In *Basis Yield*, unlike here, the plaintiff asserted a claim for rescission, and brought the claim against the actual seller of the CDO investments.  *Id.* at 24.  Notwithstanding, the First Department *dismissed* the rescission claim on the ground that the plaintiff had adequate remedies at law.  *Id.* at 31.

counter-party to the Guaranty or from the beneficiary does not evidence the

"impracticability" of that remedy.

In any event, FGIC's argument that a plaintiff asserting a

rescission claim is relieved from pleading and proving loss causation is

meritless.  The cases cited by FGIC hold that proof of "pecuniary loss" is not

required where a plaintiff asserts a claim for rescission based on fraud.  (Br.

at 19.)  These cases are uniform that the plaintiff still must show "injury"

caused by the defendant's alleged misrepresentation and establish that it

bargained for something different from what it received as a result of the

defendant's misrepresentation.  *See, e.g., Dornberger v. Metro. Life Ins. Co.*,

961 F. Supp. 506, 543 (S.D.N.Y. 1997).  This Court has not hesitated to

dismiss rescission claims where the plaintiff failed to allege such an injury.

*See, e.g., Mott v. Tri-Continental Financial Corp.*, 330 F.2d 468, 469 (2d

Cir. 1964); *see also Loreley Fin. (Jersey) No. 4 Ltd. v. UBS Ltd.*, 978

N.Y.S.2d 615, 620 (Sup. Ct. 2013) (dismissing rescission claim for failure to

plead loss causation:  "[T]hough an investor may be able to prove that he

would not have invested *but for* the misrepresentation, if the investor lost his

money for *wholly unrelated reasons* (say, the market crashing), the investor

cannot get his money back via rescission.").[6]

FGIC's related contention that rescission may sometimes be

sought from a party not in privity of contract has no relevance here.  Even

assuming FGIC had asserted a rescission claim against Putnam, the case

cited by FGIC in support of its contention—*Gordon v. Burr*, 506 F.2d 1080

(2d Cir. 1974)—made clear that this principle should be narrowly applied.

*Gordon* held that where the principal does not restore the defrauded plaintiff

to the status quo, the law allows the plaintiff to seek restitution from the

principal's agent, at least to the extent the agent aided and abetted the

principal and profited from the fraud.  *See id.* at 1084-85.  FGIC, however,

did not allege that the counterparty on the Guaranty (its subsidiary) or the

---

[6] FGIC argues that it alleged such an "injury" sufficient to obtain rescission
(which it never sought) because "it received something different from what
it bargained for—exposure to a portfolio with a much higher risk of
default—and, had it known the true facts, it would not have issued the Pyxis
Guaranty."  (Br. at 22.)  But FGIC received exposure to exactly the type of
collateral portfolio the Offering Memorandum advised investors would be
constructed for Pyxis:  a portfolio consisting overwhelmingly of subprime
RMBS, most of which were "BBB"-rated, the lowest possible investment
grade.  This is not a case where the plaintiff bargained for the purchase of a
Picasso and received a fake painting.

beneficiary of the Guaranty (Calyon) engaged in any fraudulent conduct or that either acted as Putnam's principal.[7]

Finally, FGIC has not preserved this argument for appeal. In opposing Putnam's motion to dismiss, FGIC relegated to a footnote its argument that it was relieved from pleading loss causation because it was seeking "rescissory relief." [Dkt. 27, at 11, n. 2] This is insufficient to preserve an issue for appellate review. *See Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 446 & n.3 (2d Cir. 2006).

### B. New York Insurance Law Does Not Relieve FGIC Of Its Burden To Plead Loss Causation

The District Court rejected FGIC's contention that Section 3105 of the New York Insurance Law excused FGIC from pleading loss causation because FGIC had alleged fraud in the inducement of an insurance contract. The District Court held that FGIC's fraud claim did not fall under Section 3105 because Putnam "'did not apply for any insurance, nor did it enter into any sort of contract—insurance-related or otherwise—with FGIC.'" (A1514.) That holding was correct and should be affirmed.

---

[7] Moreover, *Gordon* expressly held that "[t]o avoid unjust enrichment, general equitable principles indicate the preferability of the purchaser pursuing first the seller, rather than his partner in the fraud." *Gordon*, 506 F.2d at 1085. There is no allegation that FGIC did so.

Section 3105, by its express terms, addresses only two
situations:  (i) where an insurer seeks to "avoid any contract of insurance" *ab
initio*—that is, where an insurer seeks to rescind an insurance policy, and (ii)
where an insurer seeks to "defeat recovery thereunder."  (*See* A1516.)
Neither scenario applies to FGIC's fraud claim against Putnam.[8]

Assuming for the sake of argument the Guaranty is a "contract
of insurance," FGIC's prayer for relief did not seek to avoid the Guaranty *ab
initio*.  Moreover, such relief would be unavailable to FGIC given its failure
to name as parties either FGIC Credit Products LLC, the counterparty to the
Guaranty, or Calyon, the alleged beneficiary.

Nor did FGIC seek to "defeat recovery" under the Guaranty,
within the meaning of Section 3105, by bringing suit against Putnam.  As
the District Court correctly noted, Putnam was not a party to the Guaranty
and is not alleged to seek recovery from FGIC thereunder.  (A1516.)
Relatedly, a judgment in favor of FGIC would not "defeat" the ability of
FGIC Credit Products LLC or of Calyon to enforce their rights under the
Guaranty.  (*Id.*)

---

[8] FGIC's attempt to extend the reach of Section 3105 beyond its narrow
statutory language is unavailing.  Under New York law, "the common law is
never abrogated by implication" and "must be held no further changed than
the clear import of the language used in a statute absolutely requires."  N.Y.
Stat. Law § 301, cmt. 2 (McKinney 2013).

FGIC's contention that Section 3105 nevertheless applies because Putnam purportedly acted "by the authority of" Calyon in soliciting the Guaranty is meritless. Although Section 3105(a), by its terms, extends to misrepresentations made by agents acting "by the authority of" the applicant, FGIC cannot point to any allegations showing that Calyon controlled Putnam's actions or directed Putnam to make any statements to FGIC "regarding the Pyxis Guaranty." (A1515.) FGIC notably did not plead that Calyon was a participant in the fraud alleged in the SAC. FGIC's argument that "most of Putnam's [alleged] misrepresentations were made in offering materials . . . which, in turn, *were prepared by Calyon* and were *presented by Calyon to FGIC*" (A1515 (emphasis added)) falls well short of pleading with the requisite particularity that Putnam acted as Calyon's broker in connection with the Guaranty. *See Falcon Crest Diamonds, Inc. v. Dixon*, 655 N.Y.S.2d 232, 236 (Sup. Ct. 1996) (construing "by the authority of" to mean that one may make a representation under Section 3105 through a broker);[9] *see also Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 121 (E.D.N.Y. 2011) (where, as here, purported agency relationship "is an

---

[9] *See also Postler & Jaeckle Corp. v. Cnty. of Monroe Indus. Dev. Agency,* 582 N.Y.S.2d 328, 332 (Sup. Ct. 1992) (an agent is "one who, *by the authority of* another, undertakes to transact some business or manage some affairs on account of such other") (quoting 2 *N.Y. Jur. 2d Agency* § 1, at 471 (1979) (emphasis added).

integral element of an alleged fraud, courts have required the facts establishing agency be pled with Rule 9(b) particularity").

