*14-1673-cv*
*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*

# In the
# United States Court of Appeals
## For the Second Circuit

————————————

August Term, 2014
No. 14-1673-cv

FINANCIAL GUARANTY INSURANCE COMPANY,
*Plaintiff-Appellant,*

*v.*

THE PUTNAM ADVISORY COMPANY, LLC,
*Defendant-Appellee.*

————————————

Appeal from the United States District Court
for the Southern District of New York.
No. 12-cv-7372 — Robert W. Sweet, *Judge.*

————————————

ARGUED: NOVEMBER 17, 2014
DECIDED: APRIL 15, 2015

————————————

Before: KEARSE, STRAUB and RAGGI, *Circuit Judges.*

————————————

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

Appeal from the judgment of the United States District Court for the Southern District of New York (Robert W. Sweet, *Judge*), granting defendant-appellee's motion to dismiss for failure to state a claim. The District Court dismissed plaintiff-appellant's fraud claim on the ground that the complaint did not adequately plead loss causation, and dismissed plaintiff-appellant's negligence claims on the ground that the complaint did not allege facts sufficient to establish a special relationship between the parties. For the reasons set forth below, we hold that the District Court erred in dismissing the complaint for failure to state a claim. We therefore VACATE the judgment of the District Court and REMAND for further proceedings.

————————————

SANFORD I. WEISBURST (Peter E. Calamari, Sean P. Baldwin, Paul P. Hughes, *on the brief*), Quinn Emanuel Urquhart & Sullivan LLP, New York, New York, *for Plaintiff-Appellant*.

THOMAS A. ARENA (Sean M. Murphy, Robert C. Hora, Ian E. Browning, *on the brief*), Milbank, Tweed, Hadley & McCloy LLP, New York, New York, *for Defendant-Appellee*.

————————————

STRAUB, *Circuit Judge*:

Plaintiff-Appellant Financial Guaranty Insurance Company

("FGIC") appeals from a judgment of the United States District

Court for the Southern District of New York (Robert W. Sweet,

-2-

FIN. GUAR. INS. CO. v. PUTNAM ADVISORY CO.

Judge), dismissing its second amended complaint ("SAC") for

failure to state a claim. *See FGIC v. Putnam Advisory Co., LLC*, No. 12

CIV. 7372, 2014 WL 1678912 (S.D.N.Y. Apr. 28, 2014). FGIC filed this

action against Defendant-Appellee Putnam Advisory Company,

LLC ("Putnam") for fraud, negligent misrepresentation, and

negligence. FGIC contends that Putnam misrepresented its

management of a collateralized debt obligation ("CDO") called

Pyxis ABS CDO 2006-1 ("Pyxis") in order to induce FGIC to provide

financial guaranty insurance for Pyxis. According to FGIC's

complaint, Putnam stated that it would select the collateral for Pyxis

independently and in the interests of long investors (i.e., investors

who profit when the investment succeeds), but in fact permitted the

collateral selection and acquisition process to be controlled by a

hedge fund, Magnetar Capital LLC ("Magnetar"), which maintained

significant short positions in Pyxis (i.e., investments that would pay

off if Pyxis defaulted). In sum, FGIC alleges that Putnam

FIN. GUAR. INS. CO. v. PUTNAM ADVISORY CO.

misrepresented the independence of its management of a structured

finance product, which, upon default, caused FGIC millions of

dollars in losses.

On April 28, 2014, the District Court dismissed FGIC's fraud

claim on the ground that the complaint did not adequately plead

loss causation, and it dismissed FGIC's negligence claims on the

ground that the complaint failed to allege a special or privity-like

relationship between FGIC and Putnam. For the reasons set forth

below, we find that FGIC has sufficiently alleged both its fraud and

negligence-based claims. Accordingly, we VACATE the judgment

of dismissal and REMAND to the District Court for further

proceedings.