Even if Section 3105 applied to FGIC's damages claims against Putnam, FGIC's assertion that this statute relieves a plaintiff from having to plead and prove loss causation is baseless.  The sole authority FGIC relies upon for this proposition—*MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, 963 N.Y.S.2d 21 (App. Div. 2013)—does not support its position.  *MBIA* involved claims for the recovery of damages *against the actual applicant for insurance* under the insurance contract.  Although the trial court announced that the plaintiff insurer did not need to plead or prove loss causation in its claims for "rescissionary damages," the Appellate Division reversed the trial court's decision and held that the plaintiff insurer was not entitled to either rescission or rescissionary damages as an equitable remedy.  *MBIA Ins. Corp.*, 963 N.Y.S.2d at 21.  The Appellate Division nowhere held that a plaintiff did not need to plead and prove loss causation where, as here, the plaintiff sought only monetary damages as a legal remedy.

**C.    FGIC's Allegations Of Loss Causation Are Deficient**

The District Court correctly held that FGIC had failed to plead loss causation, stating that the SAC "has not sufficiently pled that

28

Magnetar's alleged control of the collateral selection process for Pyxis

caused FGIC's losses, as opposed to the global financial crisis." (A1516-

517.) That judgment should be affirmed.

### 1.   The Applicable Pleading Standard

To plead loss causation under New York law, FGIC was

obligated to "plead facts that indicate that the information concealed by the

defendant['s] misrepresentations was the reason the transaction turned out to

be a losing one." *Dexia SA/NV v. Bear, Stearns & Co.*, 929 F. Supp. 2d 231,

243 (S.D.N.Y. 2013) (citation and internal quotation marks omitted). As

this Court has recognized:

> "[W]hen the plaintiff's loss coincides with a
> marketwide phenomenon causing comparable
> losses to other investors, the prospect that the
> plaintiff's loss was caused by the fraud decreases,"
> and a plaintiff's claim fails when "it has not
> adequately ple[]d facts which, if proven, would
> show that its loss was caused by the alleged
> misstatements as opposed to intervening events."

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (citation

omitted); *Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, No. 09

Civ. 4050, 2010 WL 3790810, at *22 (S.D.N.Y. Sept. 28, 2010) (complaint

must "include facts which, if proven, would show that the loss in value of

plaintiffs' Securities was caused by the alleged misstatements as opposed to

the 'broader market declines'").

29

In dismissing FGIC's fraud claim for failure to plead loss causation, the District Court applied the notice pleading standards of Rule 8(a).  Putnam respectfully submits that the heightened pleading standards of Rule 9(b) should apply to the FGIC's loss causation allegations, at least as they relate to the fraud claim.  Although the Second Circuit has left this issue open, *see Rosado v. China N.E. Petroleum Holdings, Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012), loss causation is indisputably an element of a claim of fraud, and Rule 9(b) does not exempt this element from its requirement that the "circumstances constituting fraud" be "state[d] with particularity."  Fed. R. Civ. P. 9(b).[10]

### 2.    The SAC Did Not Adequately Plead Loss Causation Under Either Rule 9(b) Or Rule 8(a)

FGIC's initial argument that the SAC adequately pleaded loss causation by alleging, in conclusory fashion, that FGIC's losses were purportedly the "intended and expected consequence of the Pyxis fraud"

---

[10] In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005), the Supreme Court left open the issue of whether Rule 9(b) applies to such allegations given the complaint's failure to meet Rule 8(a)'s lesser standard. The Court only "*assume[d], at least for argument's sake*, that neither the Rules nor the [PSLRA] impose any special further requirement [beyond Rule 8] in respect to the pleading of proximate causation or economic loss." *Id.*at 346 (emphasis added)*; compare Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 & n.5 (4th Cir. 2011) (holding that Rule 9(b) applies to loss causation allegations for fraud claims) *with Lormand v. US Unwired, Inc.*, 565 F.3d 228, 256-58 (5th Cir. 2009) (holding that Rule 8(a) applies to such loss causation allegations).

finds no support in the case law. (Br. at 30.) Citing a New York trial court decision that was overturned on appeal (*see* Br. at 30 (referencing *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 951 N.Y.S.2d 84 (Sup. Ct. 2012), *rev'd on other grounds*, 967 N.Y.S.2d 1 (App. Div. 2013))), FGIC argues that loss causation is simply a question of foreseeability and intent. This is not the pleading standard for loss causation. *See Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1496-97 (2d Cir. 1992) (affirming dismissal of common law fraud claim because plaintiff did not adequately allege that damages suffered were proximately caused by defendants' alleged misrepresentations); *Laub v. Faessel*, 745 N.Y.S.2d 534, 536 (App. Div. 2002) ("To establish causation, plaintiff must show both that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)."). In any event, the SAC failed adequately to allege that it was foreseeable to Putnam that FGIC would suffer losses on the Guaranty or that Putnam intended for FGIC to suffer any losses.[11] *See infra* at Section III(A).

---

[11] The sole allegation cited by FGIC in support of this contention does not establish any basis for accusing Putnam of seeking to cause FGIC's losses. FGIC cites a November 2006 email in which *Magnetar*, not Putnam, advised Calyon of its interest in buying protection on certain Pyxis classes of notes,

The SAC's conclusory allegation that Putnam would have picked different collateral assets had it not been under Magnetar's alleged "control" has no merit. (A246.) FGIC did not allege any facts showing what this purported portfolio would have consisted of, let alone any facts sufficient to establish that such a portfolio would have prevented Pyxis's default. As the District Court noted, FGIC failed to "make any allegation that there are *any set of assets* Putnam could have selected that would have complied with the Pyxis eligibility requirements and constraints set forth in the Offering Memoranda and still would have avoided default." (A1520 (emphasis added).)