## BACKGROUND

The allegations contained in FGIC's complaint have been

comprehensively set forth in the District Court's opinion below. *See*

*FGIC*, 2014 WL 1678912, at *1-7. We nevertheless provide a brief

recitation of the most pertinent factual allegations, which are

FIN. GUAR. INS. CO. v. PUTNAM ADVISORY CO.

presumed to be true for purposes of considering a motion to dismiss for failure to state a claim.

## I.     The Pyxis CDO

This case arises out of Putnam's role as collateral manager of the Pyxis CDO.  A CDO is a special purpose vehicle that purchases, or assumes the risk of, a portfolio of assets.  To buy their portfolio of assets, CDOs raise money from investors by issuing notes and equity interests.  The assets that comprise the CDO generate cash, which is then paid out to the CDO's investors.  Investors in a CDO are not necessarily all subject to the same level of risk.  Rather, CDO notes may be issued in "tranches" representing different levels of risk and potential reward.  Generally, senior tranches carry the lowest risk, whereas investors in the equity tranche assume the greatest risk in the event of a default.

Pyxis was a "hybrid" CDO, in that its $1.5 billion portfolio included both "cash" assets (i.e., assets that Pyxis actually purchased) and "synthetic" assets (i.e., assets created through

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

transactions that referenced securities not actually owned by Pyxis).

About 23% of Pyxis's assets were cash assets and 77% were synthetic

assets created by credit default swaps that referenced other asset-

backed securities. In these credit default swaps, Pyxis sold credit

protection to counterparties in exchange for premium payments to

Pyxis. If the assets referenced in the swaps performed well, Pyxis

would enjoy the premium payments without having to make credit

protection payments. If the assets performed poorly, however, Pyxis

would have to make credit protection payments to the credit default

swap counterparty, potentially up to the full notional amount of the

referenced obligation.

Calyon Corporate and Investment Bank ("Calyon"), the

structuring bank[1] for Pyxis, paid premiums to Pyxis under a credit

---

[1] A bank structuring a CDO transaction is responsible for financing and facilitating the purchase of the CDO's assets, constructing the CDO, and interacting with rating agencies. *See Loreley Fin. (Jersey) No. 7, Ltd. v. Credit Agricole Corporate and Inv. Bank*, Index No. 650673/2010 (N.Y. Sup. Ct. June 9, 2011); J.A. 1151-61.

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

default swap in exchange for protection payments in the event that a portfolio asset experienced a "credit event," such as a default or failure to pay a defined obligation. For most of the specified assets, Calyon acted only as an intermediary, meaning that the ultimate short positions were held by other market participants.

## II.    Putnam's Representations and the Pyxis Guaranty

In July 2006, Calyon contacted FGIC to solicit credit protection for the Pyxis CDO. Under the deal that Calyon proposed to FGIC, FGIC was to insure all payments owed by its subsidiary FGIC Credit Products LLC under a credit default swap which would provide credit protection on the $900 million "super senior" Pyxis tranche ("the Pyxis Guaranty"). Without the Pyxis Guaranty, Pyxis would not have closed. Calyon represented that the CDO would be managed by Putnam, which would select the Pyxis asset portfolio independently, in good faith, and in the best interests of the investors.

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

FGIC alleges that it and investors were heavily dependent on Putnam's experience, independence, and integrity as collateral manager. Putnam represented to FGIC, orally and in writing, that it was an experienced and reputable collateral manager and that it would select the assets for the Pyxis portfolio diligently and independently. Putnam provided documents, such as a 52-page marketing pitchbook and an offering memorandum, containing extensive representations about Putnam's role as a "global leader in asset management" and the rigorous selection process by which it would select the assets for the Pyxis portfolio. SAC ¶¶ 69-71, 86-87; J.A. 210, 217.