FGIC's argument that other CDOs in which Magnetar held an equity position defaulted in greater numbers, and more quickly, than "comparable non-Magnetar CDOs" is also meritless. (Br. at 37.) As the District Court recognized, FGIC did not plead any facts sufficient to show that these other CDOs were "comparable" in any meaningful sense to Pyxis:

> The comparison itself is problematic, as the SAC
> does not plead what exactly made the Magnetar
> and non-Magnetar CDOs comparable, including
> whether the alleged Magnetar CDOs or
> comparable CDOs had the same asset eligibility

---

including the "super level." (Br. at 30 (citing A205-06.)) There is no allegation that Putnam was copied on this email. Nor does the email, on its face, reflect any intent by Magnetar, let alone Putnam, to cause FGIC to suffer any losses.

> criteria, payment waterfall, trigger structure or
> other features of Pyxis.  FGIC alleges that the
> CDOs compared have identical vintages and
> collateral classes, but FGIC fails to allege any
> basis that vintage and collateral classes are more
> significant than any of [the] other structural
> features.

(A1521.)

FGIC's related allegation that the final collateral portfolio did

not include $145 million of prime RMBS assets also fails to plead loss

causation.  (Br. at 32.)  FGIC understood that the vast majority—at least

80% and as much as 100%—of the collateral pool would consist of

subprime and mid-prime RMBS assets.  The $145 million in prime RMBS

assets included in a target portfolio set forth in an early version of the

Investor Presentation would have comprised less than 10% of the Pyxis

collateral.  The Investor Presentation warned investors that its information

was "preliminary" and that investors should not rely upon the document in

making an investment decision.  (A992, A1004.)  Moreover, the SAC

nowhere alleged that Magnetar "directed" Putnam to replace any prime

RMBS assets with subprime assets or that the composition of the final

collateral portfolio violated any of Pyxis's Eligibility Criteria.  Nor did the

SAC allege that inclusion of any prime RMBS assets would have prevented

the default of Pyxis.  (A1519.)

FGIC also references a table in the SAC purportedly listing "Magnetar-selected" collateral amounting to $167 million and states that, on average, these assets defaulted after 1.5 years while the remainder of the Pyxis collateral pool defaulted, on average, in 1.85 years. (*See* Br. at 32 (citing A247-50).) To begin with, FGIC offers no basis for its assertion that Magnetar selected any of the assets that defaulted, on average, after 1.5 years instead of after 1.85 years. The suggestion itself is at odds with FGIC's theory that Magnetar controlled the entire collateral selection process. In addition, FGIC failed to allege how it was damaged by the fact that a small fraction of the Pyxis collateral assets purportedly defaulted a few months earlier than the rest of the collateral pool. (*See* A1520, A1522.) As the District Court observed:

> The pool of assets alleged to be controlled by Magnetar represented roughly 11% of the $1.5 billion collateral pool, and the SAC does not allege how the selection of safer assets in this 11% pool would have prevented a default.

(A1519.)

FGIC tries to have it both ways when it contends that even if market forces caused a general Pyxis default, it can still establish loss causation by showing that the default of a collateral asset purportedly selected by Magnetar incrementally added to its liability under the Guaranty.

34

(Br. at 31-33.)  But FGIC did not adequately plead that Magnetar's alleged adverse selection caused any assets to default as opposed to the operation of ordinary market forces.  Nor did FGIC adequately plead that the selection of any set of collateral assets, consistent with Pyxis's Eligibility Criteria, would not have caused the same level of "potential liability" FGIC faces on the Guaranty.

Equally meritless is FGIC's argument that a small fraction of the Pyxis collateral defaulted before the purported onset of the financial crisis.  The specific allegation in the SAC is that because $95.5 million of the collateral assets defaulted prior to the collapse of Bear Stearns, the default of this collateral was "necessarily caused primarily by their inherent defects, not by the financial crisis."  (A249-50.)  This allegation underscores the infirmity of FGIC's loss causation allegations.  FGIC has no basis to suggest that the collapse of Bear Stearns in March 2008 marked the beginning of the financial crisis, and, as a simple matter of cause and effect, the onset of the market-wide downturn in RMBS pre-dated the collapse of Bear Stearns.  Nor did FGIC allege what purported "inherent defects" would have caused these assets to default, not as a result of market events, but as a result of Magnetar's alleged adverse selection.  The District Court correctly held that this allegation "does not promote an inference that the defaults

35

were caused by anything other than marketwide events leading up to the market downturn in 2008." (A1520.)[12]

In a footnote, FGIC asserts that in two recent decisions, the New York Appellate Division sustained fraud claims in connection with other CDOs in which Magnetar was alleged to have participated, even though the defendants purportedly had asserted a failure to plead loss causation as a basis for dismissal. (Br. at 31 n.4 (citing *Basis Yield*, 980 N.Y.S.2d 21; *Loreley Fin. (Jersey) No. 3 Ltd. v. Citigroup Global Mkts. Inc.*, 987 N.Y.S.2d 299, 301 (App. Div. 2014)).) In neither of these cases, however, did the Appellate Division address the defendants' loss causation arguments in any respect. In addition, the defendants in those cases were the underwriters and structurers of the CDOs at issue, not simply the collateral manager like Putnam. Finally, in stark contrast to the allegations here, the underwriters were alleged to have structured their respective CDOs in order to offload underperforming subprime securities from their own balance sheets. *See Basis Yield*, 980 N.Y.S.2d at 26; *Citigroup Global Mkts. Inc.*,

---

[12] FGIC erroneously contends the District Court "ignore[d]" that the financial crisis itself was caused by the type of conduct in which Putnam is alleged to have engaged. (Br. at 39.) The District Court, however, did not "ignore" this argument. FGIC did not raise it below and the SAC made no well-pleaded allegation to that effect.

987 N.Y.S.2d at 301. There are no allegations in the SAC that Putnam engaged in any similar conduct.

In view of the foregoing, the District Court's determination that FGIC failed to plead loss causation should be affirmed.

## III. FGIC'S FRAUD CLAIMS SHOULD BE DISMISSED ON GROUNDS NOT REACHED BY THE DISTRICT COURT

Although the District Court did not address the sufficiency of FGIC's allegations of scienter or of material misrepresentations, the deficiency of those allegations provides separate, independent grounds on which to affirm the District Court's judgment. *See McNally Wellman Co. v. New York State Elec. & Gas Corp.*, 63 F.3d 1188, 1194 (2d Cir. 1995); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 12 Civ. 3723, 2013 WL 1294668, at *9 (S.D.N.Y. Mar. 28, 2013) ("*Wells Fargo*") (dismissing fraud claims against CDO collateral managers for failure to plead scienter and material misrepresentations).