Putnam made similar representations to FGIC in the course of FGIC's extensive due diligence for Pyxis, which included an on-site review of Putnam's operations at Putnam's Boston offices. During a face-to-face meeting of representatives from FGIC and Putnam, Putnam represented that it would select and manage the

FIN. GUAR. INS. CO. v. PUTNAM ADVISORY CO.

assets in the Pyxis portfolio and described in detail its expertise and strategy for doing so. In a follow-up call, Putnam again made clear that it would select and manage the assets for Pyxis and that it had considerable experience in the residential mortgage-backed securities ("RMBS") market, particularly in the market for subprime RMBS, of which the Pyxis portfolio would primarily be composed. Putnam represented that it performed extensive due diligence with respect to prospective RMBS investments, including conducting on-site visits to most of the servicers of the loans underlying these investments, and, more importantly, that it maintained ongoing interactions with all servicers to keep tabs on their servicing strategy and performance. **[*Id.*]** As a result of these representations, FGIC provided the Pyxis Guaranty.

## III. Magnetar's Alleged Scheme

FGIC contends that, contrary to its representations, Putnam abdicated control of the selection of Pyxis's assets to Magnetar, a hedge fund that had a financial interest in Pyxis's failure.

FIN. GUAR. INS. CO. v. PUTNAM ADVISORY CO.

According to the SAC, in early 2006, the hedge fund Magnetar worked with collateral managers to launch a series of CDOs. By supplying the funds for the equity tranche, the riskiest stake, Magnetar made it possible to secure investors (and insurers like FGIC) willing to take long positions in those CDOs. But unlike an ordinary investor, Magnetar purchased the equity tranche of Pyxis and other similar CDOs not because it thought the CDO was a sound investment but because the investment permitted Magnetar to simultaneously bet against the more senior tranches in the same deal. These short positions were much greater (often six-to-one) than Magnetar's long equity position. In other words, Magnetar stood to gain significantly more if the CDO failed than if it succeeded.

As collateral manager of Pyxis, Putnam was responsible for selecting the assets for inclusion in the portfolio, monitoring the credit status of the underlying assets, reinvesting payment proceeds

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

from maturing assets, and making substitutions in the portfolio of assets.  But, according to the SAC, Putnam was well aware of Magnetar's "hedged equity" strategy of betting against the assets included or referenced in Pyxis, and Putnam allowed Magnetar to secretly control the composition of those assets.  FGIC alleges that Magnetar made a "behind the scenes" arrangement with Calyon, of which Putnam was aware, requiring Calyon or Putnam to notify Magnetar of any proposed acquisition for the Pyxis portfolio and giving Magnetar veto rights over any such proposed acquisition. SAC ¶ 95; J.A. 221.  Magnetar also designated which collateral it wanted to include in the Pyxis portfolio, which Putnam accommodated.  For example, the SAC alleges that in July 2006, James Prusko of Magnetar emailed Carl Bell at Putnam to suggest that Putnam increase the synthetic portion of Pyxis by entering into more credit default swaps referencing low-rated RMBS, which would allow Magnetar to short more of the Pyxis assets.  Prusko

explained that it was "very hard to get off sizable CDO CDS trades unless they're done against a deal, and this is a natural delta hedge against our equity." Bell wrote back: "Got it. So when we find a deal we want to buy, we shouldn't put in an order with the syndicate desk but have Calyon broker a synthetic trade between you and [Pyxis] at an agreed upon level?" Prusko replied: "That would be preferable . . . ." SAC ¶ 98 (alteration in complaint); J.A. 223.

FGIC alleges that Magnetar's long position on Pyxis by the time Pyxis defaulted was approximately $21 million. Magnetar's short position on the CDOs in which it invested averaged approximately 7% of the aggregate assets of those CDOs. If Pyxis were an average Magnetar CDO, therefore, Magnetar's short position on Pyxis, a $1.5 billion CDO, would have totaled $105 million.

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

For its role in cooperating with Magnetar's scheme, Putnam received a fixed fee of fifteen basis points (i.e., 0.15% of the outstanding principal of Pyxis each year) and an additional "incentive" fee of five basis points. Due to Pyxis's size, this was a substantial sum; Putnam's fixed fee was $2.25 million for the first year alone, and by 2012, Putnam had received cumulative total fees of $5,707,429. The SAC also alleges that Putnam saw Pyxis as an opportunity to "establish a foothold in the market" for managing similar CDOs in the future. SAC ¶¶ 6, 51; J.A. 186, 203. Indeed, Putnam was selected by Magnetar to serve as collateral manager for a second Pyxis CDO, Pyxis ABS CDO 2007–1, which closed a few months after Pyxis.