### A. The SAC Failed To Allege A Strong Inference Of Scienter

#### 1. The SAC Failed To Allege A Plausible Motive For Putnam's Participation In The Alleged Fraud

To establish a "strong inference" of scienter, FGIC was required to allege either (i) facts sufficient to show that Putnam had both a motive and opportunity to commit fraud or (ii) facts constituting strong

circumstantial evidence of conscious misbehavior or recklessness."

*Landesbank Baden-Württemberg v. Goldman, Sachs & Co.*, 478 F. App'x

679, 681 (2d Cir. 2012).  FGIC, however, failed to allege a plausible

explanation for why Putnam would engage in a billion-dollar fraud, risk its

reputation and business, and intentionally assist in the creation of a CDO

designed to fail, all so that it could put tens of millions of dollars, and

perhaps more, in the pocket of an unaffiliated third party, Magnetar.

FGIC's suggestion that Putnam's collateral management fees

provided a financial incentive to commit a billion dollar fraud is facially

meritless.  Putnam's fees, by design, were contingent upon the successful

performance of Pyxis in all respects.  Under the Collateral Management

Agreement, Pyxis agreed to pay Putnam a senior collateral management fee

equal to 0.15% per annum, and a subordinated incentive collateral

management fee equal to 0.05% per annum, of the portfolio's "Monthly

Asset Amount."  (A595-96.)  Although FGIC alleged that the senior fee was

"fixed" (*see* A201), it was anything but.  The definition of "Monthly Asset

Amount" expressly excluded any collateral assets that had defaulted.  (A672,

A675-76.)  Thus, any collateral defaults would decrease both the Monthly

Asset Amount and the size of the senior and subordinated collateral

management fees.  Putnam therefore had no incentive to select assets that would fail:  any defaults would (and did) directly reduce the size of its fees.

Moreover, Putnam's subordinated collateral management fee was junior to the Pyxis noteholders' right to receive interest payments.  (See A350-54.)  Putnam would receive the subordinated fee (0.05% of the Monthly Asset Amount) only if Pyxis performed well enough to first pay all six classes of noteholders the maximum amount they were entitled to receive on each applicable distribution date.  FGIC has no argument for why this fee did not fully incentivize Putnam to select collateral assets it thought would perform well.

FGIC's allegation that Putnam was paid "$5,707,429" in total senior and subordinated fees for its role as collateral manager (A203) does not support an inference of scienter.  If Pyxis had not defaulted, Putnam's senior fees would have amounted to $2.25 million per year, or approximately thirty-five times more than the $320,000 Putnam allegedly received since the Pyxis default.  Similarly, Putnam would have received approximately $750,000 per year in subordinated fees, or roughly

$3,750,000 more than it received in the five years after Pyxis's default.[13] These amounts are several times greater than the actual fees Putnam allegedly received.

Before the District Court, FGIC erroneously asserted that the subordinated fee was "not dependent on Pyxis performing well, but rather on Magnetar receiving its target return[.]" (A202.) The governing transaction documents, however, establish that the subordinated fee was absolutely dependent on Pyxis performing well. Under the Indenture, Putnam's subordinated fee was expressly conditioned on (i) Pyxis not defaulting, and (ii) all CDO investors, including the senior noteholders, first receiving all amounts to which they were entitled on each quarterly distribution date. (A861.)

The SAC's allegation that Putnam's subordinated fee was "virtually assured" by Magnetar's alleged "control" over the Pyxis portfolio (A202, A228) is empty rhetoric. FGIC quotes out of context a November 2006 email between Deutsche Bank and Calyon that includes no Putnam personnel, discusses an unrelated collateral manager (NIBC), concerns a different CDO (Orion 2) in which Putnam is not alleged to have participated,

---

[13] Under the terms of the Collateral Management Agreement, Putnam was entitled to be paid only for its management of *performing, non-defaulted* collateral assets. (*See* A595-96.)

40

mentions nothing about subordinated fees, and addresses the irrelevant issue of whether Orion 2's long (not short) investors should be entitled to terminate the collateral manager.  (*See* A1054.)  Nothing in this email remotely supports FGIC's contention that Putnam's subordinated fee would be "virtually assured."  In fact, FGIC's assertion is at odds with its theory of its case:  FGIC alleges that Magnetar exercised its alleged "control" for the singular goal of causing Pyxis to default.  If that were the case, Magnetar's control would not have "assured" the payment of Putnam's management fees; its control would have "assured" their non-payment.  (*See* A202.)

FGIC's allegation that Putnam's collateral management fees were purportedly higher than customary because the $1.5 billion size of the Pyxis deal was larger than many other CDO deals (*see* A201) likewise failed adequately to allege motive.  One of the emails on which the SAC relies establishes that Putnam's 0.15% senior fee and 0.05% subordinated fee were half the rate received by managers on smaller CDOs.  (A227.)  The desire to earn ordinary fees is not a permissible basis for inferring a motive to defraud.  *See, e.g., Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 428-29

(S.D.N.Y. 2010). This principle applies with even greater force to less than ordinary fees.[14]

Finally, FGIC's allegation that Magnetar "promis[ed]" Putnam "additional, similarly lucrative deal volume," which was purportedly "realized when Putnam was selected to serve as collateral manager for a second Pyxis CDO" (A203, A228), also fails to allege a plausible theory of motive. At bottom, FGIC's argument is that Putnam agreed to participate in a $1.5 billion fraud for nothing more than ordinary fees so that it could participate in a second $1.5 billion fraud, for which it would again receive only ordinary professional fees. The law is well-settled that "neither a desire to earn transactional fees nor a desire to cultivate business relations is sufficient to establish scienter." *Alki, Partners, L.P. v. Windhorst*, 472 F. App'x 7, 10 (2d Cir. 2012); *see also Wells Fargo*, 2013 WL 1294668, at *14 ("Plaintiffs do not explain how Defendants would help their bottom line by facilitating a massive scheme to scuttle their own financial instruments.").

---

[14] FGIC alleges, solely on information and belief, that Putnam's senior fee on the Pyxis CDO was higher (by apparently a mere five basis points) than the senior fee paid to the collateral manager in other CDOs in which Magnetar had purchased an equity stake. (*See* A201.) These allegations say nothing about whether Putnam's fixed fee was high for so-called "typical" CDOs. The correspondence cited by FGIC in the SAC, discussed above, shows that it was not. (*See* A227.)

## 2.    The SAC Failed To Allege Circumstantial Evidence Of Conscious Misbehavior Or Recklessness

Where, as here, a complaint fails to allege "facts supporting a motive to commit fraud, the circumstantial evidence of scienter must be 'correspondingly greater.'" *Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 369-70 (2d Cir. 2011) (citation omitted). To avoid dismissal, FGIC must plead that Putnam engaged in "highly unreasonable" conduct that "represent[ed] an extreme departure from the standards of ordinary care . . . ." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citation and internal quotation marks omitted). The SAC falls well short of meeting this high standard.