## IV. Magnetar's Control Over the Pyxis Portfolio and Pyxis's Default

FGIC alleges that the assets Magnetar directed Putnam to include in the Pyxis portfolio were, on their face, more likely to default than the assets Putnam would have selected had it acted

-13-

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

independently. Putnam invested half of Pyxis's cash allocated to CDO investments in four other Magnetar CDOs, even though there were over two hundred asset-backed CDOs issued in 2006 alone in which Putnam could have invested.

According to the SAC, Putnam concealed the extent to which Pyxis sold protection on the ABX Index of low-rated RMBS. The ABS Index is an independent benchmark designed to measure the overall value of mortgages made to borrowers with subprime or weak credit. Magnetar pushed Putnam to circumvent the limit represented to Pyxis investors on investment in the ABX Index to a level more than three times the specified concentration limit, which increased the risk profile of the Pyxis portfolio. Putnam also provided FGIC with a "target portfolio" for Pyxis that included $145 million of prime RMBS, but then, without alerting FGIC, replaced all of the prime RMBS with subprime RMBS, which were more likely to default.

-14-

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

On April 30, 2008, only eighteen months after Pyxis closed, Fitch Ratings Ltd. downgraded the credit rating of the Pyxis Super Senior tranche from AAA to C. Ultimately, Pyxis defaulted and FGIC incurred liability of up to $900 million under the Pyxis Guaranty.

## V.  Proceedings in the District Court

FGIC sued Putnam for fraud, negligent misrepresentation, and negligence. After FGIC filed the SAC, Putnam moved to dismiss the complaint for failure to state a claim. The District Court granted Putnam's motion to dismiss. The District Court held that FGIC had failed to state a claim for fraud because the SAC did not contain sufficient allegations to plausibly indicate that "Magnetar's alleged control of the collateral selection process for Pyxis caused FGIC's losses, as opposed to the global financial crisis." *FGIC*, 2014 WL 1678912, at *10. The District Court also dismissed FGIC's negligent-misrepresentation and negligence claims on the ground that the SAC did not contain allegations sufficient to establish a

-15-

FIN. GUAR. INS. CO. v. PUTNAM ADVISORY CO.

"special relationship" between FGIC and Putnam. *Id.* at *13.

Putnam timely appealed.

**DISCUSSION**

We review *de novo* a District Court's grant of a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "accepting all factual allegations in the complaint as true and drawing all inferences in the plaintiff's favor." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). To state a plausible claim, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

We begin by rejecting Putnam's argument, raised for the first time on appeal, that FGIC lacks standing to sue. Putnam contends that FGIC did not allege a cognizable injury in fact. This point

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

merits little discussion because, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *see Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003) ("[A]t the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury."). FGIC satisfies this requirement by alleging that it "was required to pay out a huge sum" pursuant to its insurance policy and that it "lost millions" as a result of Pyxis's default. SAC ¶¶ 1, 90, J.A. 185, 219. FGIC therefore has standing to bring this action.

FGIC challenges the dismissal of its complaint for failure to state a claim. With respect to its fraud claim, FGIC contends that it alleged facts sufficient to establish loss causation. FGIC argues, in the alternative, that it is not required to plead loss causation under New York law because (1) it is seeking rescission based on fraud and

-17-

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

(2) New York Insurance Law § 3105 does not require an insurer to establish loss causation in a claim for fraud in the inducement of an insurance contract. FGIC also argues that the District Court erred in dismissing its negligent-misrepresentation and negligence claims for failure to sufficiently allege a special relationship between it and Putnam.

We agree with FGIC that, even if loss causation must be pleaded, its allegations are sufficient to state claims for fraud, negligent misrepresentation, and negligence. We therefore vacate the judgment of the District Court.