The SAC contains allegations purportedly referencing emails between Putnam and Magnetar that were described in complaints filed in other proceedings not involving FGIC. Although these allegations should carry no weight in assessing the sufficiency of the SAC's pleadings, *see, e.g.*, *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 891-94 (2d Cir. 1976) (allegations based on contested and unproven allegations from another proceeding should not be considered in assessing sufficiency of complaint), Putnam put many of the emails before the District Court to demonstrate that, on their face, they did not evidence "highly unreasonable" conduct that "represented an extreme departure from the standards of ordinary care."

43

These emails do not support FGIC's allegation that Magnetar controlled the selection of Pyxis collateral; they evidence Putnam's independence.

For instance, in an email with Magnetar dated July 7, 2006, Putnam emphasized that it would only select collateral assets it believed would perform well. Putnam unequivocally told Magnetar: "***We are going to pick the deals that have the best fundamental value.*** We, of course, would pick different deals as the best short candidates (in terms of being a hedge against sub-prime issues)." (A1131 (emphasis added).) In response, Magnetar did not dispute that Putnam should pick RMBS with "the best fundamental value." Rather, Magnetar emphasized that its short positions were not premised on the relative quality of any particular RMBS; Magnetar advised that its short trades were a "natural delta hedge" against its long equity position, "even if they are the best names." (*Id.*)

Other emails described in complaints filed in other proceedings, adopted in whole cloth by FGIC in the SAC, reflect only that Magnetar expressed an interest in buying protection on CDS assets Putnam selected. (*See, e.g.*, A223, A1138 (Magnetar advising Putnam that "[a]ny recent mezz[anine] [asset backed securities] deal is fine").) This is hardly the conduct of an entity controlling the collateral selection by a co-conspirator. As the district court recognized in *Wells Fargo*, an action involving another

CDO in which Magnetar was alleged to have controlled collateral selection, there was not anything "improper about Magnetar's hedging its exposure to the equity tranche," or with Magnetar "wish[ing] to be kept apprised of which assets are going into the CDO," or with Magnetar "sourcing" the short positions of the CDOs selected for the collateral pool. *Wells Fargo*, 2013 WL 1294668, at *10.

      Moreover, the emails referenced by FGIC in the SAC reinforce that Putnam was free to accept or reject any collateral assets being discussed by Magnetar, Calyon or Deutsche Bank (the other equity investor), as Putnam deemed appropriate in its independent judgment. (*See, e.g.*, A1138 (Magnetar stating that it would buy CDS "***on names of [Putnam's] choosing***") (emphasis added); A1143 (noting that Magnetar had pre-warehoused certain assets for Pyxis ABS CDO 2007-1, "which [Putnam] can take if [it] like[s] them").)

      The SAC also references a number of emails that were attached to a motion to dismiss in connection with a complaint filed against Putnam in New York state court by a different investor in the Pyxis CDO—a case in which the court granted Putnam's motion to dismiss all claims asserted

against it.[15] *Loreley Fin. (Jersey) No. 7 Ltd. v. Credit Agricole & Inv. Bank*, Index No. 650673/2010, slip op. at 10-11 (N.Y. Sup. Ct. June 9, 2011). These emails also do not evidence Putnam's conscious misbehavior or recklessness. For example, in an August 2006 email chain, Putnam advised Magnetar that the "collateral pool" it was buying "score[d] well on [Putnam's] risk scoring model," and that only after Putnam had finished a "benchmarking" analysis, which involved doing "preliminary work across a range of deals," would Putnam pursue additional trades. (A1138-39.) In response, Magnetar replied that it "[would] buy CDO CDS ***on names of [Putnam's] choosing*** at mid-market, or bid list +3bp, whatever you prefer." (A1138) (emphasis added).) Later emails in the chain are even more damaging to FGIC's theory that Putnam ceded control to Magnetar, as a Magnetar representative advised Calyon that he "[didn't] like that [Putnam]

---

[15] The SAC erroneously alleged that after purportedly "incriminating evidence came to light" (the same Pyxis-related emails that FGIC quotes in the SAC), "the investors' claims were promptly settled for an undisclosed amount." (*See* A189, A205.) FGIC has no basis for this allegation. The New York state court dismissed Putnam from the *Loreley* action *prior* to any settlement by other defendants, and *after* the *Loreley* plaintiffs had invoked many of the same defective emails now raised in the SAC. (*See* A1157-161.) Putnam did not enter into any settlement agreement with, or pay any settlement sum to, the *Loreley* plaintiff, which simply filed a notice of discontinuance after the *Loreley* court granted Putnam's motion to dismiss.

[was] buying CDO's without us knowing about it"—showing that Putnam, not Magnetar, was the entity selecting the collateral. (A1137.)[16]

Other emails referenced in the SAC and put before the District Court on Putnam's motion to dismiss, are equally benign. Several emails do not include any Putnam representatives, but were exchanges involving Magnetar, Deutsche Bank, and Calyon—none of whom is a defendant in this proceeding. (A1054, A1137, A1193, A1198, A1205.) These emails say nothing to indicate that, if selected as collateral manager, Putnam would abdicate its responsibility to select collateral to Magnetar.

---

[16] The September 2006 exchange between Putnam and Calyon cited by FGIC (*see* A205-06; A1202) indicates the unremarkable fact that Putnam became aware of a small short position taken by Magnetar in Pyxis collateral. As discussed above, however, the emails cited in the SAC permit only the inference that Magnetar told Putnam its short positions were a "hedge" against its long equity position. The Offering Memorandum, moreover, disclosed that investors would be taking short positions in Pyxis through back-to-back hedging arrangements with Calyon. (A327.) FGIC pleaded no facts to support its conclusory assertion that Putnam "was aware" that the credit protection Magnetar had purchased "far exceeded Magnetar's long position." (A205); *see also Wells Fargo*, 2013 WL 1294668, at *10, *12 (holding that proof of Magnetar's short position was not evidence of fraudulent conduct: "At most, the exchange can plausibly be read to reveal that Magnetar was looking to hedge the CDO's long bets by staking out short positions.").)

**B.    FGIC Failed To Plead An Actionable Misrepresentation Or Omission**

**1.    FGIC Failed To Allege Any Misrepresentations Regarding Putnam's Role**

The SAC alleged that Putnam represented in offering documents and in communications with FGIC that it would serve as the collateral manager for Pyxis and that it would select the collateral for the CDO.  But the SAC nowhere plausibly alleged that these representations were false.  The SAC attempted to cobble together snippets of emails and other documents to create the impression that Putnam ceded control over collateral selection so that Magnetar could "select weaker assets whose performance it could bet against through the use of CDS[.]"  (A188; *see also* A218, A251, A255, A256.)  As discussed above, however, these allegations do not support an inference that Magnetar controlled the selection of collateral assets, much less that Putnam allowed Magnetar to control the collateral selection process to the detriment of noteholders' interests.  *See supra* at 43-47.