## I.    Fraud Claim

To state a claim for fraud under New York law, a plaintiff must allege (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff. *See Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006); *Wynn v.*

FIN. GUAR. INS. CO. v. PUTNAM ADVISORY CO.

*AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (per curiam). On this appeal, we primarily focus on the fifth element, causation. To satisfy that element, a plaintiff must allege both that the "defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)." *Laub v. Faessel*, 745 N.Y.S.2d 534, 536 (1st Dep't 2002) (citations omitted); *see, e.g., Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 776 (S.D.N.Y. 2011) (applying New York law). There is no dispute here that FGIC has sufficiently pleaded transaction causation, as the SAC contains repeated allegations that but for Putnam's fraudulent misrepresentations, FGIC would not have entered into the transaction. *See, e.g.*, SAC ¶ 11; J.A. 188 ("[H]ad FGIC known the truth about Pyxis . . . it would never have agreed to issue the Pyxis Guaranty.").

FIN. GUAR. INS. CO. v. PUTNAM ADVISORY CO.

Loss causation, on the other hand, "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir.) (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)) (internal quotation marks omitted), *cert. denied*, 546 U.S. 935 (2005). To plead loss causation, FGIC must allege that the "subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Id.* at 173 (emphasis omitted) (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)); *see Laub*, 745 N.Y.S.2d at 536 (explaining that loss causation is the "fundamental core of the common-law concept of proximate cause").

## A. Sufficiency of Loss Causation Allegations

A claim for common law fraud is subject to the particularity pleading requirements of Federal Rule of Civil Procedure 9(b), "which requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 187 (2d Cir. 2004) (internal quotation marks omitted). The District Court did not apply the heightened pleading standards of Rule 9(b) to FGIC's loss causation allegations, but on appeal, Putnam argues that Rule 9(b) should apply. We have not yet resolved whether allegations as to loss causation must be pleaded with the specificity required by Rule 9(b). *Acticon AG v. China N. E. Petrol. Holdings Ltd.,* 692 F.3d 34, 37–38 (2d Cir. 2012); *see Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 346 (2005) (assuming, but not deciding, that loss causation allegations are governed by ordinary notice pleading standards).

We need not decide the question today because we find that FGIC's loss causation allegations are sufficient even under the heightened pleading standards of Rule 9(b). FGIC has alleged

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

particular facts that, when considered as a whole, plausibly allege

that Putnam's alleged misrepresentations and omissions caused at

least some of the economic harm it suffered.  These allegations

include that:

- Had Putnam selected the Pyxis collateral itself, as it
  represented it would do, and had it not acquiesced in
  Magnetar's control of collateral selection, Pyxis would not
  have defaulted as quickly as it did, and may well not have
  defaulted at all.  At a minimum, any losses incurred by
  Pyxis would have been substantially smaller than they
  were.  Thus, FGIC's liability for losses incurred by Pyxis
  would either not have been incurred at all, or would have
  been substantially smaller.

- The purpose of Magnetar's control of the collateral
  selection process was to ensure that the assets selected for
  inclusion in the Pyxis portfolio would be likely to default.

- Many of the assets selected for the Pyxis portfolio by
  Magnetar, on their face, were more liable to default than
  the assets Putnam would have selected had it acted
  independently.  For example, Putnam's original target
  portfolio for Pyxis included $145 million of prime RMBS.
  At Magnetar's direction, Putnam replaced these assets in
  the final portfolio with $145 million of subprime RMBS.

- The Magnetar-selected assets in the Pyxis portfolio
  defaulted more quickly than other assets in the Pyxis
  portfolio.  Based on a preliminary analysis of the

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

performance of assets in the Pyxis portfolio for which FGIC has evidence that Magnetar directed selection, all Magnetar-selected assets had defaulted by March 2009, and their average life before default was just 1.5 years. By contrast, the average life before default of the Pyxis collateral for which FGIC does not have direct evidence of Magnetar's control was 1.85 years.