Before the District Court, FGIC cited an email attaching a draft agreement among Calyon, Deutsche Bank, and Magnetar, but not Putnam, that included a term that would have given Magnetar purported "veto rights" over assets selected for the Pyxis CDO's warehouse.  (*See* A221; A1043.)

But the SAC did not allege well-pleaded facts showing (i) an agreement including this draft term was ever signed; (ii) that Putnam knew about this arrangement; (iii) that this proposed veto right was ever exercised; (iv) that Putnam, Calyon, or any other party ever honored any request by Magnetar to remove or block collateral from the Pyxis CDO warehouse; or (v) that FGIC did not have the ability to inspect the warehoused assets prior to issuing the Guaranty.

FGIC alleged that Putnam must have allowed Magnetar to control collateral selection for Pyxis because there purportedly was a "remarkably high correlation between the issuers whose securities were held or referenced by Pyxis and the issuers whose securities were held or referenced by" other CDOs in which Magnetar allegedly invested.  (A233.) In an effort to cloak this speculation with an air of authority, the SAC referenced an "analysis," which it hired an unidentified consultant to perform, reaching the tepid conclusion that the alleged correlation across various CDOs in which Magnetar invested "*may* indicate that the portfolio selection by independent portfolio managers was influenced by an external factor."  (A234 (emphasis added).)  There are no well-pleaded factual allegations, however, that Putnam had any involvement in these other CDOs, knew the contents of their portfolios, or failed to perform a rigorous,

independent analysis of any of the collateral common to the CDOs under consideration.[17]

The SAC alleged that, when choosing to enter into the Guaranty, FGIC relied upon statements in the offering materials and in purported oral statements regarding Putnam's experience and capabilities. (*See* A185-86, A208, A213-14, A217.)  As a threshold matter, FGIC failed to allege any facts suggesting that Putnam lacked the experience and capabilities described in such statements.  In any event, such general statements regarding Putnam's business practices are not actionable as a matter of law.  *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JPMorgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (rejecting allegations of "numerous misrepresentations regarding [defendant's] 'highly disciplined' risk management and its standard-setting reputation for integrity").

Nor do the emails referenced in the SAC assist FGIC in pleading with particularity that Putnam made a material misrepresentation in

---

[17] FGIC's allegation that Putnam "included offset trades on ABX index components of a type unique to" other CDOs in which Magnetar invested (*see* A235-36) fails for the same reasons—there is no well-pleaded allegation (i) that Putnam knew the composition of these other CDOs, (ii) that these alleged "offset" trades violated any of the Eligibility Criteria, or (iii) that Putnam failed to perform an independent analysis of these trades.

advising potential investors that it would select the collateral for Pyxis,
much less that Putnam constructed the collateral portfolio with the intent of
causing Pyxis to fail.  For the reasons discussed at length in Section III(A)
above, none of these emails supports the allegation that Putnam abdicated its
collateral selection responsibilities to Magnetar.

> ### 2.    FGIC Failed To Plead A Misrepresentation Concerning The Composition Of The Pyxis Portfolio

FGIC's allegation that the final make-up of the Pyxis collateral
portfolio differed from preliminary "target" portfolios that FGIC received
likewise failed to plead an actionable misrepresentation or omission by
Putnam.  (See A211-12, A214-15, A236, A247.)

FGIC's failure to allege that a single asset in the $1.5 billion
portfolio did not comply with the CDO's detailed Eligibility Criteria is fatal
to its claim.  In a section entitled "Security for the Notes," the Offering
Memorandum contained more than 40 pages of disclosures concerning the
composition of the collateral assets and the Eligibility Criteria governing the
selection of these assets.  (A394-438.)  Among other things, the Offering
Memorandum disclosed that not less than 80% of the Pyxis portfolio would
consist of subprime and mid-prime RMBS assets.  (A310, A406, A421-22.)
There was no corresponding minimum concentration of prime RMBS

assets—in other words, the Offering Memorandum disclosed and FGIC was on notice that the Pyxis portfolio might not contain any prime RMBS assets.

The Investor Presentation upon which FGIC allegedly relied expressly stated that its pie-chart setting forth a proposed "asset type distribution" was "indicative," and that "[a]ll information contained herein is preliminary and subject to change without further notice."  (A1004.) Nothing in the Investor Presentation purported to "set forth the ramped portfolio that had been purchased for the CDO to date" (A211), as the SAC alleged, and no investor or other market participant reading the disclosures in the offering documents could have been misled into believing that the portfolio would consist of any minimum amount of "prime RMBS" assets.[18]

*See Epirus Capital Mgmt., LLC v. Citigroup Inc.*, No. 09 Civ. 2594 (SHS),

---

[18] FGIC also alleged that an "initial launch email" sent to prospective investors stating that "the collateral manager [Putnam] is able to cherry-pick the collateral for this portfolio . . . with the ability to focus on seasoned product" was somehow false because 60% of the Pyxis portfolio supposedly was not seasoned.  (A209.)  This allegation also failed to state a material misrepresentation by Putnam.  There is no allegation that the CDO's terms required any specific amount of "seasoned product."  Nor, for that matter, is there any well-pled allegation of what type of collateral security constituted "seasoned product," which was not a defined term in the Offering Memorandum or a component of any of the Eligibility Criteria governing the selection of collateral assets.  In any event, *Calyon*, not Putnam, made this statement.  Putnam cannot be held liable for it.  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2303 (2011) ("[W]e will not expand liability beyond the person or entity that ultimately has authority over a false statement.").

2010 U.S. Dist. LEXIS 42200, at *16 (S.D.N.Y. Apr. 28, 2010) (holding that CDO investors failed to state securities fraud claim where offering materials explicitly disclosed nature of collateral being selected).

Conspicuously absent from the SAC is any allegation that FGIC made any effort to obtain either the portfolio as it existed at closing on October 3, 2006, or the final, fully-ramped portfolio, which it easily could have compared with the "target" portfolio it alleges it received on August 9, 2006.  As a sophisticated party, FGIC had "a duty to exercise ordinary diligence and conduct an independent appraisal of the risk," *HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 66 (App. Div. 2012) (citation and internal quotation marks omitted), and it plainly had the ability to do so.  (*See* A211 (FGIC "performed due diligence . . . focusing on an analysis of . . . the assets that would be included in the Pyxis portfolio").