▪ In general, Magnetar's CDOs defaulted in greater numbers, and defaulted much more quickly, than comparable CDOs. As of April 2012, all 18 of Magnetar's 2006-vintage mezzanine CDOs had defaulted while only 72% of 2006-vintage non-Magnetar mezzanine CDOs had defaulted. As of December 2008, when Pyxis defaulted, 94% of Magnetar's 2006-vintage mezzanine CDOs had defaulted, while only 40% of 2006-vintage non-Magnetar mezzanine CDOs had done so.

▪ Over $95 million of the Magnetar-selected assets defaulted before the financial crisis took hold. The default of these assets substantially contributed to Pyxis's collapse and to FGIC's losses under the Pyxis Guaranty.

At this preliminary stage, accepting all factual allegations as true and drawing all reasonable inferences in FGIC's favor, the SAC alleges a causal connection between Putnam's fraudulent misrepresentations and FGIC's losses under the Pyxis Guaranty such that FGIC "would have been spared all or an ascertainable

FIN. GUAR. INS. CO. v. PUTNAM ADVISORY CO.

portion of that loss absent the fraud." *Lentell*, 396 F.3d at 175. The District Court found the SAC's allegations deficient in part because the "pool of assets alleged to be controlled by Magnetar represented roughly 11% of the $1.5 billion collateral pool, and the SAC does not allege how the selection of safer assets in this 11% pool would have prevented a default." *FGIC*, 2014 WL 1678912, at *11. The District Court also determined that FGIC's allegations did not allow for an inference of loss causation because "[e]ven if the Magnetar-selected assets in the Pyxis portfolio defaulted more quickly than other assets, there is nothing in the SAC that alleges that this . . . was sufficient to cause Pyxis to default ahead of any market-wide downturn or isolates Pyxis' default in any reasonable manner from the market downturn." *Id.*

In so concluding, however, the District Court misapplied the standard on a motion to dismiss. The purpose of the loss causation element is to require a plaintiff "to provide a defendant with some

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

indication of the loss and the causal connection that the plaintiff has in mind," not to make a conclusive proof of that causal link. *Dura*, 544 U.S. at 347; *see id.* (explaining that the requirement is not intended to "impose a great burden" on a plaintiff). At this stage of the proceedings, FGIC is not required to establish that the collateral it has identified as selected by Magnetar was the exclusive cause of its losses; rather, it need only allege sufficient facts to raise a reasonable inference that Magnetar's overall involvement caused an ascertainable portion of its loss. In addition, the assets identified in the SAC are only those that, without the benefit of discovery, FGIC claims to have evidence that Magnetar selected. FGIC alleges that Magnetar exercised control over the entire collateral selection process. *See, e.g.*, SAC ¶ 4; J.A. 186.

Nor is FGIC required to allege that its losses were caused solely by Putnam's misrepresentations to satisfy its but-for pleading

FIN. GUAR. INS. CO. v. PUTNAM ADVISORY CO.

obligations.[2]  "Of course, if the loss was caused by an intervening event [here, the market downturn] . . . the chain of causation will not have been established.  But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."  *Emergent Capital*, 343 F.3d at 197.  At this preliminary stage, accepting all factual allegations in the SAC as true and drawing all reasonable inferences in FGIC's favor, FGIC has plausibly alleged that Putnam's misrepresentations caused at least some of its losses.

---

[2] That Pyxis defaulted around the time of a global financial crisis was central to the District Court's loss causation analysis.  Certainly, when a "plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud" is lessened.  *See Lentell*, 396 F.3d at 174.  We observe that there may be circumstances under which a marketwide economic collapse is itself caused by the conduct alleged to have caused a plaintiff's loss, although the link between any particular defendant's alleged misconduct and the downturn may be difficult to establish.  *See, e.g.,* Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* 190–95 (2011) (concluding that the role of synthetic CDOs and distorted incentives of CDO managers and hedge funds "contributed significantly" to the financial crisis); Permanent Subcomm. on Investigations of the S. Comm. on Homeland Sec. & Govt'l Affairs, 112th Cong., *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* (2011).  Because the SAC does not contain factual allegations to this effect, we take no view as to whether such circumstances are presented here.