Finally, FGIC's allegation that Putnam "concealed the extent to which Pyxis sold protection on the ABX Index of low-rated RMBS" is patently erroneous.  (A234.)  The Eligibility Criteria specified concentration limits on the ABX Index and the indices contained therein, not on the constituent RMBS.  (*See* A400) (providing that the aggregate amount of CDS referencing any of the series of indices included in the ABX Index could not exceed 5% of the Pyxis portfolio, and that the aggregate amount of

53

CDS referencing any one series included in the ABX Index could not exceed 2% of the Pyxis portfolio).)  FGIC's attempt to create new collateral selection criteria not set forth in the Offering Memorandum should be rejected.

> **3.    FGIC Failed To Plead A Misrepresentation Or Omission As To The Identity Of Any Short Counterparty**

FGIC argued before the District Court that Putnam had failed to disclose Magnetar's alleged short positions on some of the CDO's collateral assets.  (See A205-06.)  There is no well-pleaded allegation, however, that Putnam believed Magnetar was engaged in anything other than ordinary hedging, or that Putnam knew the overall size of Magnetar's hedges.  Nor did Putnam make any affirmative statements to FGIC that would have required the disclosure of Magnetar's identity as one of the short counterparties on the more than $1 billion in CDS in the collateral pool.

FGIC possessed information that large financial institutions would have economic interests directly opposite to its own in the Pyxis transaction.  The Offering Memorandum expressly disclosed that 77% of the Pyxis portfolio (or $1.15 billion of the total $1.5 billion par value portfolio) would be comprised of CDS in which the Pyxis CDO would act as the long counterparty.  (A296, A313, A452.)  It would have been readily apparent to

FGIC, a sophisticated monoline insurer, that the short counterparties on these CDS would be betting against the performance of the RMBS reference obligations.

The Offering Memorandum also clearly disclosed that investors would not know the identity of the CDS short counterparties.  (A327; A200-01.)  The Offering Memorandum stated that Calyon, which assumed these short positions in the first instance, expected to enter into a series of "back-to-back hedging transactions" transferring some or all of the risk of these positions to other market participants selected by Calyon in its "sole discretion."  (A327; *see also* A200-01.)  This fundamental aspect of the Pyxis transaction was also depicted in a large diagram in the Investor Presentation on which FGIC claims it relied.  (*See* A1000; A209.)  FGIC cannot plead fraud where it knew that it lacked information and proceeded anyway.  *Permasteelisa, S.p.A. v. Lincolnshire Mgmt., Inc.*, 793 N.Y.S.2d 16, 17 (App. Div. 2005); *Graham Packaging Co., L.P. v. Owens-Illinois, Inc.*, 892 N.Y.S.2d 1, 1.

## IV.   THE DISTRICT COURT PROPERLY HELD THAT THE SAC FAILED TO STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION OR NEGLIGENCE

"New York strictly limits negligent misrepresentation claims to situations involving actual privity of contract between the parties or a relationship so close as to approach that of privity." *Anschutz Corp. v. Merrill Lynch & Co.,* 690 F.3d 98, 114 (2d Cir. 2012) (citation and internal quotation marks omitted).  So significant is the relationship of privity that this Court has stated that "under New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty." *Stewart v. Jackson & Nash*, 976 F.2d 86, 90 (2d Cir. 1992).  Claims for monetary damages based on negligence are no different—they also require "actual privity" or the "functional equivalent of privity." *Travelers Cas. & Sur. Co. v. Dormitory Auth*., 734 F. Supp. 2d 368, 378-82 (S.D.N.Y. 2010).

The SAC does not come close to alleging actual privity or its functional equivalent between Putnam and FGIC.  No contractual relationship existed between Putnam and FGIC:  The SAC conceded that Putnam was not a party to the Guaranty, and FGIC was not a party to the Pyxis Collateral Management Agreement.  Moreover, as the District Court recognized, the documents upon which FGIC concedes it relied (*see* A209-

11) expressly disclaim any creation of a fiduciary or special duty. (*See*
A992 ("None of . . . the Putnam Advisory Company, LLC . . ., or any of
their respective affiliates are acting as financial adviser nor in [a] fiduciary
capacity . . . to any investor. . . ."); (A271 (stating, in bolded capital letters,
that no investor was permitted to rely on any representations other than those
set forth in the Offering Memorandum, and that, in making an investment
decision, investors "must rely on their own examination of the co-issuers
and the terms of the offering, including the merits and risks involved");
(A498-99 (CDO investors' representations that they were knowledgeable
and sophisticated, and were not relying on the advice or recommendations of
the Collateral Manager).)

        Under New York law, these disclaimers preclude as a matter of
law any claim of a fiduciary or similar duty.  *See, e.g.*, *HSH Nordbank AG*,
941 N.Y.S.2d at 76 (dismissing negligent misrepresentation claim where
defendant disclaimed any advisory relationship); *M&T Bank Corp. v.
Gemstone CDO VII, Ltd.*, 891 N.Y.S.2d 578, 579-80 (App. Div. 2009)
(dismissing negligent misrepresentation claim against CDO collateral
manager where "'Preliminary Offering Circular' and 'Debt Investor
Presentation,' contained numerous disclaimers and advised plaintiff to
perform its own due diligence"); *Landesbank Baden-Württemberg v.*

*Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 624 (S.D.N.Y. 2011)

("*LBBW*") (dismissing negligent misrepresentation claim where "the

[Offering] Circular expressly disclaimed any special relationship").[19]  FGIC

has alleged no facts to overcome these express disclaimers.

FGIC contends that *Bayerische Landesbank v. Aladdin Capital*

*Mgmt. LLC*, 692 F.3d 42 (2d Cir. 2012), establishes the sufficiency of its

allegations that Putnam purportedly owed a duty to FGIC.  *Bayerische* does

not so hold.  *Bayerische* recognized that, under New York law, the "scope of

the 'orbit of duty' to third parties must be carefully examined" and that the

plaintiff must "demonstrate a relationship between plaintiff and defendant

that is 'so close as to approach that of privity, if not completely one with it.'"