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

### B.    Sufficiency of Other Fraud Allegations

On appeal, Putnam asserts other, separate grounds on which to affirm the District Court's judgment:  that the SAC fails to allege a strong inference of fraudulent intent and fails to plead an actionable misrepresentation or omission.  These arguments are meritless and warrant little discussion.

Putnam contends that FGIC does not provide a "plausible explanation for why Putnam would engage in a billion-dollar fraud."  Brief for Defendant-Appellee at 38.  The SAC specifically alleges, however, that Putnam was motivated to cooperate with Magnetar's scheme in exchange for unusually lucrative collateral management fees and additional business.  *See* SAC ¶¶ 6, 46-52, 110-12; J.A. 186, 201-03, 227-28.  Although Putnam argues that these fees did not provide a financial incentive to commit fraud, such an argument raises a factual dispute that is inappropriate for resolution on a motion to dismiss.

FIN. GUAR. INS. CO. v. PUTNAM ADVISORY CO.

We also reject Putnam's argument that FGIC fails to allege an actionable misrepresentation or omission by Putnam. As described above, FGIC has alleged that Putnam represented that it would select and manage the assets for the Pyxis portfolio independently and in the interests of long investors, representations that FGIC contends were false.

## II. Negligence Claims

FGIC also argues that the District Court erred in dismissing its negligent-misrepresentation and negligence claims for failure to sufficiently allege a special or privity-like relationship between FGIC and Putnam. FGIC's negligence-based claims require that it establish that Putnam owed it a "duty to speak with care." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263-64 (1996). Under New York law, such a duty exists in the commercial context when "the relationship of the parties, arising out of contract or otherwise, is such that in morals and good conscience the one has the right to rely upon the other for information." *Id.* at 263 (quoting *Int'l Prods. Co. v. Erie R.R. Co.*, 244

FIN. GUAR. INS. CO. v. PUTNAM ADVISORY CO.

N.Y. 331, 338 (1927)); *see Anschutz Corp. v. Merrill Lynch & Co.*, 690
F.3d 98, 114 (2d Cir. 2012) (explaining that New York law strictly
limits negligent-misrepresentation claims to "situations involving
actual privity of contract between the parties or a relationship so
close as to approach that of privity" (internal quotation marks
omitted)).

It is undisputed that there was no actual contractual privity
between FGIC and Putnam. FGIC contends that Putnam
nevertheless owed it a duty of care under this Court's holding in
*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 59-61
(2d Cir. 2012). In *Bayerische*, we held that an investor in a CDO
could bring a negligence action against the defendant CDO manager
in the absence of any contractual privity. In examining the scope of
the "orbit of duty" to third parties, we stated that "a plaintiff must
establish that (1) the defendant had awareness that its work was to
be used for a particular purpose; (2) there was reliance by a third

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

party known to the defendant in furtherance of that purpose; and

(3) there existed some conduct by the defendant linking it to that

known third party evincing the defendant's understanding of the

third party's reliance." *Id.* at 59 (citing *Credit Alliance Corp. v. Arthur*

*Andersen & Co.*, 65 N.Y.2d 536, 551 (1985)). We reasoned that

Bayerische had sufficiently alleged that the CDO manager "was

aware that its work as Portfolio Manager would be relied on by

Bayerische, a non-party to the contract" and that Bayerische had

relied on the CDO manager's representations, made during a

meeting at the CDO manager's offices in New York, that it would

"competently and effectively protect Bayerische's interests." *Id.*

at 60.