*Id*. at 59-60 (citations omitted).  "Put another way, plaintiff must show that

the benefit to the non-party was the ***end and aim*** of the transaction."  *Id.* at

60 (internal quotation marks and citations omitted) (emphasis added).  The

---

[19]  FGIC's attempt to distinguish, in a footnote, *M&T Bank Corp.* and
*LBBW* does not work.  FGIC begins with the faulty premise that it transacted
with Putnam; it knows it did not.  Even if FGIC had gotten this right,
FGIC's suggestion that it entered into a fiduciary or similar relationship with
Putnam simply because it met with Putnam about Pyxis has no support in
New York law.  *See HSH Nordbank AG*, 941 N.Y.S.2d at 65 ("Under the
disclaimers set forth in the extensively negotiated governing documents,
however, HSH had no right to look to UBS for advice concerning the
suitability of the deal for HSH.").  Lastly, FGIC's effort to distinguish
*LBBW* on the ground that it involved the quality of a portfolio, not who
selected it, is a distinction without significance.

plaintiff in *Bayerische*, a CDO noteholder, sufficiently alleged that a benefit to it was the "end and aim" of the Portfolio Management Agreement where, among other things, the Portfolio Management Agreement supported the conclusion that noteholders were third-party beneficiaries, and the parties' alleged course of conduct indicated that the portfolio manager "was aware that its work as Portfolio Manager would be relied on by Bayerische" as a third-party beneficiary. *Id.* at 60.

In an effort to shoehorn this case into *Bayerische*'s fact pattern, FGIC references a meeting at Putnam's offices and "phone interviews" it allegedly conducted with Putnam. (A212-14, A253-54.) The SAC alleged, at the highest level of generality possible, that unnamed persons from Putnam represented that "Putnam would exercise its professional expertise" in managing the Pyxis CDO and selecting collateral for the Pyxis portfolio in the interests of investors—representations that FGIC claimed it relied upon in making its investment decision and that give rise to a fiduciary duty running from Putnam to FGIC. (A253-54.)

But in stark contrast to *Bayerische*, neither the Collateral Management Agreement nor the parties' course of conduct, as alleged by FGIC, demonstrate that the "end and aim" of the Collateral Management Agreement was to benefit FGIC—which simply acted as a guarantor of a

third-party swap between Calyon and a FGIC subsidiary—or that Putnam had any valid reason whatsoever to believe that, notwithstanding its disclaimers of any duty, FGIC would be relying upon it in a fiduciary or similar capacity.  Section 20 of the Collateral Management Agreement, to which FGIC was not a party, specifically identified the narrow set of third party beneficiaries thereunder, and notably did not include FGIC as a party for whose benefit Putnam would be performing its obligations.  (A613.)

The SAC's references to due diligence meetings and phone calls in which unspecified persons from Putnam allegedly discussed Putnam's expertise to manage and select collateral for the Pyxis portfolio do not spring a special duty upon Putnam.  They cannot override the express terms of the Collateral Management Agreement, which do not establish FGIC as the "end and aim" of the agreement, nor can they override the express disclaimers that Putnam was not acting as a fiduciary or investment adviser to any person, that all prospective investors were required to perform their own due diligence, that no investor was permitted to rely on any representations other than those set forth in the Offering Memorandum, and that, in making an investment decision, investors "must rely on their own examination of the co-issuers and the terms of the offering, including the merits and risks involved."  (A271.)

In an effort to skirt the import of these disclaimers, FGIC argues that the Offering Circular in the securitization transaction at issue in *Bayerische* contained disclaimer language similar to that in the Pyxis Offering Memorandum. But the portfolio manager in *Bayerische* did not argue in its Second Circuit briefing that disclaimer language precluded the existence of a duty, and there is no evidence that the Second Circuit considered such an argument in holding that the specific allegations in that case were sufficient to give rise to a duty running from the portfolio manager to the plaintiff.  Nothing in the *Bayerische* opinion disturbs the well-settled principle that sophisticated parties conducting arms'-length transactions are precluded from asserting a claim of fiduciary or similar duty where such disclaimer language is present.

Nor is there any allegation in the SAC that Putnam and FGIC had a *pre-existing* relationship of trust and confidence.  Under New York law, the special relationship required to support a claim for negligent misrepresentation or negligence must have existed prior to the transaction at issue.  *Emigrant Bank v. UBS Real Estate Sec., Inc.*, 854 N.Y.S.2d 39, 42 (App Div. 2008) (relationship of trust and confidence "must have existed prior to the transaction giving rise to the alleged wrong, and not as a result of it"); *see also M&T Bank Corp.*, 891 N.Y.S.2d at 581 (finding "there is no . .

61

. special relationship in this case, particularly in light of the fact[] that the parties had no relationship prior to this arm's length transaction . . ."); *HSH Nordbank, AG v. UBS AG*, No. 600562/08, 2008 N.Y. Misc. LEXIS 10416, at *16 (Sup. Ct. Oct. 21, 2008) (no special relationship where "there was no relationship of trust between the parties pre-dating the transactions").

Finally, FGIC's contention that Putnam's purportedly superior knowledge established a special relationship has repeatedly been rejected by New York courts, especially where, as here, FGIC is a sophisticated financial institution. *See, e.g.*, *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928 N.Y.S.2d 229, 235-36 (App. Div. 2011) ("The claim that [defendant] had superior knowledge of the particulars of its own business practices is insufficient to sustain the [negligent misrepresentation] cause of action."); *Sebastian Holdings, Inc. v. Deutsche Bank AG*, 912 N.Y.S.2d 13, 15 (App. Div. 2010) ("Plaintiff's alleged reliance on defendant's superior knowledge and expertise in connection with its foreign exchange trading account ignores the reality that the parties engaged in arm's-length transactions pursuant to contracts between sophisticated business entities that do not give rise to fiduciary duties.").

Finally, FGIC must plead loss causation in order to state claims for both negligent misrepresentation and negligence. *See Water St.*

*Leasehold LLC v. Deloitte & Touche LLP*, 796 N.Y.S.2d 598, 599-600

(App. Div. 2005).  FGIC has failed to do so for the reasons stated above.

   The District Court's order dismissing FGIC's negligent

misrepresentation and negligence claims should be affirmed.

## **CONCLUSION**

For the reasons set forth above, Putnam respectfully requests that this Court affirm the District Court's judgment.

Dated:  New York, New York
        August 6, 2014

MILBANK, TWEED, HADLEY &
MᶜCLOY LLP
1 Chase Manhattan Plaza
New York, New York  10005
(212) 530-5000

By:   /s/ Thomas A. Arena

Sean M. Murphy
Thomas A. Arena
Robert C. Hora
Ian E. Browning

*Attorneys for Defendant-Appellee*
*The Putnam Advisory Company, LLC*

64

## <u>CERTIFICATE  OF COMPLIANCE</u>

This brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B)(i).  It contains 13,560 words as counted by the word-processing system used to prepare the brief, exclusive of the parts of the brief exempted from the type-volume limitation by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally-spaced typeface using Microsoft Office Word 2010 with a size 14 Times New Roman font.


Dated:        August 6, 2014


  /s/ Thomas A. Arena

*Attorney for Defendant-Appellee*