The District Court distinguished *Bayerische*, finding "the

investing relationship" between the CDO manager and the third-

party notes holder in *Bayerische* to be "much closer in scope and

shared goals than the one a guarantor of a transaction has with a

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

CDO manager." *FGIC*, 2014 WL 1678912, at *13. We disagree. Just as in *Bayerische*, FGIC alleges that Putnam repeatedly represented that it would select and manage the assets for the Pyxis portfolio independently and in the interests of long investors, which were aligned with FGIC's interests. Before FGIC agreed to insure credit protection on Pyxis, it met with Putnam representatives at Putnam's offices in Boston. FGIC alleges that it relied on representations made by Putnam in issuing the Pyxis Guaranty, and that, without the credit protection it provided, Pyxis would not have closed. We find, therefore, that the SAC plausibly alleges facts evincing Putnam's understanding that FGIC would "rely on [Putnam's] care and competence in managing" the Pyxis portfolio. *Bayerische*, 692 F.3d at 60.

Further, to the extent the District Court read *Bayerische* to recognize a special relationship only where "the end and aim" of the transaction was to benefit the plaintiff, *FGIC*, 2014 WL 1678912, at

FIN. GUAR. INS. CO. v. PUTNAM ADVISORY CO.

*13, we here clarify that the "end and aim" language in *Bayerische* is a useful rephrasing of the three elements of the special-relationship test, but is not an independent requirement. *See Bayerische*, 692 F.3d at 60 (discussing three elements and stating "[p]ut another way, plaintiff must show that the benefit to the non-party was the end and aim of the transaction" (internal quotation marks omitted)); *see also Sykes v. RFD Third Ave. 1 Assocs., LLC*, 15 N.Y.3d 370, 373 (2010) (discussing three elements for special relationship and omitting mention of "end and aim").

The District Court also noted that statements in the written materials provided to FGIC by Putnam "expressly disclaim any creation of a special duty." *FGIC*, 2014 WL 1678912, at *12. The Pyxis pitchbook states that Putnam was not "acting as a financial advisor" or in a "fiduciary capacity" and the Pyxis offering memorandum urges investors to "rely on their own examination of the co-issuers and the terms of the offering, including the merits and

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

risks involved." *Id.* These disclaimers do not preclude the finding

of a special relationship between FGIC and Putnam. First, FGIC's

claims are not premised on Putnam's acting as a fiduciary or

financial advisor to FGIC. FGIC alleges that Putnam fraudulently

represented that it would select the collateral for Pyxis and that it

would do so independently and in good faith. As these disclaimers

do not disclose the possibility that Putnam would cede control of the

collateral selection process to other market participants with

interests adverse to long investors, they "fall well short of tracking

the particular misrepresentations alleged" by FGIC. *Caiola v.*

*Citibank, N.A., N.Y.*, 295 F.3d 312, 330 (2d Cir. 2002) (holding, in

context of securities fraud claim, that general disclaimers did not bar

plaintiff from relying on defendant's oral statements); *cf. HSH*

*Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59 (1st Dep't 2012) (affirming

dismissal of claim where plaintiff alleged defendant bank

misrepresented risk involved in transaction but contractual

-33-

FIN. GUAR. INS. CO. V. PUTNAM ADVISORY CO.

documents were "replete with detailed disclosures" of risks involved and defendant's conflicts of interest).

Second, the disclaimers, which urge investors to conduct an "examination" of the terms of the offering, only underscore the significance of Putnam's representations within those offering documents, which FGIC alleges were themselves fraudulent. *See* SAC ¶¶ 86-87; J.A. 217. Given that a determination of whether a special relationship exists is a "factual inquiry," FGIC's allegations are sufficient to survive a motion to dismiss. *Suez*, 250 F.3d at 104 (reversing dismissal of negligent-misrepresentation claim where conflict between alleged oral representations and disclaimer could not "be resolved on the pleadings"). Accordingly, we hold FGIC has plausibly alleged a special relationship between itself and Putnam, sufficient to state claims for negligent misrepresentation and negligence.

-34-

Fɪɴ. Gᴜᴀʀ. Iɴꜱ. Co. ᴠ. Pᴜᴛɴᴀᴍ Aᴅᴠɪꜱᴏʀʏ Co.

**CONCLUSION**

For the foregoing reasons, we vacate the District Court's

dismissal of the complaint and remand for further proceedings.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit